☐ ORIGINAL

Approved: _____
MICHAEL FARBIARZ/BRENDAN R. MCGUIRE
Assistant United States Attorneys

Before:    HONORABLE ANDREW J. PECK
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - x

09 MAG 1012

UNITED STATES OF AMERICA          :    **COMPLAINT**

          -v.-                    :    Violations of
                                       18 U.S.C. §§ 1651, 2280, 1203,
ABDUWALI ABDUKHADIR MUSE,         :    924, and 2

          Defendant.             :     COUNTY OF OFFENSE:
                                       NEW YORK
                                 :
- - - - - - - - - - - - - - - - x      **DOC # _____**

SOUTHERN DISTRICT OF NEW YORK, ss.:

          STEVEN E. SORRELLS, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

                    **Count One**

          1.    From on or about April 8, 2009, up to and
including on or about April 12, 2009, on the high seas, ABDUWALI
ABDUKHADIR MUSE, the defendant, who was first brought to and
arrested in the Southern District of New York, and others known
and unknown, committed the crime of piracy as defined by the law
of nations, and was afterwards brought into and found in the
United States, to wit, the defendant unlawfully, willfully and
knowingly seized and robbed, and aided and abetted the seizure
and robbery, of a United States-flagged ship, the Maersk Alabama,
while the ship was navigating in the Indian Ocean beyond the
outer limit of the territorial sea of any country.

          (Title 18, United States Code, Sections 1651, 3238 and 2.)

                    **Count Two**

          2.    From on or about April 8, 2009, up to and
including on or about April 12, 2009, in an offense committed
against and on board a covered ship, as that term is defined in
Tile 18, United States Code, Section 2280(e), which was flying
the flag of the United States, ABDUWALI ABDUKHADIR MUSE, the

defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, intentionally, and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Section 2280.

3.    It was a part and an object of the conspiracy that ABDUWALI ABDUKHADIR MUSE, the defendant, and others known and unknown, would and did seize and exercise control over a ship by force and threat of force and intimidation, to wit, the defendant, and others known and unknown, armed with firearms, hijacked the Maersk Alabama, a United States-flagged ship that was navigating in the Indian Ocean beyond the outer limit of the territorial sea of any country.

(Title 18, United States Code, Sections 2280(a)(1)(H) and 3238.)

### Count Three

4.    From on or about April 8, 2009, up to and including on or about April 12, 2009, on the high seas, ABDUWALI ABDUKHADIR MUSE, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, willfully, and knowingly, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, to wit, the defendant, and others known and unknown, discharged and otherwise used and carried and possessed firearms during and in relation to the offense charged in Count Two of this Complaint.

(Title 18, United States Code, Sections 924(c)(1)(A)(iii), 3238 and 2.)

### Count Four

5.    From on or about April 8, 2009, up to and including on or about April 12, 2009, on the high seas, ABDUWALI ABDUKHADIR MUSE, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Section 1203.

6.    It was a part and an object of the conspiracy that ABDUWALI ABDUKHADIR MUSE, the defendant, and others known and unknown, would and did seize and detain and threaten to kill, to injure, and to continue to detain another person, namely, a

national of the United States, in order to compel third persons
to do or abstain from doing an act as an explicit and implicit
condition for the release of the person detained, to wit, the
defendant, and others known and unknown, detained the captain of
the Maersk Alabama on a life boat in the Indian Ocean, and
demanded safe passage from the scene in exchange for the release
of the captain.

(Title 18, United States Code, Sections 1203(a) and 3238.)

## Count Five

7.    From on or about April 8, 2009, up to and
including on or about April 12, 2009, on the high seas, ABDUWALI
ABDUKHADIR MUSE, the defendant, who was first brought to and
arrested in the Southern District of New York, unlawfully,
willfully, and knowingly, during and in relation to a crime of
violence for which he may be prosecuted in a court of the United
States, did use and carry a firearm, and, in furtherance of such
crime, did possess a firearm, and did aid and abet the use,
carrying, and possession of a firearm, to wit, the defendant, and
others known and unknown, brandished and otherwise used and
carried and possessed firearms during and in relation to the
offense charged in Count Four of this Complaint.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 3238
and 2.)[1]

The bases for my knowledge and the foregoing charges
are, in part, as follows:

