UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

UNITED STATES OF AMERICA      :

    - v. -            :

                                        09 Cr. 512 (LAP)

ABDUWALI ABDUKHADIR MUSE,    :

              Defendant.       :

-------------------------------------------------x

## **SENTENCING SUBMISSION OF ABDUWALI ABDUKHADIR MUSE**

 

LEONARD F. JOY, ESQ.
Federal Defenders of New York, Inc.
Attorney for Defendant
**ABDUWALI ABDUKHADIR MUSE**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8744

**Fiona Doherty, Esq.**
**Philip Weinstein, Esq.**
**Deirdre von Dornum, Esq.**
<u>Of</u> Counsel

TO:    PREET BHARARA, ESQ.
       United States Attorney
       Southern District of New York
       One Saint Andrew's Plaza
       New York, New York 10007
       Attn: **Brendan McGuire, Esq.**
            **Jeffrey Brown, Esq.**
            Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

UNITED STATES OF AMERICA          :

    - v. -          :

                                 09 Cr. 512 (LAP)

ABDUWALI ABDUKHADIR MUSE,     :

         Defendant.          :

-------------------------------------------------x

## SENTENCING SUBMISSION OF ABDUWALI ABDUKHADIR MUSE

### PRELIMINARY STATEMENT

The defense respectfully submits this sentencing memorandum on behalf of Abduwali Abdukhadir Muse in advance of his sentencing, which is scheduled for February 16, 2011, at 10 A.M.  On May 18, 2010, Abduwali[1] pled guilty to Counts 2, 3, 5, 6, 8, and 9 of the superceding indictment.  He pled guilty pursuant to a plea agreement that incorporated a Stipulated Guidelines Range of 324 months to 405 months (27 years to 33.75 years), based on offense level 41 and Criminal History Category I.  Under the terms of that plea agreement, neither party can argue for a sentence outside the Stipulated Guidelines Range.

Abduwali is from the semi-autonomous province of Puntland in Somalia.  He suffered from hunger and malnutrition as a small child.  By the age of 11 or 12, Abduwali was living on his own and working odd jobs to feed himself.  When he was about 13, he moved with some

---

[1]    In Somalia, a person is identified by three names – his given name, followed by his father's given name, followed by his grandfather's given name.  Somalis do not have last names in the Western sense; they are typically referred to by their given names, in this case "Abduwali."

Page -1-

other boys to a coastal fishing village called Garacad in order to learn how to become a

fisherman.  Garacad is one of a number of piracy centers in Puntland and, within a couple of

years, Abduwali had become involved in the piracy network.  As a young and low-status person,

Abduwali participated in the actual piracy operations, which were financed by more powerful

people.  He was about 16 at the time he became involved in the attempted hijacking of the

Maersk Alabama.

The defense submits with this memorandum a short paper by Professor Lee Cassanelli in

order to provide some background context on the operation of piracy networks in Somalia.

(Professor Cassanelli's report is attached as Exhibit A and his CV is attached as Exhibit B.).

Professor Cassanelli has been on the history faculty of the University of Pennsylvania since 1974.

He is also the Director of the African Studies Center at the University of Pennsylvania and has

conducted extensive research over many years on Somalia and neighboring countries.[2]  In his

report, Professor Cassanelli emphasizes that modern-day Somali piracy relies on networks of

supply and finance that extend far beyond the individuals who take part in the actual operations

at sea.  He also gives an account of how piracy has been tacitly condoned in Puntland, where

pirates operate with the knowledge and complicity of local officials.

In addition, at the request of defense counsel, Abduwali was evaluated by Dr. Jerome

Kroll, an esteemed psychiatrist in Minneapolis with a long history of working with Somali

---

[2]   As he notes in his report, Dr. Cassanelli's research has been incorporated into periodic
U.S. Department of State reports on Somali asylum claims and country conditions.  See Exhibit
A at p. 6.

refugees.  (Dr. Kroll's evaluation is attached as Exhibit C and his CV is attached as Exhibit D.).[3]

Dr. Kroll is a Professor of Psychiatry Emeritus at the University of Minnesota Medical School

and the Chief Psychiatrist of the Community-University Health Care Clinic in Minneapolis.  The

defense asked Dr. Kroll to evaluate Abduwali because of significant mental health problems

Abduwali has experienced at the Metropolitan Correctional Center (the "MCC") ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

        In light of a wide variety of 18 U.S.C. § 3553(a) factors – including the mental health

problems Abduwali has endured, the circumstances of his childhood, the desperate economic

conditions prevailing in Somalia, and the official sanctioning of piracy within Puntland – the

defense respectfully asks that the Court exercise some mercy in this case.  The defense

acknowledges the terrible suffering of the crew of the Maersk Alabama – including the ordeal

endured by Captain Richard Phillips, who conducted himself with great bravery during his period

of captivity.  However, we respectfully submit that a sentence of 324 months (27 years) provides

a heavy and exacting punishment and sends a strong deterrent message to the international

community.  Abduwali will serve this sentence in a U.S. prison, isolated from family and friends

in an environment foreign to all that he has ever known.  Particularly in light of his young age, a

sentence of more than 27 years would be greater than necessary to effect the statutory purposes of

---

        [3]      With the consent of the government, the defense is redacting confidential
psychiatric information from our ECF filing, including Exhibit C in its entirety.

sentencing.  Accordingly, we respectfully ask that the Court impose a sentence of 27 years – at the bottom of the range stipulated by the parties.

## FACTUAL BACKGROUND

### I.     Early Childhood Until Eight Years Old

Abduwali Abdukhadir Muse was born in Puntland, Somalia in a village outside of Galkayo.  See Exhibit E (map of Puntland).  He was the first child born to Adar Abdirahman Hassan and Abdukhadir Muse Ghedi.  See PSR ¶ 94.[4]  Although birth-records are non-existent in Puntland, Abduwali's mother has provided an affirmation to establish his age.  See Exhibit F (Affirmation of Adar Abdirahman Hassan).  She explains that Abduwali, her oldest child, was born in 1993.  Id. ¶ 3.  She knows this because he was born after the collapse of the Somali government in 1991, which was a defining experience for her.  Id.  Before the collapse of the government, she had been living in the town of Galkayo.  Id. ¶ 2.

Abduwali's parents had four children together.  Id. ¶¶ 4-5; see also PSR ¶ 94. Abduwali's younger siblings – Mohamed, Abdusaark, and Akran – were each born approximately a year apart.  See Exhibit F ¶ 5.  In her affirmation, Abduwali's mother provides the current ages of Abduwali's siblings as 16, 15, and 14.  Id.; see also Exhibit G (Affirmation of Mohamed Abdukhadir Muse, Abduwali's brother, confirming these ages).  Abduwali is currently 17 or 18.

