UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                              :

UNITED STATES OF AMERICA      :
                              :

      - v. -                  :     S1 09 Cr. 512 (LAP)
                              :

ABDUWALI ABDUKHADIR MUSE,   :
                              :

            Defendant.      :
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN CONNECTION WITH THE SENTENCING OF ABDUWALI ABDUKHADIR MUSE

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

BRENDAN R. MCGUIRE
JEFFREY A. BROWN
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.   Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    A.   Muse's Hijacking of the Serenity . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    B.   Muse's Hijacking of the Win Far 161 . . . . . . . . . . . . . . . . . . . . . . . . .  6

    C.   Muse's Hijacking of the Maersk Alabama . . . . . . . . . . . . . . . . . . . . . .  8

    D.   Muse's Kidnaping of Captain Phillips. . . . . . . . . . . . . . . . . . . . . . . . . .  10

    E.   Muse's Post-Arrest Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

    F.   Muse's Presentment and Age Hearing . . . . . . . . . . . . . . . . . . . . . . . . .  13

    G.   The Hostages on the Serenity And Win Far . . . . . . . . . . . . . . . . . . . . .  16

    H.   Muse's Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

II.  Applicable Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

III. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

    A.   The Applicable Guidelines Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

    B.   The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence . . . . . . . . . . .  20

        1.   Muse's Offenses Are Extraordinary . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

        2.   The Public Must Be Protected From Muse . . . . . . . . . . . . . . . . . . . . . .  28

        3.   The Need For Specific and General Deterrence is Clear . . . . . . . . . . . .  31

        4.   Muse's Arguments are Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

# TABLE OF AUTHORITIES

*Cases:*

Gall v. United States, 552 U.S. 46 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

United States v. Alvarez-Porras, 643 F.2d 54 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . .   33

United States v. Booker, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

United States v. Carty, 264 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

United States v. Carty, 95 Cr. 973 (S.D.N.Y. Nov. 9, 2001) . . . . . . . . . . . . . . . . . . . . .   36

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . .   18

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . .   17, 18, 20

United States v. Green, 04 Cr. 424-14, 2006 WL 3478340, at *4
(S.D.N.Y. Dec. 1, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

United States v. Mateo, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . .   35

United States v. Mohammed Modin Hassen, et al., Criminal
No. 2:10 Cr. 56 (E.D. Va.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

United States v. Naranjo-Ramirez, No. 09-4343-cr, 2010 WL 4723301,
at *2, *4 (2d Cir. Nov. 23, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

United States v. Torres-Teyer, 322 F. Supp. 2d 359 (S.D.N.Y. 2004) . . . . . . . . . . . . . .   36


*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 20, 28, 31

U.S.S.G. § 2A4.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

U.S.S.G. § 2A4.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

U.S.S.G. § 3B1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

U.S.S.G. §§ 3D1.2(a) and 3D1.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. §§ 3D1.3(a) and 2A4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. §§ 3E1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                            :
UNITED STATES OF AMERICA                    :
                                            :
        - v. -                              :        S1 09 Cr. 512 (LAP)
                                            :
ABDUWALI ABDUKHADIR MUSE,                   :
                                            :
                Defendant.                  :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN CONNECTION
## WITH THE SENTENCING OF ABDUWALI ABDUKHADIR MUSE

The Government respectfully submits this memorandum in connection with the

sentencing of Abduwali Abdukhadir Muse ("Muse") scheduled for February 16, 2011.   Because

of the extraordinarily depraved and violent nature of Muse's crimes, the Government requests

that the Court impose a sentence at the top of the stipulated sentencing range – 405 months'

imprisonment.

During a five-week period in the spring of 2009, Muse, a Somali citizen, led a gang of

pirates on a series of violent attacks against three different ships that were navigating in the

Indian Ocean off the coast of Somalia.  During each of these attacks, Muse and his fellow pirates

hijacked the targeted ship by pulling alongside it in a smaller motor boat; firing machine guns at

the ship and its defenseless crewmembers; and then demanding, at gunpoint, that the crew stop

the ship.  Once onboard, Muse, as the acknowledged leader of the gang, assumed command of

the ship and directed his men to corral the ship's crewmembers together at gunpoint.

Muse, an experienced seaman who bragged to multiple hostages that he had collected

millions of dollars in ransoms from numerous hijackings in the past, proceeded to use each ship

as a base from which to launch the next hijacking. Muse ordered the first captain to tie his ship to the back of the second hijacked ship as Muse and his gang trolled the ocean for weeks for their next target. And all the while, he held the ships' captains and crewmembers hostage – more than thirty men - and threatened to kill them if they did not obey his orders. According to one hostage, Muse assembled an improvised explosive device using a coffee jar, screws and pointed pieces from broken forks in front of him, placed it near the hostage, and told the hostage that he intended to detonate it if the authorities located them.

On April 8, 2009, approximately one month after hijacking the first two ships, Muse and his gang set their sights on the Maersk Alabama, a five-hundred-foot long U.S.-flagged container ship operated by a crew of twenty American sailors. Using a portable ladder and machineguns, Muse and three other pirates boarded the Maersk Alabama and took command of the ship, as they had during the two prior hijackings. However, the resistance mounted by the Maersk Alabama crewmembers ultimately led Muse and his men to kidnap Richard Phillips, the captain of the Maersk Alabama, and hold him hostage in an enclosed motorized life boat that was launched from the ship.

For nearly four full days in the middle of the Indian Ocean, Muse and the three other pirates kept a gun trained on Captain Phillips and repeatedly threatened to kill him. Muse himself held his gun to Captain Phillips' head, pulled the trigger, and then laughed when the gun clicked but did not fire. During this period, Muse directed his crew to bind Captain Phillips' wrists and ankles with rope, and he told Captain Phillips that he planned to bury him in a shallow area of the ocean. At one point, Captain Phillips attempted to escape by jumping into the water whereupon one of Muse's men fired his machinegun into the water until Captain Phillips

2

surrendered. And thereafter one of the pirates hit Captain Phillips so hard in the head that he lost consciousness, causing him to believe that he had been shot in the head.

After four days, Muse asked to leave the life boat and boarded one of the U.S. Navy vessels that was on the scene. Once on board, Muse received medical treatment from U.S. Navy doctors and insisted that he and his men be granted safe passage to Somalia before they released Captain Phillips. After several more hours of negotiations during which Muse and his three men refused to release Captain Phillips, members of the U.S. Navy shot the three pirates on the life boat and rescued Captain Phillips. Muse was taken into custody immediately thereafter. After his arrest and after waiving his Miranda rights, Muse stated, among other things, that he was forced to participate in the hijacking of the Maersk Alabama by the three other pirates who were with him. Muse also told investigators that he was 15 years old but then began laughing and stated he was between 18 and 19 years old.

As a result of the foregoing conduct, Muse was charged in a ten-count indictment with the following crimes: (1) piracy on the high seas, in violation of Title 18, United States Code, Section 1651; (2) hijacking a ship, in violation of Title 18, United States Code, Section 2280; (3) conspiracy to hijack three ships, in violation of Title 18, United States Code, Section 2280; (4) possession of machine guns during and in relation to the crime of violence charged in Count Two, in violation of Title 18, United States Code, Section 924(c); (5) hostage taking, in violation of Title 18, United States Code, Section 1203; (6) conspiracy to engage in hostage taking, in violation of Title 18, United States Code, Section 1203; (7) possession of machine guns during and in relation to the crime of violence charged in Count Five, in violation of Title 18, United States Code, Section 924(c); (8) kidnaping, in violation of Title 18, United States Code, Section

3

1201; (9) conspiracy to engage in kidnaping, in violation of Title 18, United States Code, Section 1201; and (10) possession of machine guns during and in relation to the crime of violence charged in Count Eight, in violation of Title 18, United States Code, Section 924(c).