8.    I am a Special Agent with the FBI and a member of
the FBI's New York-based Joint Terrorism Task Force ("JTTF").
The JTTF is responsible for investigating the hijacking of the
Maersk Alabama container ship in the Indian Ocean on or about
April 8, 2009, and the subsequent taking of the captain of the
Maersk Alabama ("Captain") as a hostage from on or about April 8,
2009, up to and including on or about April 12, 2009.  During the
course of my investigation, I have, among other things, spoken
with law enforcement officials, military officials, and other

_____

[1]    There is extraterritorial jurisdiction for each of the
five counts charged. See United States v. Yousef, 327 F.3d 56, 86
(2d Cir. 2003); United States v. Bin Laden, 92 F. Supp. 2d 189, 201
(S.D.N.Y. 2000), aff'd, 552 F.3d 177 (2d Cir. 2008); United States
v. Shi, 525 F.3d 709, 720-24 (9th Cir. 2008); United States v.
Davis, 905 F.2d 245, 248-49 (9th Cir. 1990); Blancas v. United
States, 344 F. Supp. 2d 507, 528 (W.D. Tex. 2004).

-3-

individuals, and I have reviewed documents relating to this investigation. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included details of every aspect of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported in this Complaint, they are reported in sum and substance, except where otherwise indicated.

### Background

9.    As part of this investigation, I have reviewed the March 16, 2009 Report of the Secretary General of the United Nations to the United Nations Security Council ("Report"), which addressed the threat that piracy and armed robbery at sea pose to the security of international navigation off the coast of Somalia. According to the Report, in 2008, there were 111 reported incidents of piracy or armed robbery at sea against ships off the coast of Somalia. The Report states that this number constitutes an annual increase of nearly 200 percent when compared to the number of reported incidents in 2007. The Report also states that, by the end of 2008, one group of pirates based in Somalia was believed to have earned approximately $30 million in ransom payments.

10.   As part of this investigation, I have spoken to a representative of Maersk Line, Limited ("MLL") and reviewed documents maintained by MLL. Based upon that conversation and my review of the documents, I have learned the following:

a.    MLL is a company based in Norfolk, Virginia, that provides, among other things, container ships and crews for the transportation of various types of cargo around the world.

b.    One of the container ships in MLL's fleet is the Maersk Alabama, a United States-flagged vessel. As a United States-flagged vessel, the Maersk Alabama is registered in the United States, subject to the regulatory authority of the United States, and flies the flag of the United States while at sea.

c.    The Maersk Alabama is approximately 500 feet long and 80 feet wide. The engines of the Maersk Alabama are located in the rear of the ship, and the remainder of the ship may be used for storing cargo. The ship is typically operated and controlled from the bridge ("Bridge"), which is an enclosed room in the rear, raised part of the ship that provides a view of the deck of the ship and the waters around the ship.

d.    The Maersk Alabama also contains an area that is equipped to be secured from the inside for the crew to use in the event of an emergency on board the ship ("Safe Room").

e.    On or about April 3, 2009, the Maersk Alabama left the Republic of Djibouti with a crew of 20 sailors (collectively, "the Crew") for Mombasa, Kenya.  All 20 members of the Crew, including the Captain, are United States citizens. When it left Djibouti, the ship contained thousands of metric tons of cargo, including humanitarian relief supplies.

## The Offenses

11.    On April 8, 2009, I learned that a container ship called the Maersk Alabama had been hijacked by a group of pirates off the coast of Somalia in the Indian Ocean.  Based on this information, I, along with other members of the JTTF, traveled to Africa in order to assist with the investigation of the hijacking.

12.    On April 11, 2009, the Maersk Alabama arrived in the port of Mombasa with 19 of its Crew members, but without the Captain.  On April 12, 2009, a group of JTTF agents and detectives and agents with the Naval Criminal Investigative Service ("NCIS") interviewed each of the 19 Crew members about the hijacking.  After the interviews of the 19 Crew members were completed, I spoke to a Detective with the New York City Police Department who is a member of the JTTF ("Detective 1") and who interviewed one of the members of the Crew ("Crew Member 1") and a Somali interpreter ("Interpreter") who was on board the USS Bainbridge, a United States Navy missile destroyer, from April 9, 2009 through April 12, 2009.  I also spoke to an NCIS agent ("Agent 1") who interviewed another Crew member ("Crew Member 2") and a member of the United States Navy ("Navy Witness") who was on board the USS Bainbridge from April 9, 2009 through April 12, 2009.  I also interviewed one of the Crew members ("Crew Member 3") myself.