Abduwali's parents divorced before he turned five years old.  See Exhibit F ¶ 6.  After the divorce, Abduwali and his siblings remained with their mother.  She had no means of supporting

---

[4]     The cites in this submission are to the draft PSR.

them.  As she explains in her affirmation to the Court: "I had absolutely nothing when Abduwali's father left us.  I could not support them by myself.  I could not feed them.  They were hungry."  Id.

Because of this, Abduwali's mother brought the children to her father, Abdirahman Hassan Nuur, who lived in the countryside near the Ethiopian border.  Id. ¶ 7.  Although her father had some livestock, he was very poor.  Id.  After a while, Abduwali's mother went to find work, leaving the children with her father.  Id.  She went to Bosaso, a city that was hundreds of miles away.  Id.  She explains that even at her father's house, the children were hungry as her father "often did not have anything to give them."  Id.  During this period, Abduwali began attending a religious school that provided the only available form of free education.

About a year later, Abduwali's father came and took him from his grandfather's home.  Id. ¶ 8.  Abduwali went to live with his father and new stepmother in the countryside outside of Galkayo.  At the time, Abduwali's father did not have any animals and could not provide sufficient food for Abduwali.  Abduwali remembers rummaging in the garbage, desperately looking for something to eat.  See PSR ¶ 96.  Later on, Abduwali was sent to live with Ahmed, a paternal uncle.  While he was living with his uncle, a camel kicked him in the mouth.  He lost his two front teeth.  He was sent briefly to live with another uncle, Abdi Rahman, to recuperate.  Ultimately, he went back to his father.

Throughout these early years, Abduwali experienced a state of deprivation that is almost inconceivable in the United States.  He was hungry nearly all the time.  Id.; see also Exhibit C at p. 3.  He sometimes had no clothes to wear, particularly when he was living with his father.  The living conditions were very rough.  He had no blanket and no bed.  The adults would have a hut (a

bool), and the children would sleep outside on the ground. See Exhibit C at p. 3. When it was

raining or too hot, the children would be allowed to sleep inside for the night. Usually, however,

Abduwali and his siblings slept outside in front of the bool. There was no bathroom, electricity,

or running water. As a young child, Abduwali survived primarily on camel's milk, although

sometimes he had fruit or nuts. About once a month, he might be given a cooked meal. He

vividly remembers the agonizing hunger that he experienced as a young boy. See PSR ¶ 96.

Abduwali's life was difficult in other ways. He endured a significant amount of abuse.

His father and stepmother beat him regularly, for example. See Exhibit F ¶ 8; Exhibit C at p. 3.

When his father was particularly upset, he would tie Abduwali to a tree and tell him that a lion

would come to eat him. See PSR ¶ 96; Exhibit C at p. 3. Because of this abuse, Abduwali ran

away from his father and stepmother for days at a time.

## II.    Eight to Thirteen Years Old

When Abduwali was approximately eight years old, he decided to run away from his

father's home for good. His plan was to travel to Bosaso to find his mother. See PSR ¶ 98;

Exhibit C at p. 3. As explained in Dr. Kroll's report, this trip covered a distance of approximately

400 to 450 miles. See Exhibit C at p. 3. Abduwali was not able to take any food or clothes for

the journey, which took two months. Id. He had no money. Dr. Kroll recounts the details of this

trip for the Court:

> [Abduwali's] two main concerns were to obtain food and to avoid beatings by strangers.
> Sometimes he would travel across the countryside in the company of other displaced boys
> and adolescents. He and the other children were beaten because they were "nothing" that
> is, when walking from town to town, they could not claim the protection of a clan because
> they were temporarily detached from their clan base, they had no goods and they lived like
> 'outlaws'. After two months of this kind of travel, Mr. Muse came across a group of men,

who found him hungry and naked and took pity on him. They called his mother who promised to pay them if they arranged for Mr. Muse to get transport to Bosaso. He was put on a truck carrying goats and sheep for the journey, which took one day and one night.

Id.

Abduwali's mother discusses this episode in her own affirmation to the Court. She notes that life was "very difficult" for Abduwali at his father's house – and that when he "was about eight years old, he ran away" to Bosaso to find her. Exhibit F ¶ 9. At the time, Abduwali's mother was supporting herself in Bosaso by selling milk out in the streets. Id. She was struggling to survive financially. Id. Conditions were very hard, and she often could not provide enough food for herself or for Abduwali. Id.

Abduwali's mother enrolled him in a religious school in Bosaso, as she wanted him to study and become educated. Id. ¶ 10. She wanted Abduwali to have a better life than herself. Id. Although he attended school for a while, he saw other children working in Bosaso. Id. ¶ 11. Determined to earn money for food, he decided that he would work too. See Exhibit C at p. 3. He began by collecting sticks to sell as toothbrushes. Then, he started shining shoes. Id. Initially, his mother tried to prevent him from working, as she recounts in her affirmation:

> [Abduwali] would run away from school to work. One day, I heard that he was shining shoes in a particular spot. I went to find him and brought him back home. I tied him up and left him. He freed himself and dug his way out of the hut. He ran away again to try to make money.

Exhibit F ¶ 11. Abduwali's mother explains that "he wanted to make money, because we were hungry." Id. She emphasizes that he was concerned not only about himself, but also about his younger siblings, who were still with their grandfather. Id.

When Abduwali was 11 or 12, he had moved out of his mother's home.  Id. ¶ 12; Ex. C at

p. 4.  By that time, his mother was no longer trying to get him to go back to school.  Id.  She had

remarried, and her husband did not want Abduwali around.  Abduwali began working and living

at the shore in Bosaso.  Id.  As he had no place to stay, he would sleep out on the beach.  Id.  He

began working as a "krishbey," a boy who helps taxi drivers.  Id.  As a krishbey, he learned to fix

taxis (which were primarily vans) and to take care of them.  Id.  He also learned how to drive.

After about six months, he was allowed to drive one of the vans.  He also began working as a

conductor, collecting fares from passengers.

Because Abduwali was earning some money to eat, his life was better than it had been

before.  However, living on the shore in Bosaso was dangerous.  As Dr. Kroll recounts in his

report, Abduwali was victimized by drunkards, who stole his money.  See Exhibit C at p. 4.  One

time, he was strangled during a robbery and lost consciousness.  Id.  He remembers throwing up

when he awoke.  Id.  Once, he was seriously injured during an incident as a taxi-driver as he was

helping to transport a herd of cows.  See PSR ¶ 99; Exhibit F ¶ 12.  He fell between the cows in

the back of the truck and got trampled.  Id.  He was sick for three months, barely able to get up.

Id.

## III.    Thirteen to Sixteen Years Old

When Abduwali was about 13, he moved to Garacad, a village on the coast of Puntland

closer to where he was born.  See PSR ¶ 101; Exhibit C at p. 4.  He went to Garacad to become a

fisherman.  At first, Abduwali cooked for the fishermen and learned the basics of the trade.  See

PSR ¶ 101.  He slept with the fishermen out on the shore in Garacad.  They rented a room only when the weather was too bad to sleep outside.