On May 18, 2010, Muse pled guilty to Counts Two, Three, Five, Six, Eight and Nine pursuant to a plea agreement under which the Government elected not to proceed on Count One, which carries a mandatory life sentence for piracy. Based on that agreement, Muse faces a stipulated sentencing range of 324 to 405 months' imprisonment. For the reasons set forth below, the Government respectfully submits that a sentence of no less than 405 months' imprisonment is appropriate.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Muse's Hijacking of the Serenity

The SY Serenity (the "Serenity") is a privately-owned thirty-eight foot yacht that was docked in the Seychelles in 2009.[1] On March 4, 2009, an independent captain, who had been hired by the owner of the Serenity to sail the Serenity to Madagascar, and his crewmember were sailing the Serenity in the waters near the Seychelles. At approximately 2:00 p.m., the Serenity captain and his crewmember were attacked by a gang of nine pirates in a small boat. During an interview with an agent of the U.S. Naval Criminal Investigative Service, the Serenity captain was shown a photo array of six photographs and asked if he recognized the leader of the pirate gang. The Serenity captain identified Muse as the leader and the first one to board the Serenity.

---

[1] The Republic of Seychelles is comprised of an archipelago of 115 islands in the Indian Ocean approximately 1,000 miles east of mainland Africa.

4

According to the Serenity captain, Muse said the pirates were members of the "Indian Ocean Coast Guard," and fired his gun in the air as he boarded the ship. Muse then asked the Serenity captain for his satellite phone. Muse and his gang then robbed the captain and his crewmember of their possessions, including their watches, rings and clothing.

Muse told the Serenity captain that he was looking for a French ship and directed the Serenity captain to sail toward a nearby island where Muse believed the French ship was anchored. The pirates tied their small boat to the Serenity and the Serenity captain began to sail toward the island. On the way, Muse saw a light in the distance and told the Serenity captain to stop. Muse and some of the pirates got into their small boat and drove toward the light. They returned later with another man who they had apparently taken from another ship. Muse then told the Serenity captain to take this man on board the Serenity. When the Serenity captain refused, Muse threatened to kill him and ordered him to sail for Somalia.

On the way to Somalia, Muse saw another ship and again ordered the Serenity captain to stop the Serenity. Muse and some other pirates then took their small boat and attempted to hijack the ship but they were repelled, the Serenity captain was told by one of Muse's men, because the crew of the ship had guns. After several days, the Serenity reached the coast of Somalia, first near Mogadishu and then near Garacad. At this point, Muse told the Serenity captain that he wanted $3 million for his release. In response, the Serenity captain told Muse that neither he nor the Seychelles government had any money for a ransom payment.

Several days later, Muse approached the Serenity captain while laughing and pointing a gun at his head. Muse said, "I make you spare part." When the Serenity captain asked one of Muse's men what Muse was saying, he advised that Muse meant that he would cut up the

5

Serenity captain in spare parts and sell his organs. Upon hearing this, the Serenity captain began to cry and asked Muse why he kidnaped people. In response, Muse laughed at him and said "Seychelles no money, you take us to high seas." The Serenity captain became upset at the idea of taking the Serenity back out into the open water because, at this point, only one of its engines was functioning. Muse then told the Serenity captain that he would kill him if he did not follow Muse's orders. Later that day, the Serenity departed from the Somali coast, towing the pirates' smaller boat and searching for the next ship to attack.

During this trip out toward the middle of the Indian Ocean, Muse told the Serenity captain that he would release him if he helped Muse hijack a big ship. But if they did not hijack a big ship, according to Muse, he would kill the Serenity captain. At one point during this trip, which lasted several days, Muse, in front of the Serenity captain, built an improvised explosive device using a glass coffee jar, screws and pointed pieces from broken forks. Muse placed the device near where the Serenity captain was sitting, and told him that he intended to detonate it and kill the Serenity captain if the Serenity was located by the authorities.

B.    **Muse's Hijacking of the Win Far 161**

The Win Far 161 (the "Win Far") is a 180-foot fishing vessel owned by a Taiwanese company that was operating in the Indian Ocean in 2009. On April 6, 2009, approximately one week after the Serenity had left the coast of Somalia, Muse spotted the Win Far from the deck of the Serenity. Muse and three other pirates got into their smaller motor boat and headed toward the Win Far. At this time, the Win Far was being operated by a crew of thirty men – seventeen of the crew members were from the Philippines, six were from Indonesia, five were from China, and two were from Taiwan.

6

According to three of those crew members who were interviewed by members of the New York Joint Terrorism Task Force ("JTTF"), on the morning of April 6, 2009, a speed boat full of pirates began firing at the Win Far. Shortly thereafter, the pirates boarded the Win Far, some armed with AK-47 machineguns, and, according to one crew member, one pirate was equipped with a rocket-propelled grenade launcher on his back. During their respective interviews with members of the JTTF, each of the three crew members from the Win Far was shown the same photo array that was shown to the Serenity captain. All three crew members identified Muse as the English-speaking leader of the pirates.[2] According to two of the crew members, Muse was carrying a gun when he boarded the Win Far (the third crewmember did not remember Muse carrying a gun), and the pirates robbed the crew members at gun point after boarding.[3]

Later that day, according to the three Win Far crew members, a second group of pirates boarded the Win Far along with three hostages from the Seychelles that they brought with them. At this point, according to the Serenity captain, the Serenity and the pirates' motor boat were tied to the rear of the Win Far and the Win Far captain was directed to sail to Somalia.

All three crew members from the Win Far and the Serenity captain recounted that within days of the hijacking of the Win Far on April 6, 2009, they saw Muse and three other pirates leave the Win Far in the pirates' motor boat and never saw them return.[4]

_____

[2] One of the crew members said he was not 100 percent certain of his identification.

[3] A wallet containing identification documents and family photos belonging to one of the Win Far crew members was recovered from the life boat of the Maersk Alabama after the rescue of Captain Phillips on April 12, 2009. During his interview, the Win Far crewmember identified the wallet and its contents as his own.

[4] The Serenity captain identified two of the pirates who left with Muse as "Ali" and
(continued...)

### C.    Muse's Hijacking of the Maersk Alabama

On April 8, 2009, the Maersk Alabama, a five-hundred-foot long container ship owned by Maersk Lines Limited of Norfolk, Virginia, was en route from the Republic of Djibouti for Mombasa, Kenya.  The ship, which was several hundred miles off the coast of Somalia in the Indian Ocean, was being operated by a crew of twenty sailors, all of whom were United States citizens.  The following account of the events of that day are based upon law enforcement interviews of the captain and the crew of the Maersk Alabama.

At approximately 7:30 a.m. on April 8, 2009, Muse and his three men approached the Maersk Alabama in their motor boat.  The pirates fired guns at the ship as they neared.  Muse used a portable ladder to board the Maersk Alabama and was the first pirate to get onto the deck of the ship.  Muse, who was armed, quickly entered the bridge of the ship and told the captain, Richard Phillips, to stop the ship.[4]  Before Muse had boarded the Maersk Alabama, most of the crew had retreated to a designated safe room within the interior of the ship.