13.    Based upon my conversations with Detective 1 and Agent 1 regarding their interviews of Crew Member 1, the Interpreter, Crew Member 2 and the Navy Witness, and my interview of Crew Member 3, I have learned the following:

a.    On April 8, 2009, at approximately 4:30 a.m., Crew Member 1 and Crew Member 2 were on the Bridge of the Maersk Alabama.  From the Bridge, Crew Member 1 and Crew Member 2 both saw lights that appeared to be from a boat that was traveling toward the Maersk Alabama.  After a brief period of time, the lights disappeared from view.

b.    Approximately two and a half hours later, while still on the Bridge, Crew Member 1 and Crew Member 2 both saw a small boat approaching the Maersk Alabama ("Pirate Boat"). Crew Member 1 and Crew Member 2 each heard what sounded like gun shots.  Crew Member 1 saw some members of the Crew go to the Safe Room.

c.    Crew Member 1 left the Bridge of the Maersk Alabama and looked over the port side of the ship.  Crew Member 1 was carrying a radio.  He saw the Pirate Boat with two men in it. Crew Member 1 heard a voice on his radio that he recognized to be the Captain's.  Crew Member 1 heard the Captain say, in sum and substance, that two pirates were on the Bridge.

d.    Crew Member 3 heard a voice on his radio that he recognized to be the Captain's saying, in sum and substance, that there were pirates on the ship.  Crew Member 3 then began to shut down the power on the Maersk Alabama.

e.    At approximately the same time, Crew Member 2 saw a man, later identified as ABDUWALI ABDUKHADIR MUSE, the defendant, and another man ("Pirate 2") enter the Bridge.  MUSE and Pirate 2 were each carrying a gun.  MUSE demanded, among other things, that the Maersk Alabama be stopped; that the Crew provide him with the telephone number for the owner of the Maersk Alabama; and that the Crew lower a ladder down to the Pirate Boat.

f.    MUSE, Crew Member 2 and another member of the Crew left the Bridge and lowered a ladder down to the Pirate Boat.  Crew Member 2 saw two men ("Pirate 3" and "Pirate 4") in the Pirate Boat.  Pirate 3 and Pirate 4 climbed the ladder and boarded the Maersk Alabama.  Crew Member 2 saw that Pirate 3 and Pirate 4 were carrying guns.

g.    Aboard the Maersk Alabama, Pirate 3 and Pirate 4 led Crew Member 2 and the other member of the Crew back to the Bridge at gunpoint.  Inside the Bridge, Crew Member 2 heard MUSE demand that the Captain order the rest of the Crew to come to the Bridge.  The Captain directed the Crew to come to the Bridge over the radio.  Only one additional member of the Crew came to the Bridge.

h.    Crew Member 1 surreptitiously climbed up a crane that was located on the deck of the Maersk Alabama to see into the Bridge.  He saw the Captain and at least one other member of the Crew in the Bridge, as well as three of the

Pirates.   Each of the three Pirates appeared to be carrying a gun.

    i.    One of the Crew Members told MUSE that the Crew would be too afraid to surrender to him if he (MUSE) was armed.   Then, leaving his gun in the Bridge with the other Pirates, MUSE left the Bridge with Crew Member 2.

    j.    MUSE then began to canvass the ship, using Crew Member 2 as a guide.   MUSE and Crew Member 2 each carried a flashlight because, at this time, the interior of the Maersk Alabama was dark, the power having been shut down by Crew Member 3.

    k.    Crew Member 2 lost sight of MUSE in the darkness of one of the areas of the ship.   At or about that time, in the same area, Crew Member 3 determined that he may have been spotted in the darkness by MUSE.   Crew Member 3 briefly hid from MUSE and then tackled him to the ground.   Meanwhile, Crew Member 2, hearing the sounds of a struggle, shined his flashlight in the direction of the sounds and saw Crew Member 3 fighting with MUSE.   Crew Member 2 helped Crew Member 3 subdue MUSE.   Crew Member 2 and Crew Member 3 then tied MUSE's hands with wire, and took MUSE to the Safe Room where several Crew members had secured themselves.