 While in Garacad, Abduwali had his first contact with pirates.  Garacad is known as one of several piracy centers in Puntland.  The United Nations has reported that in Puntland, "the most important pirate group is located in the Eyl district, with other smaller groups operating from Bossaso, Qandala, Caluula, Bargaal and Garacad."  See United Nations Security Council, "Report of the Secretary-General Pursuant to Security Council Resolution 1846 (2008)," at ¶ 5, March 16, 2009.[5]  According to the United Nations, the most prominent pirate militias "have their roots in the fishing communities of the Somali coast."  Id.

 The temptations of piracy were overwhelming for Abduwali.  He had so little to lose.  Without any real status or education, he had no means of creating a stable life for himself.  He had grown up in a war-torn country that provided no meaningful path for his future.  He had experienced terrible, prolonged periods of hunger and had struggled on his own to earn enough money to eat.  Unsurprisingly, piracy seemed like a way out – the only way to provide a future for himself.

 Six months before his arrest, Abduwali married a girl named Basra.[6]  See PSR ¶ 102.  Abduwali's parents did not know about the wedding and did not attend the wedding ceremony.

---

[5] This report is available at http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N09/257/27/PDF/N0925727.pdf?OpenElement (accessed February 1, 2011).

[6] The defense understands from a number of sources that it is not unusual for young teenagers to marry in Somalia.

Because Abduwali did not have any money to establish a home for himself and Basra, Basra continued to live with her mother.  Id.  Accordingly, the marriage was not consummated before his arrest.  See Exhibit C at p. 5.

## IV.    Offense Conduct

Approximately two or three years after moving to Garacad, Abduwali became involved in the attempted seizure of the Maersk Alabama.  He and three older men – Ali, Nuur, and Mowlid – boarded a small speed boat and began to chase the ship.  At the time, they had no idea that the Maersk Alabama was a U.S. flagged-ship.  At the instruction of their leaders, they were searching for any ship that looked promising.

After Abduwali and his three companions boarded the Maersk Alabama, they went to the bridge of the ship.  See PSR ¶ 34.  Although Captain Richard Phillips was on the bridge, most of the crew-members were elsewhere.  Abduwali subsequently went below deck with a flashlight to search for the missing crew-members.  Id. ¶ 36.  Abduwali was unarmed during this search and was overpowered by two of the crew.  Id. ¶ 37.  He was stabbed in the hand, tied up with wire and then held captive in the crew's safe room.  Id.  Later on, Abduwali was returned to his companions and left the Maersk Alabama on a small lifeboat.  Id. ¶ 38.  He and his companions held Captain Phillips as a hostage on the lifeboat.  Id.

On April 9, 2009, the U.S. Navy arrived on the scene.  Id. ¶ 39.  The U.S.S. Bainbridge, a missile destroyer, was the first Navy ship to appear, followed by the U.S.S. Halyburton.  Abduwali and his companions were trying to navigate the lifeboat toward Somalia.  The two Navy

warships blocked the lifeboat's efforts.  Navy helicopters also sprayed the lifeboat from the sky to push the lifeboat further back into the sea.

Over a three-day period, there were repeated communications between the U.S.S. Bainbridge and the lifeboat.  These communications centered on efforts to negotiate an end to the stand-off.  On the morning of April 12, 2009, Abduwali chose to leave the lifeboat and board the U.S.S. Bainbridge.  Id. ¶ 42.  He did so to receive medical treatment for his hand, which was festering, and to continue negotiations for a resolution.  He wanted safe passage for himself and his three companions.

Once on the U.S.S. Bainbridge, Abduwali negotiated an agreement with the U.S. Navy. He agreed to the release of Captain Phillips in exchange for having the Navy tow the lifeboat to Somalia, where he and his companions would be released.  Abduwali communicated this agreement to his three companions, who allowed the Navy to attach a tow rope to the lifeboat. After about an hour, the Navy stopped towing the lifeboat.  The tow was creating too many waves, threatening to swamp the lifeboat.  At some point, a gunshot rang out on the lifeboat.  Abduwali's companions indicated that this was a mistake and that Captain Phillips had not been harmed.

From the deck of the Bainbridge, Abduwali spoke to his three companions and convinced them that they had to release the captain immediately, as there was no other choice.  All three men agreed, coming out to talk to Abduwali – and making themselves visible to those on the Bainbridge.  The three men were in the process of surrendering, when Abduwali heard a stream of gun shots and was thrown to the ground.  Abduwali does not believe that any of the men was holding a gun on the captain when they were killed.  He saw all three men clearly before they

were shot.  Nuur and Mowlid were standing talking to him from the lifeboat's front hatch.  Ali was in the driver's seat, sticking his head out the window.  Abduwali believes that he was betrayed by the Navy, who had come to an agreement with him that his companions would not be harmed.  Watching the three men be killed in this context was traumatic for Abduwali.

Abduwali was held in Navy custody after the rescue of Captain Phillips and the killing of his three companions.  The Navy operated on his hand.  After the operation, Navy interrogators showed Abduwali pictures of his companions.  Their bodies were riddled with bullets.  On April 20, 2009, Abduwali was transferred to FBI custody and flown to the Southern District of New York.  Id. ¶ 44.  He was presented in magistrate's court on April 21, 2009 and transferred to the MCC.

On May 18, 2010, Abduwali pled guilty to Counts 2, 3, 5, 6, 8, and 9 of the superceding indictment against him.  Id. ¶ 12.  He pled guilty pursuant to a plea agreement that relied on a Stipulated Guidelines Range of 324 months to 405 months (27 years to 33.75 years), based on offense level 41 and Criminal History Category I.  Id. ¶ 13(j).  Under the terms of that plea agreement, neither party can argue for a sentence outside the Stipulated Guidelines Range.  Id. ¶ 13(k).  Probation agrees with the calculation of the Guidelines range laid out in the plea agreement.  See PSR ¶ 119.

### SENTENCING STANDARDS

The sentencing court must consider all of the 18 U.S.C. § 3553(a) factors in determining what would be an appropriate sentence.  Under § 3553(a), the court is directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the

purposes of sentencing; (3) the kinds of sentences available; (4) the kinds of sentences and the

sentencing range established in the Sentencing Guidelines; (5) the policy statements issued by the

Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among

similarly situated defendants; and, (7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a)(1)-(a)(7).

In any sentencing, the court is directed first and foremost to ensure that the sentence

imposed is consistent with the parsimony principle of § 3553(a).  See, e.g., United States v.

Rodriguez, 527 F.3d 221, 227-28 (1st Cir. 2008) (emphasizing that under new Supreme Court

precedent, the parsimony of a sentence is the "overarching principle" running through § 3553(a)'s

"tapestry of factors").   Under the parsimony principle, the court must impose a sentence that is

"sufficient, but not greater than necessary, to comply with the purposes" of sentencing – namely,

punishment, deterrence and rehabilitation.  See 18 U.S.C. § 3553(a)(2); United States v. Ministro-

Tapia, 470 F.3d 137, 142 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude

that two sentences equally served the statutory purposes of § 3553, it could not, consistent with

the parsimony clause, impose the higher.").