The three other pirates ultimately boarded the Maersk Alabama, and all of them were armed as well.  The motor boat used by the pirates to reach the Maersk Alabama was damaged and sunk after all of the pirates boarded the Maersk Alabama.  All four pirates generally stayed in or near the bridge during their nearly twelve-hour stay on the ship.  Muse demanded that Captain Phillips order the crew to come to the bridge.  The captain complied but the majority of the crew

---

[4](...continued)
"Noor."  This is consistent with the true names of two of the deceased pirates found on the life boat after Captain Phillips was rescued.

[4]  Larger container ships are typically operated and controlled from the bridge, which is an enclosed room in the rear, raised part of the ship that provides a view of the deck of the ship and the waters around the ship.

remained in the safe room.  Based on their training, the crew understood that they should stay in the safe room.  Muse also demanded money from Captain Phillips who provided the pirates with approximately $30,000 in cash from the ship's safe.

Certain members of the crew, including the chief engineer, shut down all power on the ship shortly after Muse and the three other pirates boarded.  As a result, the ship stopped moving, there were no lights or air conditioning within the interior of the ship and various alarms were triggered.  Muse later began to canvass the ship with one of the crew members searching for the majority of the crew who were hiding in the safe room.  The crew member convinced Muse that he should leave his gun on the bridge with the other pirates because the crew members in hiding would be too afraid to surrender if Muse was armed.  During one of these walks to the darkened interior of the ship, another crew member tackled Muse and was able to subdue him and tie his hands with wire.  He then took Muse to the safe room where he was guarded by the rest of the crew.

When the other three pirates realized that Muse had been captured, they demanded his return.  They ultimately agreed to leave the Maersk Alabama, in an enclosed motorized life boat that was on board the Maersk Alabama, if Muse was returned to them.  The crew launched the life boat for the pirates and provided them with food and additional fuel, among other things.  Captain Phillips boarded the life boat with the three other pirates, and the crew members allowed Muse to board the life boat.  Captain Phillips then showed Muse how to operate the life boat and then attempted to leave the life boat.  At that time, Muse reneged on his agreement with the crew, and refused to allow Captain Phillips to get out of the life boat and return to the Maersk Alabama.  The life boat then navigated a short distance away from the Maersk Alabama with all

9

four pirates and Captain Phillips on board.

**D.    Muse's Kidnaping of Captain Phillips**

Several hours later, on April 9, 2009, the USS Bainbridge, a U.S. Navy destroyer, arrived at the scene to coordinate the safe passage of the Maersk Alabama and its nineteen crew members to Kenya as well as the rescue of Captain Phillips from the life boat. Two other United States Navy vessels – the USS Boxer and the USS Halyburton – ultimately reached the scene as well. Over the course of the following three days, there were hours of radio communications between Muse from the life boat and hostage negotiators on the USS Bainbridge. During these recorded communications, Muse repeatedly threatened to kill Captain Phillips and refused to release him unless and until he and his group were given safe passage to Somalia.

One night, Captain Phillips attempted to escape from the life boat by jumping into the water and swimming toward one of the U.S. Navy vessels. In response, the pirates shot an AK-47 into the water at him until he surrendered. The next day, Muse told the negotiators on the USS Bainbridge, "We are going to punish him now. We are going to tie him." Thereafter, Muse and his men beat Captain Phillips and yelled at him. They also bound his hands and feet with rope and tied his hands to the interior of the life boat.

Muse also accused Captain Phillips of being dirty and performed a religious ritual involving ropes, which the captain believed was going to end in his death. Muse told Captain Phillips that he was going to bury him in a shallow area of the ocean because he was dirty. At this time, Muse also said, "Not tonight. Tomorrow night." The captain understood Muse to mean that Muse intended to kill him the following night.

Muse also explained to the captain that he liked having hijacked an American ship and

wanted to kill Americans. Muse also told Captain Phillips about previous hijackings that he had committed, which had yielded him millions of dollars in ransom payments. Muse said that a ransom payment of only a few million dollars for the captain was not worth it and that he would rather kill the captain than accept that amount. After Captain Phillips' escape attempt, Muse and his men also deprived him of food and water. In addition, at a certain point, one of the pirates hit the captain so hard in the head that he thought he had been shot as he lost consciousness and began to bleed.

After Muse and his men tied him up, Captain Phillips told them that other pirates would be upset with them for what they were doing. In response, Muse pointed his pistol at Captain Phillips' head and pulled the trigger. After it clicked and did not fire, Muse laughed. Thereafter, Captain Phillips began to chew on the ropes tied around his wrists and legs. This upset the pirates to the point that they stuck a stick inside Captain Phillips' mouth. After doing that, Muse called the captain "stick mouth" and shined a flashlight into his mouth to make sure the stick stayed in position.

On the morning of April 12, 2009, Muse asked to leave the life boat and board the USS Bainbridge. The three other pirates remained in the life boat with Captain Phillips. Once on board the USS Bainbridge, Muse received medical treatment for a cut on his hand and continued to negotiate for the safe passage of his crew to Somalia. The pirates on the life boat ultimately agreed to allow the USS Bainbridge to tow them because the life boat had run out of fuel. After several more hours of negotiations involving the three pirates on the life boat, Muse on the deck of the USS Bainbridge, and Government personnel on the USS Bainbridge, the situation became increasingly tense as the three pirates continued to refuse to release Captain Phillips. In these

11

circumstances, the U.S. Navy shot the three pirates on the life boat and rescued Captain Phillips. Muse was taken into custody immediately thereafter.

During a search of the life boat, 2 loaded AK-47 assault rifles, 6 AK-47 magazines, and a pistol were recovered, among other things. In addition, a wallet that had been stolen from one of the Win Far crewmembers was also recovered. See footnote 3 supra.

### E.    Muse's Post-Arrest Statement

After his arrest and transfer to the custody of the JTTF, Muse provided oral and written waivers of his Miranda rights. When asked his age at the beginning of the interview, Muse said that he was fifteen years old and then began to laugh. The interviewing detective then asked Muse for his religion and Muse advised that he was a "true Muslim." When the detective asked Muse if a true Muslim lies, Muse retracted his statement that he was fifteen years old and said that he was between eighteen and nineteen years old. Muse then apologized to the detective for lying to him about his age and said that he would ask Allah for forgiveness.

When asked about his role in the hijacking of the Maersk Alabama, Muse stated that, one week before the hijacking, he was preparing for a fishing trip with two friends. While the three of them were in their motor boat near the shore, they were approached by a group of men in a second motor boat who fired guns into the air, causing Muse's two friends to flee to shore. Some of the men with the guns then boarded the motor boat Muse was in and forced him to join them while they roamed the Indian Ocean looking for foreign cargo ships to hijack. Muse then claimed that he was given a gun by one of the men but did not use it to escape because he was too intimidated by them. Muse then stated that he boarded the Maersk Alabama and held a gun

to Captain Phillips' head on the life boat because he feared the U.S. Navy ship nearby would kill him.

**F.     Muse's Presentment and Age Hearing**

On April 21, 2009, Muse was charged in a five-count complaint with piracy, seizing a ship by force, hostage taking, and two firearm possession counts.  On the same date, Muse was presented before Magistrate Judge Andrew J. Peck in the Southern District of New York.  Prior to Muse's presentment, defense counsel requested a sealed hearing pursuant to 18 U.S.C. § 5031 et seq. to establish that Muse was under 18 years old at the time of the charged conduct and therefore should be prosecuted as a juvenile.  Over the objections of the Government and members of the media who were present in court, Magistrate Judge Peck agreed to conduct the requested hearing.  A transcript of the hearing is attached as Exhibit A.