    l.    After several hours elapsed, the other Pirates said they would leave the Maersk Alabama if the Crew returned MUSE to them and provided them with, among other things, a life boat ("Life Boat").   The Captain boarded the Life Boat with the other Pirates, and the Crew allowed MUSE to board the Life Boat.   At that time, the Captain did not return to the Maersk Alabama, and the Life Boat navigated a short distance away from the ship with the Pirates and the Captain aboard.

    m.    On April 9, 2009, the USS Bainbridge met up with the Maersk Alabama.   When the USS Bainbridge arrived, the Pirates and the Captain were on the Life Boat, a short distance away from the Maersk Alabama.

    n.    Over the following three days, there were multiple radio communications between the Pirates and personnel on the USS Bainbridge.   In those communications, the Pirates threatened to kill the Captain if they were not provided with safe passage away from the scene.

    o.    On April 12, 2009, MUSE requested and was permitted to board the USS Bainbridge.   The other three Pirates continued to hold the Captain on the Life Boat.   On the USS

Bainbridge, MUSE continued to demand for himself and the other Pirates safe passage from the scene in exchange for the Captain's release.   In addition, MUSE received medical treatment.

14.   On April 19, 2009, I interviewed the Captain of the Maersk Alabama.   Based upon my interview of the Captain, I have learned the following:

a.   On April 8, 2009, at approximately 7:30 a.m., the Captain was on the Bridge of the Maersk Alabama.   From the Bridge, the Captain saw the Pirates approaching the Maersk Alabama in the Pirate Boat.   The Pirates fired guns at the ship. The Captain fired multiple warning flares at the Pirate Boat in an effort to divert the Pirates.

b.   ABDUWALI ABDUKHADIR MUSE, the defendant, was the first Pirate to board the Maersk Alabama.   MUSE used a portable ladder to board the ship and was carrying a gun.   From the deck of the Maersk Alabama, MUSE fired his gun at the Captain who was still in the Bridge.

c.   MUSE entered the Bridge, and told the Captain to stop the ship.   MUSE, who conducted himself as the leader of the Pirates, later demanded money from the Captain.   MUSE and two other Pirates, each of whom was armed with a gun, then walked with the Captain to a room on the Maersk Alabama that contained the ship's safe.   The Captain opened the safe and took out approximately $30,000 in cash.   MUSE and the two other Pirates then took the cash.

d.   Thereafter, the Pirates held the Captain on the Life Boat from April 8 to April 12, 2009.   During this period, MUSE told the Captain, in sum and substance, that he had hijacked other ships before.   MUSE also handed out some of the approximately $30,000 in cash from the Maersk Alabama to the other Pirates.   At one point, the Captain attempted to escape; in response, the Pirates shot a gun at him.   After the Captain attempted to escape, the Pirates tied him up inside the Life Boat and hit him.

e.   On April 12, 2009, MUSE left the Life Boat. Later that day, one of the three remaining Pirates shot a gun on the Life Boat.   Less than one hour later, the Captain heard several gun shots on the Life Boat, and saw that the three remaining Pirates had been shot.

15.   According to evidence reports prepared by the United States Navy, which I have reviewed, United States Navy

personnel recovered the following, among other things, from the Life Boat:

     a.    2 loaded AK-47 assault rifles;

     b.    2 gun straps, each containing 3 AK-47 magazines;

     c.    1 magazine for a handgun; and

     d.    Multiple cell phones and handheld radios.

     16.  As part of this investigation, I have spoken to another JTTF agent about the transport of ABDUWALI ABDUKHADIR MUSE, the defendant, to the Southern District of New York. Based on those conversations, I have learned that, on April 12, 2009, MUSE was taken into custody by the United States Navy while on the USS Bainbridge, which was at sea in the Indian Ocean approximately 280 miles off the coast of Somalia. I have also learned that, on April 20, 2008, the FBI took custody of MUSE from the United States Navy. On the same day, MUSE was flown by the FBI to the Southern District of New York.

WHEREFORE, deponent respectfully requests that ABDUWALI ABDUKHADIR MUSE, the defendant, be imprisoned or bailed, as the case may be.

_____
STEVEN E. SORRELLS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
21st day of April, 2009

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

ANDREW J. PECK
UNITED STATES    MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-10-