## ARGUMENT

**I.      Abduwali Did Not Threaten the Captain of the Win Far 161 from the MCC.**

On January 15, 2010, the Attorney General imposed Special Administrative Measures

(SAMs) on Abduwali as a result of an investigation initiated by the government.  Agents from the

FBI had interviewed Gilbert Victor, the captain of a boat named the Serenity, in December 2009.

According to the SAMs order, a Somali pirate (who belonged to the same organization as

Abduwali) had informed Victor "on approximately five separate occasions" in July or August 2009 that Abduwali had sent a message from prison "instructing the pirate crew to kill the captain of the Win Far 161." See Attorney General, "Memo for Harley G. Lappin, Director, Federal Bureau of Prisons," p. 1, January 15, 2010. According to the government, Victor's account was corroborated by "two of Muse's prison call recordings." Id. On that basis, the Attorney General implemented SAMs measures against Abduwali.

As a result of the SAMs order, the Bureau of Prisons (the "BOP") held Abduwali in highly restrictive conditions for one year – until January 15, 2011. He was held in isolation in a small cell with blackened windows in the Special Housing Unit (the "SHU") of the MCC. He was not allowed to communicate with any other inmate. He was prevented from communicating with his family with the exception of one 15-minute call to his mother every 30 days. The MCC took away his radio and did not permit him any access to a television. His ability to obtain reading materials was severely limited. He was not allowed to exercise outside. He could not attend religious services. He ate all of his meals alone in his cell.[7]

As noted in the PSR, the defense strongly disputes any allegation that Abduwali threatened the captain of the Win Far 161 from prison. See PSR ¶¶ 18-19. The two prison calls identified by the government do not provide proof of any such threat. We believe that the government has

---

[7]     Even after SAMs measures were lifted on January 15, 2011, staff at the MCC decided to keep Abduwali in solitary confinement in the SHU. The only apparent change to Abduwali's conditions of confinement was that the MCC gave him back his radio (without providing him any batteries). ▮▮▮▮▮▮▮▮▮▮▮▮▮

misinterpreted these calls.  We do acknowledge, however, that Abduwali discussed piracy matters

over the phone.

     The first call identified by the government took place on August 22, 2009.  A translation

of the call, as prepared by the defense,[8] included the following relevant exchange:

| ABDIWALI MUSE: | There is a gentleman called Ilko Asse.  Mohamed knows Ilko Asse.  Do you get it? |
| --- | --- |
| UNIDENTIFIED FEMALE: | I understand. |
| ABDIWALI MUSE: | I wanted him to do a **task** for me. |
| UNIDENTIFIED FEMALE: | I understand. |
| ABDIWALI MUSE: | **There was a promise between him and me when we were in Garacad.** |
| UNIDENTIFIED FEMALE: | I understand. |
| ABDIWALI MUSE: | He told me that he is afraid of you, but mom I want him to do that **task**, so let him do that and leave him alone. |
| UNIDENTIFIED FEMALE: | A **task** for you? |
| ABDIWALI MUSE: | Yes, a **task** for me. |
| UNIDENTIFIED FEMALE: | Which clan does he belong to? |
| ABDIWALI MUSE: | Mohamed knows, his name is Ilko Asse. |
| UNIDENTIFIED FEMALE: | Alright. |

---

     [8]     The government's translation of the two calls is laid out in the PSR.  See PSR ¶ 16.  The defense believes that certain words in the government's version were mistranslated.  We have notified the government of our position and are waiting for its response.  For the convenience of the Court, we have bolded the words in the defense translation that are materially different from the government's version.

ABDIWALI MUSE:             I made a promise to a man and Ilko Asse is fulfilling that
                          promise.  I want you to leave him alone.

UNIDENTIFIED FEMALE:       Did you say to leave him alone?

ABDIWALI MUSE:             Yes, he is going to fulfill my promise and I want that promise to
                          be done, mother.

UNIDENTIFIED FEMALE:       Alright, if God is willing.

       The second call on August 23, 2009 included the following exchange:

ABDIWALI MUSE:             I get it, mother did you give my message to Mohamed?

UNIDENTIFIED FEMALE:       Yes, I told him.

ABDIWALI MUSE:             Did you go then?

UNIDENTIFIED FEMALE:       Did I go there?

ABDIWALI MUSE:             Yes.

UNIDENTIFIED FEMALE:       I did not go [U/I] . . .

                          [Voices overlap]

AUTOMATED VOICE:  This is a call from a federal prison.

                          [Voices overlap]

UNIDENTIFIED FEMALE:       . . . did you ask us to go there?

ABDIWALI MUSE:             What mother?

UNIDENTIFIED FEMALE:       Did you tell us to go there?

ABDIWALI MUSE:             No, but send Mohamed, ask him to give him [unidentified
                          person] permission to do the **task**.  Say that to him, tell him that.

UNIDENTIFIED FEMALE:       Should I say you can do it?

ABDIWALI MUSE:             Yes, tell him you can do the **task** Abdiwali asked you to do.

UNIDENTIFIED FEMALE:        Alright I will tell him.

ABDIWALI MUSE:              Alright mother I greet you.

Our objection to the government's interpretation of the calls is noted in the PSR. As a

preliminary matter, the timing of the two calls (late August 2009) does not match the timing of the

alleged threats against the captain of the Win Far 161, as relayed by Victor. As reflected in an

FBI interview report, Victor said that he first heard about the threat against the captain about two

months before his own release. Given that he was released on September 14, 2009, Victor heard

about the threat in mid-July 2009 – more than a month before Abduwali made the two calls upon

which the government is relying for the alleged communication of the threat.

Moreover, as we have indicated, the two August 2009 calls did not concern the captain of

the Win Far 161 in any way. See PSR ¶¶ 18-19. Abduwali was calling his mother about a

promise he had made to a young man, named Jeylani, before Abduwali left Somalia. Abduwali

had promised to buy Jeylani a car because Jeylani had escorted Abduwali during a trip to an area

of Somalia controlled by a hostile clan. This trip was undertaken in conjunction with Abduwali's

piracy activities, but Abduwali would have been in danger if he had gone alone, given his own

clan lineage. Jeylani, who was a member of the hostile clan, agreed to accompany Abduwali as a

means of protection. Jeylani had asked for a car as payment for his services, and Abduwali had

agreed. Ilko Asse, who was a leader of the piracy network, was aware of Abduwali's promise.

Abduwali had informed Ilko Asse of the promise before the piracy operation involved in this case

began.