During the hearing, the Government presented evidence regarding Muse's age both by attorney proffer and witness testimony.  First, the Government proffered that Muse stated that he was over 18 years old on four different occasions after he was taken into custody.  See Exhibit A at 27.  On April 12, 2009, after being taken into custody and initially stating that he was 16, Muse stated through a Somali interpreter that he was 19.  Id.  Hours after that, Muse stated that he was 26.  Id.  And the following day, during a pedigree interview with the assistance of a Somali interpreter, Muse again said that he was 19.  Id. at 28.  To address the fourth occasion during which Muse said he was over 18, the Government called Detective Frederick Galloway of the JTTF.

During his sworn testimony, Detective Galloway described his conversation with Muse from the day before during Muse's transport to the United States.  According to Detective

13

Galloway, when he asked Muse his age, Muse laughed. Id. at 30. Detective Galloway then asked Muse if he was 15 years old and Muse laughed again. Id. Detective Galloway then asked Muse if he was a true Muslim, and Muse responded affirmatively. Id. In response, Detective Galloway asked Muse if "true Muslims" lie. Id. According to Detective Galloway, Muse then apologized to Detective Galloway and said he was between 18 and 19 years old. Id. Muse also informed Detective Galloway that he planned to ask Allah to forgive him for lying and that he would not lie to Detective Galloway again. Id.

Before concluding Detective Galloway's direct examination, the Government further proffered to the Court that, when asked for the ages of the three deceased pirates, Muse provided approximate ages of 28, 31 and 35 years old. Id. In addition, the Government proffered that multiple witnesses on the Maersk Alabama estimated Muse's age to be approximately 25 based their perceptions of his physical appearance and the manner in which he conducted himself. Id.

Between direct and cross-examinations of Detective Galloway, Magistrate Judge Peck asked the detective whether Muse provided him with a date of birth. Id. at 33. In response, Detective Galloway testified that Muse only said that he was "between 18 and 19," and that Muse had advised him that he did not know his birth date because there were no government records in Somalia. Id. The Government then confirmed that Muse did not provide a birth date during any of his prior interviews. Id.

During cross-examination, defense counsel asked Detective Galloway about the conditions of the interview, the availability of a doctor and a second Somali interpreter, and whether Muse spoke to his parents at any point during his transport to the United States. Id. at

14

34-36. On redirect examination, Detective Galloway testified that he and Muse had the conversation about his age after Muse had waived his Miranda rights. Id. at 36-37.

   After the Government rested, the defense introduced the testimony of a man who identified himself as Muse's father via telephone from Somalia. During his direct testimony, which was conducted via speaker phone in the courtroom, the witness stated that Muse was his oldest son among twelve children. Id. at 39. The witness then stated that Muse was born on November 20, 1993. Id. at 39. According to the witness, his next oldest child was born in July or August of 1997. Id. at 40. The witness further testified that he saw Muse a lot while he was growing up and that he was present when Muse was born on November 20, 1993. Id. at 40-41.

   After brief cross-examination by the Government, Magistrate Judge asked the witness for the birth date of his fourth oldest child. Id. at 42. In response, the witness stated that his fourth oldest child was born in 1990. Id. Magistrate Judge Peck concluded his questioning after that response. Id.

   At the conclusion of this testimony, Magistrate Judge Peck asked the defense if Muse intended to testify. Id. at 43. Magistrate Judge Peck made clear that he "would be prepared to limit questions to [Muse] only about his age." Id. After conferring with Muse, defense counsel advised the Court that Muse did not wish to testify. Id.

   Magistrate Judge Peck then heard brief oral argument from the parties and ruled from the bench. Magistrate Judge Peck found that Muse was over 18 years old and would not be treated as a juvenile based on the "credible" testimony of Detective Galloway about his post-arrest interview of Muse. Id. at 46. With respect to the testimony of the man identified as Muse's father, Magistrate Judge Peck explained that it was "incredible" that he knew Muse's exact birth

date but was vague as to his second oldest child's birth date and picked a birth year that would

make the fourth oldest child his oldest child. Id. at 47. Magistrate Judge Peck further reasoned

that "it is conceivable that . . . [the witness] knew he needed to pick an age under 18 in order for

his son to be treated as a juvenile." Id. at 47. Magistrate Judge Peck concluded: "I just did not

find the father's testimony to be credible at all." Id. at 48. After noting that another "small

factor" in his decision was the fact that the need for juvenile secrecy had been obviated by the

prior press coverage of the case, Magistrate Judge Peck ordered the unsealing of the courtroom

and the transcript. Id. at 48. The Government then publicly filed the complaint against Muse.

G.    **The Hostages on the Serenity and the Win Far**

After the rescue of Captain Phillips and the arrest of Muse on April 12, 2009, Muse's

men returned to Garad, Somalia on the Win Far, continuing to hold hostage the thirty crew

members of the Win Far and the three men from the Seychelles. One of the hostages recounted

that, during the five day trip to Somalia, the hostages were not allowed to stand or to urinate

without permission. The three Seychelles hostages were held captive on board the Win Far by

Muse's men for more than six months – from March 4, 2009 to September 19, 2009. The thirty

crew members of the Win Far were held captive on board the same ship by Muse's men for more

than ten months – from April 6, 2009 to February 11, 2010. One of the hostages recalled that,

during this time, the hostages were kept in the dark, and forced to eat rice with sand in it and to

drink water mixed with diesel fuel and salt water. During the ten-month period of captivity, two

crew members of the Win Far died of illness and Muse's men disposed of their bodies.

### H.   Muse's Plea

On May 18, 2010, Muse pled guilty to Counts Two (hijacking a ship), Three (conspiracy to hijack to three ships), Five (hostage taking), Six (conspiracy to engage in hostage taking), Eight (kidnaping) and Nine (conspiracy to engage in kidnaping) pursuant to a plea agreement between the parties.  In the plea agreement, the parties agreed that Muse's total offense level is 41, which includes a four-level leadership enhancement, and his Criminal History Category is I. In addition, based on his plea, Muse faces a stipulated sentencing range of 324 to 405 months' imprisonment.

After the Court advised Muse of the terms of the plea agreement, including his waiver of any challenge to his conviction based on his age, the rights he was giving up by pleading guilty, and the maximum penalties he faced, Muse admitted the following: (i) in 2009, he agreed with others to capture any ship they found in the Indian Ocean; (ii) in April 2009, he and three other men used firearms to capture the Maersk Alabama, its captain and its crew; (iii) he and the three men then took the captain of the Maersk Alabama as their "captive" onto an emergency boat; (iv) when the U.S. Navy arrived at their location in the Indian Ocean, using the radio on the emergency boat, he and the three men demanded that they be permitted to return to land safely in exchange for the release of the captain; and (v) if their demands were not met, they threatened to harm the captain.  See May 18, 2010 Plea Transcript at 22-25.

## II.   APPLICABLE LEGAL PRINCIPLES

Under current law, sentencing courts must engage in a three-step sentencing procedure. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  First, the district court must determine the applicable sentencing range, and, in so doing, "the sentencing judge will be entitled to find all

of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112.  Second, the district court must consider whether a departure from that Guidelines range is appropriate. Id.  Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  Id. at 113.