As reflected by the August 22, 2009 recording, Abduwali was calling his mother to ask for her help in fulfilling a promise he had made before he left Somalia. Specifically, Abduwali explained that he had "made a promise to a man" and that someone else (Ilko Asse) was fulfilling that promise. Because his mother did not know Ilko Asse, Abduwali told his mother that Mohamed (Abduwali's younger brother) knew Ilko Asse. Abduwali also told his mother that Abduwali and Ilko Asse had discussed this promise when Abduwali was "in Garacad." Abduwali was letting his mother know that he wanted Ilko Asse to fulfill the promise and that he did not want his mother to interfere. Ilko Asse was afraid of offending Abduwali's mother, but Abduwali was letting his mother know in advance that the task (to fulfill the promise) was being done with Abduwali's consent. During the second call, on August 23, 2009, Abduwali asked his mother whether the message had already been relayed to Ilko Asse. He told his mother to send Mohamed to give Ilko Asse permission to do the task.

Abduwali, his mother, and Mohamed (his brother) all separately told defense counsel that the "promise" referenced in the calls was about buying a car. Abduwali needed to get prior permission from his mother for the "task" because the car was being purchased out of money that the pirates were holding for Abduwali. Ilko Asse would not spend Abduwali's money without the advance permission of his family. Abduwali's mother independently confirmed these details for defense counsel, without defense counsel having given her any indication of Abduwali's account.

Mohamed has submitted an affirmation to the Court to explain the context of the calls. See Exhibit G. In this affirmation, Mohamed indicates that the promise concerned money. He explains that "[b]efore his arrest, Abduwali had made a promise that he would buy a car for a

man." Id. ¶ 7.  Abduwali wanted their mother to send Mohamed to Ilko Asse to let him know that

it was alright to fulfill Abduwali's promise.  Id. ¶ 6.  In his affirmation, Mohamed described what

happened next:

> As Abduwali requested, I went to see Ilko Asse.  Although I did not know him personally, I knew him by reputation.  He is a man of high status in Puntland.
>
> I tried to call Ilko Asse, but he hung up on me.  Then, I went to Ilko Asse's house.  I could not get in, because there were guards at the house.  One of Ilko Asse's relatives had killed somebody of a different clan because of a land dispute.  Given Ilko Asse's high status, there was concern that Ilko Asse would be killed in retaliation.
>
> Eventually, after talking to the guards, I convinced them to allow me to speak to Ilko Asse.  I delivered Abduwali's message to Ilko Asse.  However, I am not sure if the car was ever purchased.

Id. ¶¶ 8-10.

In addition, a separate MCC recording on August 12, 2009 supports the defense's position.

See Exhibit H (relevant excerpt of the call).  During that call, Abduwali was talking to two

friends, who were aware of Abduwali's piracy activities and his past promise to Jeylani.  During

this call, Abduwali told his friends that Ilko Asse should "fulfill the promise I made to Jeylani."

Id.  He reiterated: "I want the promise I made to Jelyani to be fulfilled.  Odey and [Ilko Asse]

know about it."  Id.

Significantly, the captain of the Win Far 161 was not harmed in response to Abduwali's

calls.  Although the government interpreted Abduwali's August 22nd and 23rd calls as an order by

Abduwali to kill the captain of the Win Far 161, no such action was taken against the captain in

response to Abduwali's calls.

Finally, the defense takes issue with the government's identification of the "Mohamed" referenced in Abduwali's August 22nd and 23rd calls.  As we have explained, Abduwali was talking to his mother in these calls and referring to his younger brother, Mohamed.  Based on statements by Gilbert Victor, the Serenity Captain, the government believed that Abduwali was referring to another man named "Mohamed," whom Victor indicated had taken over the leadership of the pirates after Abduwali's capture.  Victor also told the government that this particular Mohamed was in his 40s.  However, none of the other witnesses interviewed by the government identified anyone named "Mohamed" as having taken over the leadership of the pirates after Abduwali's capture.  In direct contrast, Arnel Delos Santos and Cecilio Castilla Labuguen (two of the Win Far 161 hostages) both stated that a pirate named Shadeel (Shaheel) became the pirate leader after Abduwali was captured.  See PSR ¶ 18.

It is significant that Gilbert Victor (the sole witness upon whom the government's account of the alleged threats is based) has had other credibility problems.  In his interview with the FBI, Victor said that only he and one other person (Conrad Andre) were on the Serenity when the ship was captured by pirates on March 4, 2009.  However, another man (Robin Samson) was also on the Serenity at the time.  In order to hide the fact that Samson was on the Serenity, Victor told the FBI that the pirates intercepted Samson from a different ship, the Virgo, only after the Serenity was captured.

The defense has conducted an extensive investigation in the Seychelles to investigate the circumstances surrounding Victor's account.  See Exhibit I (affirmation of Bridget Prince, the Executive Director of One World Research, who carried out the Seychelles investigation).  The

defense spoke to Captain J.J. Benoiton of the Seychelles Martime Safety Administration, who indicated there was no record of any ship called the Virgo.  Id. ¶ 5.  Ernest Quatre, the Police Commissioner of the Central Police Station in Seychelles, told our investigator that the Seychelles police had not been able to find the Virgo and thought that it was fake.  Id. ¶ 7.  Most significantly, our investigator spoke directly to Robin Samson, who confirmed that the Virgo did not exist.  Id. ¶ 8.

The defense believes that Victor concocted the story about the Virgo in order to conceal Samson's unauthorized presence on the Serenity.  Victor was not the owner of the Serenity, but was instead hired to transport the Serenity on a voyage between the Seychelles and Madagascar. Id. ¶ 3.  The authorities in the Seychelles have conducted an investigation into whether Victor, Conrad, and Samson were using the Serenity to illegally transport drugs when they were stopped by pirates.  Id. ¶¶ 6-7.  When we asked Captain Benoiton of the Seychelles Maritime Safety Administration for documents on the Serenity, he told us that he had given the file on the Serenity to the National Drugs Enforcement Agency.  Id. ¶ 5.  The National Drugs Enforcement Agency confirmed that they had investigated the matter, but indicated that the Seychelles police had taken over the investigation.  Id. ¶ 6.  Police Commissioner Quatre told our investigator that the police had interviewed all three men about the drug smuggling allegations and was investigating whether Samson had left the Seychelles illegally.  Id. ¶ 7.

II.    **A Sentence of 27 Years Would Be Sufficient**.

A.    **Abduwali's Youth**

In deciding upon the appropriate punishment in this case under 18 U.S.C. § 3553(a), we ask the Court to consider Abduwali's youth.[9]  In an affirmation for the Court, Abduwali's mother indicates that he was born in 1993 and was 16 years old at the time of the offense in April 2009. See Exhibit F ¶ 14.[10]  Abduwali's brother, Mohamed, has also submitted an affirmation, which confirms that Abduwali is now approximately 17 or 18.  See Exhibit G.  Mohamed, who is about one year younger, is 16.  Id. ¶ 2.