Although the Guidelines are no longer mandatory, district courts must continue to "consult" the Guidelines and "take them into account" when sentencing.  United States v. Booker, 543 U.S. 220, 264 (2005); accord United States v. Cavera, 550 F.3d 180, 187 (2d Cir. 2008) (en banc) ("In [Booker], the Court retained an important role for the Sentencing Commission, leaving untouched the statutory direction to district courts that they should consult the Guidelines range when imposing sentence.") (citing Booker, 543 U.S. at 245-46).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall v. United States, 552 U.S. 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, id. at 49, and must "remain cognizant of them throughout the sentencing process," id. at 50 n.6.  It also is the Court's duty to form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant," and to then impose a sentence "sufficient, but not greater than necessary," to accomplish the objectives of criminal sentencing.  18 U.S.C. § 3553(a); see Cavera, 500 F.3d at 188 ("In addition to taking into account the Guidelines range, the district court must form its own view of 'the nature and circumstances of the offense and the history and characteristics of the defendant.'").

18

## III.    DISCUSSION

### A.    The Applicable Guidelines Range

The Government agrees with the Probation Office's analysis with respect to the applicable sentencing range for Muse.  Specifically, the Government agrees that, pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") §§ 3D1.2(a) and 3D1.2(b), all six counts are grouped together into a single group.  See Presentence Report ("PSR") ¶ 59.  The Government also agrees that the base level for the group is 32 pursuant to U.S.S.G. §§ 3D1.3(a) and 2A4.1.  Id. ¶¶ 59-60.  Because a ransom demand or a demand upon a government was made, the offense level is increased by six levels pursuant to U.S.S.G. § 2A4.1(b)(1).  Id. ¶ 61.  Pursuant to U.S.S.G. § 2A4.1(b)(3), an additional two-level enhancement is warranted because a dangerous weapon was used.  Id. ¶ 63.  In addition, because Muse was an organizer or leader of the criminal activity, which involved five or more participants or was otherwise extensive, the offense level is increased four levels pursuant to U.S.S.G. § 3B1.1(b).  Id. ¶ 65.  Finally, because Muse accepted responsibility by pleading guilty prior to trial and provided timely notification of his intention to plead guilty, the offense level is decreased by 3 levels pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b).  Id. ¶ 68.

Based on the foregoing, the Government agrees that Muse's applicable Guidelines offense level is 41.  Id. ¶ 69.  The Government also agrees that Muse's Criminal History Category is Category I.  Id. ¶ 88.  Accordingly, based on a Guidelines' offense level of 41, and a Criminal History Category of I, the resulting Guidelines range is 324 to 405 months' imprisonment.  Id. ¶ 119.

**B.   The Statutory Sentencing Factors Call For A Sentence Of 405 Months' Imprisonment**

In <u>United States</u> v. <u>Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Court of Appeals held that, after calculating the appropriate Sentencing Guidelines range, <u>see</u> <u>supra</u>, the sentencing court should determine the appropriate sentence based on the Section 3553(a) factors.  These factors are:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)   the need for the sentence imposed—
> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant;
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3)   the kinds of sentences available;
> (4)   the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
> (5)   any pertinent policy statement [issued by the Sentencing Commission];
> (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Because of the extraordinary nature of the offenses, the need for the sentence imposed to protect the public from further crimes of the defendant, and the need for the sentence imposed to afford adequate deterrence to this type of conduct, a sentence at the top end of the applicable Guidelines range – 405 months' imprisonment – is the only appropriate sentence here.  This is

the sentence that the Probation Office recommends, see PSR at 34-36, and it is the sentence Muse deserves.

Over the span of five weeks, Muse led a gang of armed men on a brazen and terrorizing wave of attacks at sea during which they commandeered three ships and kidnaped fifty-three defenseless sailors.  For Muse, however, this was not enough.

He was not willing to take the Maersk Alabama life boat and return to Somalia with his men.  Instead, he chose to turn that life boat into a floating prison for Captain Phillips for three excruciating days within which Muse and his men subjected the captain to various forms of physical and psychological trauma.  It is because of his choices and his actions that Muse is before the Court for sentencing.  And his choices and his actions warrant the maximum term of imprisonment under the applicable Sentencing Guidelines range.  The defendant's arguments to the contrary are meritless.

### 1.    Muse's Offenses Are Extraordinary

The gang of men who violently and methodically seized control of the Serenity, the Win Far and the Maersk Alabama were experienced, coordinated and ruthless in the practice of hijacking, robbery and hostage-taking.  They were skilled seamen who understood how to track and approach larger vessels from their speed boats.  They were comfortable handling and firing AK-47 machineguns while on the water.  They understood how to board and then commandeer various types of target vessels quickly and efficiently.  They did not hesitate to beat, injure and shoot at their hostages.  They were willing to hold their captives for months and they refused to surrender.  Their approach was premeditated, organized and relentless.  And it was executed under the direction of one man.

Muse was the undisputed leader of the gang of approximately ten pirates who participated in the hijackings of the Serenity, the Win Far and the Maersk Alabama. The pirates' conduct makes clear that they were not merely robbing crew members to support themselves. Theirs was a far more ambitious and lucrative objective: multi-million dollar ransom payments in exchange for the lives of the crew members. And they were committed to holding on to their dozens of hostages for as long as was necessary to get paid, even if hostages died as a result. The extreme level of violence and sadism that Muse employed – almost all of which was entirely unnecessary to his demands for ransom – emphatically demonstrates that Muse and his men were not, as Muse suggests, half-hearted participants conscripted into service by hunger or any other duress: they appeared to relish even their most depraved acts of physical and psychological violence and abandoned all pretense of humane treatment of their captives  In this regard especially, Muse was the undisputed leader, threatening to kill one of his captives with an improvised explosive device, playing Russian roulette with Captain Phillips, and continually threatening to kill his captives.

At the outset of each attack, Muse and his men fired their guns at or in the vicinity of the target ships – immediately instilling a sense of fear in their unarmed crew members. Once on board, Muse directed the ship's captain to cut the engine and instructed his men to corral all of the crew members together. On the Serenity and the Win Far, Muse and his men then robbed the crew members of their belongings at gun point. They were not just interested in cash; they took cellphones, jewelry and, in the case of at least one Win Far crew member, his wallet with his

identification and photos of his family.[5]  That was the first part of the plan.

Under threat of death, Muse then ordered the ship's captain to follow his commands. With the hijacked ships tied to one another, Muse used the floating caravan as a base of operations on which to detain his hostages and from which to launch subsequent attacks.  When a new target ship was identified, Muse loaded up the pirates' speed boat with a few of his men and some of their guns, and led them to their next attack.  The other pirates stayed behind with the hostages, awaiting an update from Muse.

After a successful hijacking, Muse and his men returned to the coast of Somalia with their hostages.  It was there that they held the three Seychelles hostages for five months and the thirty Win Far hostages for ten months.  And it was from there where they demanded multi-million dollar ransom payments for the release of the hostages.  That was the second part of the plan.

When the crew of the Maersk Alabama bravely refused to submit to them on the morning of April 8, 2009, Muse and his men could have abandoned the job.  That morning, Muse could have decided to take the Maersk Alabama life boat back to the Win Far.  He already had thirty-three hostages and two ships under his control, which could have yielded substantial ransom payments for him and his men.  But Muse made a different choice.  He chose to search for the Maersk Alabama crewmembers.  Confronted with resistance, he remained committed to gaining control of the ship and the men on it.  As a result, Muse and his men stayed on the Maersk Alabama for nearly twelve hours, hunting for its crew.