In addition, Ahmed Awil Muhammed, an interpreter and investigator for the defense in Puntland, has submitted an affirmation to the Court about Mohamed's age.  See Exhibit J. Ahmed met Mohamed (Abduwali's brother) in January 2011 and notes that Mohamed appears to be about 16 or 17 years old.  See id. ¶¶ 2-3.  As noted in the attached CV, Ahmed currently works as a BBC journalist in Puntland and as a media consultant for Relief International, an international

---

[9]    We note that the Sentencing Commission now believes that courts should weigh youth as a possible basis for a downward departure.  See U.S.S.G. § 5H1.1.  We ask that the Court consider the Commission's new policy in this regard in deciding the appropriate sentence for Abduwali under 18 U.S.C. § 3553(a).

[10]    As a result of the plea agreement, the defense chose not to submit an affirmation from Abduwali about his age.  In consultation with the government, the defense was concerned that having Abduwali discuss his age could be seen as a violation of the plea agreement, given that Abduwali agreed to be prosecuted as an adult under the law.

As the government has pointed out, Abduwali gave a number of different ages to the authorities before his presentment in this district.  However, the records from the U.S.S. Bainbridge's deck log make clear that the very first age he gave to U.S. authorities was 16.  See Exhibit L (the notation on the deck log is "ONE PIRATE IS ONBOARD. 16 YRS OLD").  This is the age he gave upon transferring to the Bainbridge for treatment of his hand.

humanitarian organization.  See Exhibit K.  He has a bachelor's degree in finance and investment analysis from Amity University in India through distance learning.  Id.

The collapse of the central government in Somalia twenty years ago means that there is no official record of Abduwali's age.  As the U.S. State Department has explained, "without established birth registration systems, it is often difficult to determine the exact age of persons" in Somalia.  U.S. Department of State, 2009 Human Rights Reports: Somalia," (hereinafter "State Department 2009 Report") March 11, 2010, p. 13.[11]  Today, nearly twenty years after the collapse of Somalia's central government, births are still "not registered in Puntland or in southern and central Somalia."  Id. at p. 26.  Because of this, as Professor Cassanelli notes, most Somali youth do not even know their own ages.  See Exhibit A ¶ 9.

Although Abduwali's birth-year was not recorded in Somalia, there is no doubt he is young.  Dental records at the MCC, dated June 11, 2009, indicate that he was most likely between ages 17 and 21 at that time (a couple of months after his arrest).  See PSR ¶ 93; Exhibit C at p. 2.  However, there have been studies showing that the teeth of Africans develop more quickly than those of European populations, making Africans appear (to Western eyes) older than they actually are.  In one such study, for example, researches found that African subjects were generally 1/2 - 2 years younger than their Caucasian counterparts when they reached the "same stages of dental development."  A. Olze, "Comparative Study on the Effect of Ethnicity on Wisdom Tooth Eruption," 121 International Journal of Legal Medicine 445, 447 April 24, 2007.  Another study

---

[11]     This report is available at http://www.state.gov/g/drl/rls/hrrpt/2009/af/135976.htm (accessed February 1, 2011).

emphasized that the third molars do not emerge before the 17th year of life in European populations, but may emerge as early as age 13 in other populations.  Andreas Olze, "Studies of the Chronological Course of Wisdom Tooth Eruption in a Black African Population," 52 Journal of Forensic Science 1161, 1162-63, September 7, 2007.  In particular, the study noted that the third molars develop as early as age 13 among Black Ugandan males – in a country not far from Somalia.  Id. at 1163.  Another study, conducted among children living in England, noted that "Somali children are significantly more dentally advanced than their Caucasian peers," highlighting the "need for population-specific dental development standards for accurate dental assessment."  Lesley E. Davidson & Helen D. Rodd, "Interrelationship Between Dental Age and Chronological Age in Somali Children," *Community Dental Health*, March 16, 2000.  These studies are attached as Exhibit M.

In addition, although Abduwali played a leadership role in the attack of the Maersk Alabama, which might seem unusual given his youth, his role must be seen in context.  Abduwali had to become independent quickly as a young boy simply to eat and take care of himself.  He had did not grow up in a country with the same concept of childhood that we have in the United States.  He began to work at age 8 and left home at age 11.  As Professor Cassanelli explains, "Somali youth without wealthy or well-placed relatives must learn to fend for themselves from an early age."  Exhibit A ¶ 9.  Without guidance from their elders, these children and adolescents must "hustle for themselves, relying on the approval and support of peer groups and seeking status and self-worth from the material goods that they can accumulate by licit or (more often) illicit means."  Id.

This lack of a protected childhood – and the kinds of roles assigned to children and adolescents – are evident in the concerns expressed by the United States and others about the widespread use of child soldiers in Somalia.  In its 2009 report on Somalia, the U.S. State Department noted that the recruitment of child soldiers was a longstanding practice in Somalia, a tradition that continued not only in clan militias and in anti-government groups, but also in western-backed government forces (the forces of the "Transitional Federal Government").  See State Department 2009 Report at p. 13.  In addition, child labor is widespread throughout Somalia.  Id. at 30.  According to UNICEF figures, for example, 36 percent of all children between the ages of five and 14 were in the workforce between 1999 and 2005.  Id.

**B.          Abduwali's Purely Economic Motivations**

Poverty was the sole motivation behind Abduwali's involvement in this case.  He was born into a chaotic country in the midst of a devastating civil war.  After the collapse of the central government, "subsequent fighting among rival faction leaders resulted in the killing, dislocation, and starvation of thousands of persons."  See U.S. Department of State, Bureau of Democracy, Human Rights and Labor, "Somalia: 1999 Country Reports on Human Rights Practices," February 23, 2000, at p. 1.[12]  As Dr. Kroll explains in his report, Abduwali's early childhood was "spent in an unsafe land of warfare, famine and sporadic clan militia raids."  Exhibit C at p. 3.

---

[12]     This report is available at http://www.state.gov/g/drl/rls/hrrpt/1999/271.htm (accessed February 1, 2011).

As a child, Abduwali suffered from malnutrition. After his parents divorced, his mother simply could not feed him.  She left him in the countryside with his grandfather, who also was extremely poor.  Rotating between his grandfather, father, and some of his uncles, the dominant memory of his childhood is the constant hunger that he experienced.  See PSR ¶ 96 (noting that Abduwali felt "unable to describe the agony he went through as a child" but that his predominant memory was of being hungry).  As an eight-year-old boy, naked and alone, he undertook a lengthy journey to try to find his mother to build a better life for himself.

After eventually reuniting with his mother in Bosaso, Abduwali was working independently by age 11 in hopes of earning enough money to eat.  He worked a series of odd-jobs in Bosaso, but this city proved to be very dangerous.  At age 13, Abduwali went to the coastal village of Garacad to become a fisherman. After learning this trade, he was eventually drawn into a much more lucrative piracy network, which was operating out of Garacad.  As a result of this chain of events, Abduwali was among the four Somalis who boarded the Maersk Alabama on April 8, 2009.