During this period, the majority of the crew was huddled in the ship's safe room, which

---

[5]  This is the wallet that was recovered from the life boat after Muse's arrest.  See footnote 3 supra.

was located within the interior area of the ship.  The ship's power had been cut so there was no air conditioning.  Temperatures reached well over 100 degrees inside the safe room.  The crewmembers had limited access to food and water, and virtually no ability to learn what was transpiring on the rest of the ship.  After several hours, there was a knock on the door of the safe room and when they opened the door, the crewmembers saw two of their own with Muse whose hands were tied with wire.  The crewmembers in the safe room then took custody of Muse.  Rather than retaliate against him for what he was forcing them to endure, the crewmembers helped him.  They provided him with a bandage for a deep cut on his hand.

Later in the day, the crewmembers agreed to release Muse to his three men in exchange for Captain Phillips and the life boat on board the Maersk Alabama.  After the three pirates boarded the enclosed life boat with supplies provided by the crew and Captain Phillips, Muse was permitted to descend a ladder down onto the life boat.  The crewmembers then expected the pirates to release Captain Phillips and depart.  Once on board the life boat, however, Muse again made a different choice.

After having been given a bandage and released by the crewmembers, Muse again decided not to abandon the ship and return to the Win Far.  Instead, he forced Captain Phillips to stay on the life boat with him and his men, and he ordered Captain Phillips to set a course for Somalia.  That evening – the evening of April 8, 2009 – the crew of the Maersk Alabama used their ship to prevent the life boat from navigating toward Somalia until the U.S. Navy arrived on the scene.

On the morning of April 9, 2009, Muse was presented with another choice.  He, his three men and Captain Phillips were now floating in the life boat in the shadow of the USS Bainbridge,

a U.S. Navy destroyer.  A Somali interpreter speaking on behalf of Government negotiators on

board the USS Bainbridge made radio contact with the life boat and asked Muse to surrender so

that neither he, his men nor Captain Phillips would be harmed.  Muse refused and threatened to

kill Captain Phillips unless Muse and his men were provided safe passage to Somalia with

Captain Phillips.  Muse maintained the same position throughout hours of negotiations

throughout the day and night on April 9, 2009.  He maintained the same position throughout

hours of negotiations throughout the day and night on April 10, 2009.  And he maintained the

same position throughout hours of negotiations throughout the day and night on April 11, 2009.

All the while, he was subjecting Captain Phillips to vicious physical attacks and horrifying

psychological abuse.  See Part B.2 infra.

On April 12, 2009, Muse asked to board the USS Bainbridge to receive treatment for the

cut on his hand.  While Muse was on the deck of the USS Bainbridge, Government personnel

continued to attempt to negotiate a peaceful resolution with him and his men.  Despite three

days' within which to surrender, Muse and his men would not relent and chose not to release

Captain Phillips.  As a result, the U.S. Navy was forced to shoot Muse's men and rescue Captain

Phillips.[6]

It is not possible to quantify the lasting trauma that Muse and his men have caused.  On

the day that Muse entered their lives, each of the fifty-three sailors were working on the sea,

---

[6]  The defendant's suggestion that, after more than three full days of negotiations the U.S.
Navy shot the other three pirates while they were in the process of surrendering, is patently false
and conflicts with the statements of multiple witnesses interviewed by the Government.  See
Sentencing Submission of Abduwali Abdukhadir Muse ("Defense Submission") at 11-12.  The
Government submits, however, that the Court need not resolve this dispute because it is not
material to sentencing.

doing their jobs and looking forward to returning home to their families and friends. As John

Cronan, the Third Assistant Engineer on the Maersk Alabama, explained in his letter to the

Court: "I am not a soldier. I never desired to be a soldier. I just wanted to go to work and

provide for my family." Letter of John Cronan, at 1. Little did these men know, however, that

they were being targeted from afar by machinegun-toting outlaws who viewed them as nothing

more than a form of currency. But as soon as each sailor heard the first rounds of machinegun

fire and saw Muse and his men bearing down on them, their lives would never again be the same.

Their inner sense of security and their way of life on the water were altered forever.

    While Muse was arrested months before their deaths, two of the fifty-three sailors

kidnaped by Muse and his men did not survive the harsh conditions of their captivity. After ten

months of living on a ship anchored off the coast of Somalia during which time they were forced

to eat rice with sand in it and drink water mixed with diesel fuel and salt water, two of the sailors

succumbed to illness. Their fellow crewmembers were forced to watch their gradual deaths,

powerless to help them and left to wonder day after day whether they would soon be next. Their

loved ones will never see them again, as Muse's men disposed of their bodies at sea.

    For the fifty-one hostages who did survive, the trauma they experienced at the hands of

Muse and his men will likely endure with them for the rest of their lives. Captain Phillips has

physical scars on his wrists from the ropes used to bind him and on his head from the beating that

knocked him unconscious. For the captain of the Serenity, the memory of Muse building an

improvised explosive device full of screws and broken forks and then placing it near him will no

doubt haunt him forever. Each of the other forty-nine survivors will have to confront and attempt

to overcome their own psychological and emotional wounds.

As Heather Cronan, the wife of John Cronan, explained in her letter to the Court: "For my family there will always [be] two very distinct parts of our lives. Before the attack, and after." Letter of Heather Cronan, at 1. Because he suffers from Post-Traumatic Stress Disorder, Mr. Cronan has been unable to return to work over the last nearly two years. Letter of John Cronan, at 1. He also has extreme difficult sleeping, and when he does sleep, he has nightmares during which he lashes out at pirates in his sleep. Letter of Heather Cronan, at 1. According to Kelly Baughman Fisher, her former husband Matthew Fisher, the First Assistant Engineer on the Maersk Alabama, came home after the hijacking "a changed man." Letter of Kelly Baughman Fisher, at 1. She noticed that his personality and his behavior were different. Id. As a result, their marriage deteriorated into divorce. Id. These are but two examples of the ways in which the fifty-one men whom Muse victimized have suffered and continue to suffer today.

Of course, the human consequences of Muse's hijackings and kidnapings have been felt by far more than those who crossed Muse's path in the Indian Ocean in the spring of 2009. The families of the crewmembers have also suffered in a variety of ways as they struggle to help their loved ones recover. Ms. Fisher writes how she has seen the crewmembers of the Maersk Alabama and their families endure "incredible hardships since the attack – mental, physical, emotional, and financial." Letter of Kelly Baughman Fisher, at 1. According to Mrs. Cronan, she still struggles with panic attacks when she is unable to reach her husband, fearing that he may have been harmed again. Letter of Heather Cronan, at 1. The Cronans' youngest daughter continues to have nightmares and told her parents that she is afraid Muse will escape from prison and come searching for her. Id. In addition, their family has been "financially devastated" because her husband's income constituted more than half of their household earnings. Id.

Because of Mr. Cronan's inability to work and thousands of dollars in additional expenses for multiple therapists for the family, the Cronan's home was lost to foreclosure. Id.

Fifty-three sailors spread across six countries, along with their families, have been profoundly affected by Muse's choices and actions. Certainly most, if not all, of them will suffer in some manner for the rest of their lives from the trauma Muse has visited upon them. The number of victims and the breadth and the depth of their suffering make plain the extraordinary nature of Muse's offenses – offenses for which a sentence of not less than 405 months' imprisonment is warranted.