Although Abduwali's involvement in the Garacad piracy network cannot be condoned in any way, it is important to recognize that he did not act out of any animosity toward the United States.  As he explained in his plea colloquy, Abduwali had no idea that the Maersk Alabama was a U.S.-flagged ship before he boarded the vessel.  See Plea Transcript, May 18, 2010, at p. 24.  At the time, he could not have identified an American flag.  Id.  His sole motivation was money.  No-one was meant to get hurt.  As Professor Cassanelli noted in his report:

> The objectives of [piracy raids in Somalia] are purely financial: there is no evidence of religious or other ideological motivation behind the pirate attacks.  And despite frequent

threats to the lives of hostages if ransom demands are not met, no foreigners have been arbitrarily killed in the hundreds of reported incidents of Somali piracy over the past two decades.

Exhibit A ¶ 1.

In his psychiatric evaluation of Abduwali, Dr. Kroll offered a strikingly similar

assessment:

> It is further my opinion that Mr. Muse was not ideologically driven in his piracy crimes and bears no ill-will toward the United States.  He does have high status in his clan and carried no authority that has any influence on future piracy plans or actions.  He was one of thousands of internally-displaced Somali individuals who followed the path of armed robbery open to them, in his case on the high seas.

Exhibit C at p. 20.  Dr. Kroll explained that this assessment of Abduwali was "not a plea for his

innocence," but instead "an effort to perceive him as a particularly psychologically vulnerable

young Somali man."  Id.

In his plea allocution, Abduwali emphasized that he would never have gotten

involved in the incident involving the Maersk Alabama except for the conditions in Somalia.  He

recognized that his actions were very wrong.  He tried his best to explain these sentiments through

the interpreter: "What we did was wrong.  I'm very, very sorry about the wrong that we did.  And

all of this is because of the problems in Somalia."  See PSR ¶ 56.

### C.        Conditions in Somalia

In this context, we ask the Court to consider the abysmal conditions in Somalia that drive

young people like Abduwali towards piracy.  Somalia is a failed state twenty years after the

collapse of its central government.  In June 2010, *Foreign Policy* magazine ranked Somalia at the

very top of its index of failed states – for the third year in a row.  See "The 2010 Failed States

Index," *Foreign Policy*, June 21, 2010.[13]

Hunger and malnutrition remain pervasive.  The U.N. Secretary General issued a report on

Somalia on April 16, 2009, four days after Abduwali was taken into custody.  See United Nations

Security Council, "Report of the Secretary-General on Somalia Pursuant to Security Council

Resolution 1863," April 16, 2009, at ¶ 11.[14]  In this report, the Secretary General used the example

of childhood malnutrition to illustrate the depths of the prevailing crisis:

> The humanitarian crisis in Somalia is deepening, owing to the combined effects of
> drought, conflict, inflation and continued lack of humanitarian access.  Some 3.25 million
> people are in need of humanitarian assistance.  One in six Somali children under 5 is
> acutely malnourished.  With an estimated median prevalence of 18.5 per cent global acute
> malnutrition and 2.5 per cent severe acute malnutrition, acute malnutrition remains
> consistently and significantly beyond the emergency threshold (15 per cent) according to
> reports of the Food Security Assessment Unit of the Food and Agriculture Organization of
> the United Nations.  In total, 330,000 children in Somalia are acutely malnourished, of
> whom 96,000 are severely malnourished (at nine times greater risk of death than non-
> malnourished children) and in need of assistance.

Id.  The Secretary General also reported that the Mudug region (the home of Abduwali and his

family) was one of the "worst-affected" owing to "the continued and worsening drought."  United

---

[13]     This index – which was created as a collaboration between *Foreign Policy* and the
Fund for Peace – is available on *Foreign Policy*'s website at:
http://www.foreignpolicy.com/articles/2010/06/21/2010_failed_states_index_interactive_map_an
d_rankings (accessed January 28, 2011).

[14]     This report is available at
http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N09/302/41/PDF/N0930241.pdf?OpenElement
(accessed February 1, 2011).

Nations Security Council, "Report of the Secretary General on the Situation in Somalia," March 9, 2009 at ¶ 72.[15]

In his April 2009 report, the Secretary General emphasized that "the security situation in Somalia remains extremely volatile and unpredictable." See "Report of the Secretary-General on Somalia Pursuant to Security Council Resolution 1863," April 16, 2009, ¶ 5. Out of a population of 7 million, approximately 1.3 million Somalis are internally displaced. Id. ¶ 12. A January 2009 U.N. assessment mission to Somalia described the human rights situation in Somalia as "among the most neglected in the world." See "Report of the Secretary General on the Situation in Somalia," March 9, 2009 at ¶ 44.

These kinds of living conditions have exacted a continuing physical toll on Abduwali. Since his arrest, for example, the BOP has extracted seven of his teeth. See PSR ¶ 105. He needs to have another two teeth extracted. Id. He has difficulty chewing. Id. Dental problems like these are a classic symptom of malnutrition and the absence of medical care.

### D.       Official Sanctioning of Piracy Networks in Puntland

We also ask the Court to consider the fact that piracy networks in Puntland operate with a large degree of official sanction and facilitation. Just one month before Abduwali's capture, the U.N. Secretary General observed that "[t]here are increasing reports of complicity by members of the Somali region of "Puntland" administration in piracy activities." United Nations Security Council, "Report of the Secretary-General Pursuant to Security Council Resolution 1846, March

---

[15]       This report is available at
http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N09/252/48/PDF/N0925248.pdf?OpenElement
(accessed February 1, 2011).

16, 2009 at ¶ 7.   Reports of complicity were increasing despite announcements by the leader of

Puntland about his government's efforts to combat piracy – in response to an avalanche of

international (including U.N.)  pressure.  In its 2009 Report on Somalia, the U.S. Department of

State observed that despite the anti-piracy efforts of some of Puntland's political leaders,

"prominent persons linked with piracy circulated freely and lived ostentatiously in Puntland."  See

State Department 2009 Report at p. 14.  In 2009, the State Department also emphasized that

"official corruption was endemic throughout the country." Id. at p. 24.

In his report, Professor Cassanelli emphasizes that modern-day piracy in Somalia has

become "deeply embedded in the local politics and economies of Puntland and central Somalia."

See Exhibit A ¶ 6.  "Pirates operate with the knowledge and complicity of political officials and

law-enforcement personnel in the seaside villages from which the ventures are launched." Id.   He

explains that the predominance of piracy operations out of Puntland is an indication of the degree

to which these operations are sanctioned:

> [I]t should be noted that virtually all documented pirate attacks over the past ten years
> have been launched from coastal districts which belong to Puntland or to the various
> regional authorities which compete for control of central Somalia.  Virtually no attacks
> have originated in the coastal districts under the jurisdiction of the Somaliland
> government, even though the latter are adjacent to the Gulf of Aden where the sea lanes
> are much closer to the Somali coast.  This suggests that regional governments (like the one
> in Somaliland) have the capacity to curtail potential pirate operatives along their coasts.  In
> contrast, it is well-known that the Puntland administration has been reluctant to crack
> down on piracy operations from coastal havens like . . . Garacad for fear of alienating the
> clans which inhabit those districts and hence of losing their political support.