### 2.   The Public Must Be Protected From Muse

Section 3553(a)(2) directs the Court to consider, among other things, the need for the sentence imposed to protect the public from further crimes of the defendant. By his choices and his actions, Muse has demonstrated himself to be a ruthless predator who targets defenseless victims. It cannot fairly be disputed that he was the leader of an armed gang of pirates who consistently exhibited no regard for the sanctity of human life.

- Under Muse's command, his men sprayed the decks of the Maersk Alabama and the Win Far with machinegun fire as they made their initial approach.

- Under Muse's command, his men deprived their hostages, including Captain Phillips, of food and water. After Muse's arrest, his men deprived their hostages of food and water and two hostages died of illness.

- Under Muse's command, one of his men indiscriminately fired an AK-47 at night into the water at Captain Phillips when he tried to escape from the life boat.

- Under Muse's command, his men hit Captain Phillips so hard in the back of the

28

head that he was rendered unconscious and thought he had been shot.

- On multiple occasions, Muse aimed his gun at the head of a hostage and pulled the trigger, laughing when the gun did not fire.

In the face of this horrifying conduct, the defendant asserts: "Noone was meant to get hurt." Defense Submission at 26. This a claim that becomes even more astounding when one considers the manner in which Muse conducted himself throughout the offenses.

By all accounts, Muse did not just commit the acts to which he pled guilty; he reveled in them. From boasting about the millions he had made from prior hijackings to laughing after pulling the trigger of his pistol next to a hostage's head to suggesting that he would cut up a hostage and sell his organs, Muse derived joy from the suffering of his victims. He abused them physically and psychologically in an effort to subdue and control them. He also directed his men to do the same. As noted above, he viewed the lives of his hostages as a form of currency to be traded for his own enrichment. Beyond that, he evinced absolutely no concern for their condition or their well-being.

Moreover, his ruthless and calculating approach was not tempered by the kind acts of his hostages. For example, after he was captured by the crew on the Maersk Alabama and placed in the safe room, crewmembers treated the gash on his hand and provided him with a bandage. Hours later, after he had deceived Captain Phillips and the crew and prevented Captain Phillips from getting off the life boat, Captain Phillips treated the same wound using the first aid kit on the life boat. Neither of these generous gestures from his victims had any effect on Muse or his view of his hostages.

After his arrest, Muse was unrepentant. He provided three different ages – 16, 19, and 26

29

– to the U.S. Navy after he was taken into custody.  He lied to the JTTF during his post-arrest interview, claiming that he had been forced at gunpoint to hijack the Maersk Alabama by the three deceased pirates.  He also continued to lie about his age, claiming he was fifteen years old. And in his sentencing submission, he now claims that his three men had agreed to surrender on the life boat but the U.S. Navy betrayed him and the shot the men.  See Defense Submission at 11.

Finally, Muse is not an older man and he could conceivably return to some type of piracy activity after his release from prison.  As evidenced by his telephone calls from the Metropolitan Correctional Center (the "MCC") described in paragraph 16 of the Presentence Report, several months after his arrest, Muse continued to engage in coded piracy-related activity from prison. While the parties differ on the meaning of these coded calls – the defense contends that Muse was discussing the payment of a piracy-related debt while the Government asserts that Muse relayed an order to kill the Win Far captain who was being held hostage by his men at the time – the calls are very troubling, even assuming the defense's interpretation is the correct one. Significantly, the defense does not dispute that the calls related to piracy matters.  See Defense Submission at 15.  More alarming, however, is that, according to the defense's interpretation of the calls, Muse was asking his mother and his brother to inform the "leader of a piracy network" (Ilko Asse) that he could use some of Muse's personal piracy funds that were being held by other pirates to satisfy a piracy-related debt.  See Defense Submission at 17-19.  And Muse's mother and brother agreed to do this.  See Defense Submission at 17-19.  Even assuming arguendo that the defense's interpretation is true, the calls weigh heavily against a sentence at the bottom of the applicable sentencing range.

30

For all of these reasons, a sentence of 405 months' imprisonment is appropriate to ensure that Muse is not a serious threat to the public again.

### 3.      The Need For Specific And General Deterrence Is Clear

Section 3553(a)(2) directs the Court to consider, among other things, the need for the sentence imposed to afford adequate deterrence to criminal conduct. For the reasons discussed above, the need for specific deterrence in this case is self-evident. The need for general deterrence is just as essential.

According to the International Chamber of Commerce's International Maritime Bureau ("IMB"), a non-profit organization that comprehensively tracks piracy and piracy-related activity, 2010 was the worst year on record for piracy. According to the IMB's Annual Piracy Report for 2010, there were 445 reported pirate attacks in 2010, a increase from 2009. In 2010 alone, Somali pirates took 1,016 sailors hostage, hijacked 49 ships, and collected tens of millions of dollars in ransom payments. Eight hostages were killed in 2010. As far as this year, in January 2011 alone, there were seven hijackings off the coast of Somalia and 148 people have been taken hostage. By the IMB's estimate, as January 29, 2011, Somali pirates were holding 33 hijacked vessels and 758 hostages for ransom.[7]

Clearly, the arrest of Muse in April 2009 has not deterred subsequent piracy attacks and hostage-takings off the coast of Somali. More importantly for the security of the United States and the safety of its citizens, the well-publicized hijacking of the Maersk Alabama did not deter subsequent attacks on U.S.-flagged ships. In fact, on April 14, 2009, just two days after the U.S.

---

[7]      See www.icc-ccs.org/home/piracy-reporting-centre/piracynewsafigures.

31

Navy rescued Captain Phillips, another U.S.-flagged container ship, the Liberty Sun, with a crew of twenty sailors was attacked off the coast of Somalia. The Liberty Sun was en route to Kenya from Texas when a gang of pirates attempted to commandeer it using machineguns and grenades. Fortunately, the crew was able to thwart the attack and the Liberty Sun was escorted to its destination by one of the U.S. Navy vessels that had participated in the rescue of Captain Phillips.

More recently, in November 2010, five Somali men were found guilty by a jury in the Eastern District of Virginia of piracy and piracy-related charges based on their participation in an April 2010 attack on a U.S. Navy vessel, which the men believed was a commercial container ship. See United States v. Mohammed Modin Hassen, et al., Criminal No. 2:10 Cr. 56 (E.D. Va.). As the above makes clear, U.S.-flagged ships in the Indian Ocean and the defenseless American sailors who operate them remain extremely vulnerable to violence at the hands of Somali pirates. The sentence in this case should send an unmistakable message to would-be pirates that the punishment will be severe for those who would consider harming Americans for their own financial gain.

### 4.    Muse's Arguments Are Meritless

Against this backdrop, Muse contends that he should be sentenced at the bottom of the applicable sentencing range. Muse offers three principal justifications for such a sentence: (1) his age; (2) the conditions he faced growing up in Somalia; and (3) his conditions of confinement in the MCC.

With respect to the issue of Muse's age, Muse has attempted to use his youthful appearance as a tool for leniency on multiple occasions since the moment he was arrested. This

Court should not permit him to do so at sentencing and should reject any mitigation argument based on his age.