Id. ¶ 4. Professor Cassanelli reports that in Puntland, "piracy continues with the tacit backing of

authorities at all levels . . . and so local pirates there enjoy, if not universal approbation, at least a

certain legitimacy and acceptability in the eyes of their local communities." Id.  Indeed, local

power-brokers would expect some share of the profits – profits which would also benefit the pirates' own clans, families, and broader communities.  Id. ¶ 5.

### E.        Abduwali's Relatively Low Status

Abduwali had relatively low status in the piracy operations.  As Professor Cassanelli explains, modern-day Somali piracy is facilitated by networks of supply and finance, which extend well beyond Somalia to Yemen, the Gulf States, and Kenya.  See Exhibit A ¶ 2; see also United Nations Security Council, "Report of the Secretary General Pursuant to Security Council Resolution 1846 (2008)," March 16, 2009 at ¶ 7 (noting that some of the piracy organizations in Somalia now rival established Somali authorities in terms of their military capabilities and resource bases).  While most of the expeditions are manned by local Somalis, "those who undertake the raids on the high seas are generally not the planners nor the most highly compensated members of these complex operations."  See Exhibit A ¶ 2.  They are "hired hands," who only get paid if they are successful.  Id.; see also Exhibit N ("Interpol: Somali Pirates Controlled by Syndicates," Mail & Guardian online, October 14, 2009 (noting that those who take part in Somali piracy operations are often teenagers from poor and disadvantaged backgrounds)).  Unlike the organizers, they must risk their own personal safety.

Abduwali was among this group of hired hands.  Although he bragged to Victor about his prior piracy successes, he was simply trying to bolster himself.  There is no evidence to support these claims.  Indeed, Abduwali was so poor when he was living in Garacad that he generally slept outside on the beach.  He was so poor that although he had gotten married six months before the Maersk incident he could not afford to establish a home for his wife.  Accordingly, the

marriage went unconsummated and his wife continued to live with her mother.   Now, because of the sentence he expects to receive, he has divorced his wife to set her free from her responsibility to him.  See PSR ¶ 102.

Given Abduwali's poverty and relatively low status, a sentence of 27 years seems amply sufficient to protect the public and to provide both specific and general deterrence under 18 U.S.C. § 3553(a).  We respectfully submit that imposing an additional seven years would not provide the kind of incremental deterrence needed to justify a higher sentence.  Any analysis of the need for deterrence must also weigh the fact that the Navy killed all three of Abduwali's companions, an outcome that received heavy publicity in Somalia and around the world.

**F.        Severe Mental Health Problems While In Prison**

We ask the Court to consider Dr. Kroll's psychiatric evaluation of Abduwali, which documents the significant mental health problems Abduwali has experienced during his almost two years in BOP custody.  See Exhibit C.  Dr. Kroll has extensive experience in working with refugees from Somalia and other countries.  Id. at p. 1.  In 2008 and 2009, he provided training workshops on war-zone refugee issues for the Department of Homeland Security in eight major American cities.  Id.

Dr. Kroll interviewed Abduwali on August 16, 2010 at the MCC.  Id.  At the time, Abduwali had been under the SAMs order for approximately eight months.  In his report, Dr. Kroll discusses the effects of the SAMs order on Abduwali, relying both on his observations of Abduwali and on detailed medical records provided by the BOP. ████████████







In his report, Dr. Kroll put Abduwali's mental health problems in context by describing the "overwhelming scientific evidence" about the devastating effects of prolonged isolation on "the human personality and psychological well-being." Id. at p. 12.  These effects are "magnified in more vulnerable populations, including adolescents and young adults whose social development, inner resilience and strength to withstand stress, and sense of identity have not yet solidified." Id.  The effects are then further magnified for youth from cultures (like the clan-based culture of Somalia) where one's mental health depends less on personal identity and the development of inner resources and more on "one's relationship to a family and kin group, which defines one's sense of self and identity." Id.  Thus, for a young Somali - who was cut off from his family, clan, and culture and placed in a completely foreign institutional environment – the mental health consequences of prolonged isolation were severe.

In considering how much punishment and deterrence is necessary in this case, we ask the Court to consider Abduwali's experiences of confinement over the last two years.  See, e.g.,

United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001) (noting that "pre-sentence confinement conditions may in appropriate cases" be a basis for a lower sentence).  As evidenced by his mental health records, Abduwali has already suffered greatly since his offense.  Although we had hoped his mental health would improve – as he is no longer under SAMs confinement – MCC staff have recently decided that he will remain in isolation pending review by the Warden.  Defense counsel is conferring with BOP staff about the decision to keep him in isolation, which we intend to challenge.  No matter what, however, Abduwali's experiences in prison will continue to be extremely difficult and lonely.  He is far removed from his family and from everything he has ever known.

<b>CONCLUSION</b>

Abduwali would not be before the Court for sentencing if not for the chaotic conditions prevalent in Somalia and the hunger and deprivation he has experienced in his young life.  We understand that significant punishment is warranted given the suffering endured by the members of the crew, including Captain Richard Phillips.  However, we ask the Court to evaluate Abduwali's involvement in this case with an appreciation of the lack of opportunities available to him, the violent culture he experienced in Somalia, and the official and community sanctioning of piracy within Puntland.  We also ask the Court to consider the extreme mental health problems he has endured at the MCC and the continuing isolation he will experience.  Given all of the circumstances of this case, the defense respectfully requests a sentence of 27 years as sufficient for the purposes of sentencing.

In terms of designation, we believe that the BOP should seriously consider Abduwali's youth and the mental health problems he has experienced.  We respectfully ask that the Court recommend that the BOP take these factors into account.  If possible, Abduwali should be housed with other Somali speakers.  We also ask that the Court recommend that Abduwali be given educational opportunities, including intensive English-language instruction, to lessen his isolation.

Dated:  New York, New York
       February 2, 2011

                                  LEONARD F. JOY, ESQ.
                                  Federal Defenders of New York, Inc.
                                  Attorney for Defendant
                                  **ABDUWALI ABDUKHADIR MUSE**
                                  52 Duane Street - 10th Floor
                                  New York, New York  10007
                                  Tel.:  (212) 417-8744

                                  *Fiona Doherty*
                                  *Philip W...* 
                                  *Deirdre Von Dornum ( by M...)*
                                  _____
                                  **Fiona Doherty, Esq.**
                                  **Philip Weinstein, Esq.**
                                  **Deirdre von Dornum, Esq.**
                                  Of <u>Counsel</u>

TO:     PREET BHARARA, ESQ.
          United States Attorney
          Southern District of New York
          One Saint Andrew's Plaza
          New York, New York 10007
          Attn: **Brendan McGuire, Esq.**
                **Jeffrey Brown, Esq.**
                Assistant United States Attorneys