More than twenty-one months have elapsed since Magistrate Judge Peck conducted an age hearing at Muse's request and found that Muse is over 18 years old and should be prosecuted as an adult. Muse never once asked this Court to reconsider Magistrate Judge Peck's finding during that period. Moreover, at that hearing, Magistrate Judge Peck heard the live testimony of Detective Galloway who recounted how Muse told him that he was 15 years old, then laughed, then admitted to lying to him, and then said that he was between 18 and 19 years old. Muse's lie of 15 years old, of course, followed the three other ages – 16, 19 and 26 – that he had previously provided to the U.S. Navy.

In the face of this evidence, the defense presented the testimony of Muse's father who claimed that he was present for Muse's birth and that Muse was born on November 20, 1993. Magistrate Judge Peck found this testimony to be "incredible" and suggested that Muse's father may have concocted his testimony so that his son would be treated as juvenile. See Exhibit A at 47. Tellingly, Muse himself chose not to testify at the hearing, even though Magistrate Judge Peck made clear that he would be prepared to limit questioning of him to his age only. Id. at 43. The defense did not call any other witnesses. Cf. United States v. Alvarez-Porras, 643 F.2d 54 (2d Cir. 1981) (holding that the Government can satisfy its burden at an age hearing by impugning the defendant's credibility as "the Constitution is not offended by requiring the defendant to come forward with credible evidence of his minority").

Now, the defense claims that he was "about 16" at the time he and his men hijacked the Maersk Alabama. See Defense Submission at 2. In support of this contention, they submit

33

multiple affirmations, including an affirmation from Muse's mother in which she states that

Muse was born in 1993.  See Defense Submission, Exhibit F.  This is the same birth year for

Muse that his father provided to Magistrate Judge Peck during the age hearing – testimony that

was adjudged to be incredible.  In addition, the defense relies on an affirmation of a self-

described "media consultant" from Somalia, which states that in January 2011, Muse's younger

brother "seemed to be 16 or 17 years old" based on his appearance.  See Defense Submission,

Exhibits J and K.  Muse has never attempted to be truthful about his age, and he now hopes it

will afford him a lower sentence.  As Magistrate Judge Peck found, Muse is over 18 years old.

His conduct makes clear that he is an adult.  And he should be held to account as an adult.

Second, Muse contends that he was driven to commit these crimes because of the

extremely difficult conditions he faced growing up in Somalia.  See Defense Submission at 27,

36 ("Abduwali would not be before the Court for sentencing if not for the chaotic conditions

prevalent in Somalia . . . .").  Somalia has been a failed state for nearly 20 years and its citizens

have suffered enormously during that time.  The Government has no reason to question that

Muse endured an extremely difficult upbringing.  Unfortunately, so have millions of other

citizens of Somalia.  Unlike Muse, however, they have not resorted to preying on the defenseless

and terrorizing the innocent – time after time.  It is an insult to all of those who are persevering

through the conditions in Somalia in a law-abiding manner to suggest that those conditions,

rather than his own choices, led Muse to where he is today.

Finally, Muse contends that his sentence should be reduced in light of his conditions of

confinement and the mental health problems he has experienced in prison.  See Defense

Submission at 32-36.  In United States v. Carty, 264 F.3d 191 (2d Cir. 2001), the Court of

Appeals held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures" under the Sentencing Guidelines.[8] 264 F.3d at 208; see also, e.g., United States v. Naranjo-Ramirez, No. 09-4343-cr, 2010 WL 4723301, at *2, *4 (2d Cir. Nov. 23, 2010) (noting that sentencing Judges are "under no obligation to depart from the Guidelines on the basis of [a defendant's] allegedly harsh pre-sentence confinement conditions," so long as they are "consider[ed]") (emphasis in original).  Following Carty, "the courts have granted relief generally where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner." United States v. Mateo, 299 F. Supp. 2d 201, 211 (S.D.N.Y. 2004) (Marrero, J.); accord, e.g., United States v. Torres-Teyer, 322 F. Supp. 2d 359, 377-78 (S.D.N.Y. 2004) (Lynch, J.); United States v. Green, 04 Cr. 424-14, 2006 WL 3478340, at *4 (S.D.N.Y. Dec. 1, 2006) (Sweet, J.).

Seeking to meet this standard, Muse contends that he is entitled to a reduction in sentence because of his conditions of confinement at the MCC, and more specifically, the mental health problems he has experienced as a result of his confinement. See Defense Submission at 32-36. As an initial matter, the Government appreciates the impact that Special Administrative Measures ("SAMs") can have on particular defendants.  However, Muse brought those measures upon himself.  Muse is no longer subject to SAMs, and had Muse not used the MCC's telephones to relay coded messages to his fellow pirates, it would not have been necessary to have him held in isolation.  Accordingly, he should not now receive the benefit of a lesser sentence as a result.

---

[8] Consistent with the parties' plea agreement, the defense is relying on Carty in support of a reduced sentence under Section 3553(a), not for a downward departure under the Sentencing Guidelines.

With respect to Muse's mental health problems detailed in the defense submission, Muse has clearly experienced some difficult episodes. Without minimizing the extent of Muse's suffering, however, the Government submits that the gravity of the defendant's crimes and the extent of his victims' suffering dwarfs any sentencing consideration that the defendant should receive based on his mental health problems.

This reasoning finds support in the case law. Courts have found that an argument for a reduction in sentence based on conditions of confinement is less compelling when the nature of the offense is more serious. In United States v. Torres-Teyer, 322 F. Supp. 2d 359 (S.D.N.Y. 2004), for example, Judge Lynch considered a defendant's application for a downward departure where the defendant had spent ten months in a foreign prison, which the defendant characterized as "an extraordinarily harsh environment filled with fear, danger, violence, rape and corruption." 322 F. Supp. 2d at 377. Given that the defendant's Guidelines sentencing range was "about twenty years," id., Judge Lynch concluded that, "[a]bsent evidence of truly horrific conditions, subjection to substandard detention conditions for ten months does not warrant a meaningful departure from a twenty-year sentence." Id. Similarly, on remand from the Court of Appeals in Carty, Judge Schwartz declined to depart downward — citing, among other things, "the severity of [the defendant's] crimes." See Exhibit B (United States v. Carty, 95 Cr. 973 (S.D.N.Y. Nov. 9, 2001)) at 23-24. Accordingly, Muse should not receive a more lenient sentence based on his conditions of confinement.

## IV.   CONCLUSION

The fifty-one surviving crewmembers from the Maersk Alabama, the Win Far and the Serenity were forced to experience a level of terror that will affect them for the rest of their lives

– a level of terror inflicted seemingly, at times, for its own sake.  For some of the survivors, the

effects have already proven to be unbearable, and for others they will be both profound and

lasting.  The suffering has been, and will be, multiplied among their loved ones, as letters from

the victims's families starkly demonstrate.  For those who can, they must return to their jobs on

the water and do their best to overcome the memories of Muse and his men.  And their families

must help them recover and overcome their own fears of future attacks.  Muse inflicted all of this

suffering – through his choices and his actions – and he cannot escape responsibility for any of it.

A sentence of 405 months' imprisonment is warranted in this case, and the Government

respectfully requests that that be the sentence the Court imposes.

Dated: February 9, 2011

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney


          By:     _____
                              BRENDAN R. MCGUIRE
                              JEFFREY A. BROWN
                              Assistant United States Attorneys
                              (212) 637-2220/1110

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following by ECF and electronic mail on February 9, 2011:

Philip L. Weinstein, Esq.
philip_weinstein@fd.org

Brendan R. McGuire