

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 2, 2023

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Abduwali Abdukhadir Muse*, S1 09 Cr. 512 (LAP)

Dear Judge Preska:

    The Government respectfully submits this letter in opposition to defendant Abduwali Abdukhadir Muse's motion for compassionate release ("Motion" or "Mot.") pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF No. 45. The defendant perpetrated shocking crimes of terrorism, hijacking an American ship and holding hostage an American citizen, and he is properly serving the sentence that was imposed by this Court. There is no basis to release him early, and his Motion should be squarely rejected.

    Muse, a Somali national, was the undisputed leader of a violent gang of pirates who, over the course of five weeks in the spring of 2009, used machineguns to hijack three different ships off the coast of Somalia, including the MV Maersk Alabama, a U.S.-flagged commercial shipping vessel. Now, after serving less than half of his 405-month sentence,[1] Muse has moved for a sentence reduction based principally on personal characteristics already considered by the Court at the time of sentencing; the impact of the COVID-19 pandemic on his conditions of confinement; and, despite a significant prison disciplinary record, his alleged rehabilitation.

    As detailed below, the Motion should be denied because Muse has not come close to satisfying his burden to show "extraordinary and compelling" reasons for a sentence reduction, and the sentencing factors under 18 U.S.C. § 3553(a) support his original sentence as strongly today as they did at sentencing. Because his request for relief is meritless, his motion for the appointment of counsel to assist him in obtaining that relief should also be denied. ECF No. 44.

---

    [1] Muse contends he was sentenced "to an aggregate sentence total of 645 months." Mot. 5. In fact, because his sentences on all counts run concurrently, he was sentenced to a total of 405 months (240 months on Counts Two and Three and 405 months on counts Five, Six, Eight, and Nine).

I.      Background

       A.  Muse's Violent Piracy

In the spring of 2009, Muse led a gang of pirates in hijacking three vessels off the coast of Somalia. Presentence Investigation Report ("PSR") ¶¶ 29, 51 (submitted under seal as Exhibit A). The pirates pulled alongside each vessel in a small boat and used pistols and machineguns to force the unarmed crewmembers to surrender. *Id.* ¶¶ 33, 74, 81, 82. Muse took command of each ship, and he and his pirate gang held the ships' crewmembers hostage at gunpoint. *Id.* ¶¶ 34, 35, 74, 81, 82.

Nine pirates led by Muse hijacked the first two ships, a small French yacht named the Serenity, carrying three men, and a Taiwanese vessel named the Win Far 161, carrying 30 men.[2] *Id.* ¶¶ 74, 76. In April 2009, Muse and three of the pirates left the Win Far 161 in a boat for the purpose of hijacking the Maersk Alabama, a 500-foot-long U.S.-flagged container ship operated by 20 American sailors. *Id.* ¶¶ 28, 29, 78. On April 8, 2009, Muse and other pirates boarded the ship and launched their attack. Muse, as the leader of the attackers, was the first pirate to board the ship. *Id.* ¶ 47. Muse fired his gun at the captain of the Maersk Alabama, Captain Richard Phillips, and forced him to empty the ship's safe, taking approximately $30,000 in cash. *Id.* ¶ 48. During the struggle for control of the ship, the crewmembers were able to subdue Muse and separate him from the other pirates in a safe room. *Id.* ¶ 37.

The other pirates agreed to leave the vessel if the crew provided them with a lifeboat and returned Muse to them. *Id.* ¶ 38. Captain Phillips boarded the lifeboat with the pirates, and the crew allowed Muse to also board. *Id.* But Captain Phillips was not permitted to return, and on April 9, 2009, when the USS Bainbridge, a U.S. Navy destroyer, was dispatched to the scene, the pirates and the captain were still on the lifeboat, a short distance from the Maersk Alabama. *Id.* ¶ 39. Over three days of negotiation by radio, Muse and the other pirates held Captain Phillips hostage, threatening to kill him if they were not provided safe passage from the scene. *Id.* ¶ 40. During that period, Muse detailed to Captain Phillips how he planned to dispose of the captain's body, and recounted to the captain his previous hijackings, which Muse said had yielded him millions of dollars in ransom. *Id.* ¶ 41. Muse and his pirate gang assaulted the captain and even conducted a mock execution of him. *Id.* ¶ 40. When Captain Phillips tried to escape into the water, Muse's pirate gang shot at him until he surrendered and, once he was back in the boat, struck him in the head so hard he bled. *Id.* ¶ 41.

On April 12, Muse asked to leave the lifeboat and board the USS Bainbridge, where he received medical treatment and continued to negotiate for safe passage while Captain Phillips was held on the lifeboat by the other pirates. *Id.* ¶ 42. The pirates continued to refuse to release the captain; ultimately, after one pirate shot a gun on the lifeboat, the U.S. Navy shot the three pirates and rescued the captain. *Id.* ¶¶ 42, 50. Two loaded AK-47 assault rifles used by the pirate hijackers

---

[2] Victims from both hijackings identified Muse as the lead hijacker. PSR ¶¶ 74, 82. The Serenity hostages were not released until September 2009, and the Win Far 161 hostages were not released until February 2010; in the course of those 10 months in captivity, two of the hostages died of illness. *Id.* ¶ 85.

were subsequently recovered from the lifeboat, along with assorted magazines and gun straps. *Id.* ¶ 43. Muse was transferred from U.S. Navy custody to the FBI on April 20, 2009. *Id.* ¶ 44.

### B. Muse's Guilty Plea and Sentencing

On May 18, 2009, Muse pled guilty to six of the ten counts charged in Superseding Indictment S1 09 Cr. 512 (LAP): hijacking a ship and conspiracy to do the same, in violation of 18 U.S.C. §§ 2280(a)(l)(A) & (H) (Counts Two and Three); hostage-taking and conspiracy to do the same, in violation of 18 U.S.C. § 1203 (Counts Five and Six); and kidnapping and conspiracy to do the same, in violation of 18 U.S.C. § 1201(a)(2) (Counts Eight and Nine). PSR ¶¶ 1-12.

In the plea agreement, the parties stipulated to an offense level of 41, which included a four-level leadership enhancement; a criminal history category of I; and a Guidelines range of 324 to 405 months' imprisonment. *Id.* ¶ 13. As the Court observed at sentencing, this Guidelines range reflected a measure of leniency because, due to uncertainty about U.S. jurisdiction, *id.* ¶ 51, the Guidelines calculation did not take into account Muse's involvement in the hijackings of the French-owned Serenity or the Taiwanese-owned Win Far 161, ECF No. 32 (Sentencing Transcript ("Tr.")) 32:10-14 (attached as Exhibit B).

At Muse's sentencing on February 16, 2011, the defense argued at length for a sentence at the bottom of the Guidelines range, emphasizing Muse's "very young" age, *id.* at 7:1-8, 17:17-19;[3] Somalia's extreme poverty and "official sanctioning of piracy," *id.* at 8:7-15, 17:23-18:25; and his mental health problems and suicide attempts while in Bureau of Prisons ("BOP") custody, *id.* at 15:5-6, 19:4-20:4.

The Court agreed with the Government and the U.S. Probation Office ("Probation") that a sentence at the top of the Guidelines range was warranted. Before imposing sentence, the Court heard the oral statement of a victim of the hijacking present in the courtroom and read aloud from letters submitted by additional victims and their family members. Three times, the Court noted "the extraordinary nature" of Muse's offense conduct and of the trauma he had inflicted on his victims and their families. *Id.* at 34:11-12, 37:12-14, 42:19-20.

---

[3] While Muse's precise age remains uncertain, Magistrate Judge Andrew J. Peck conducted a preliminary age hearing at the time of Muse's initial presentment and determined that the defendant would be treated as an adult in the ensuing proceedings; the defense subsequently agreed not to contest this finding for purposes of the plea. PSR ¶ 93. Muse had claimed to be different ages immediately after his arrest: in a *Mirandized* oral statement, Muse indicated that he was 15 years old and laughed; but he then stated that he was between 18 and 19 years old. *Id.* At a hearing on April 21, 2009, Magistrate Judge Peck heard testimony by phone from Muse's father, who indicated that the defendant was born on November 20, 1993, which would have made Muse 15 years old at the time of his arrest. *Id.* Dental records from the BOP show that Muse likely was, in fact, between 17 and 21 at the time of the offense conduct. *Id.*

### C. Muse's Incarceration at FCI Terre Haute

Muse is serving his sentence at FCI Terre Haute, a medium-security federal correctional institution, and his projected release date is not until June 20, 2038. As of the date of filing, there are no confirmed cases of COVID-19 at the facility.[4]

Muse submitted an administrative request for a sentence reduction, dated April 11, 2023, to the warden of FCI Terre Haute. In the request, he cited a number of allegedly extraordinary and compelling circumstances purportedly warranting release: the risks posed by the COVID-19 pandemic, Muse's history of mental health issues, his asserted rehabilitation efforts as allegedly evidenced by his completion of his GED and enrollment in and completion of numerous educational programs while incarcerated, and his status as a non-citizen who would be removed to a third-party host country upon release. Mot., Attachment 1. In a letter dated April 27, 2023, the warden declined to pursue a request for a sentence reduction on his behalf. *Id.*

## II. Applicable Law

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. Muse has applied for a reduction in sentence under the so-called "compassionate release" provision of 18 U.S.C. § 3582(c), which provides that a court "may reduce the term of imprisonment . . . after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

As this Court has explained, "there are three prerequisites for granting a compassionate release motion": (1) "the defendant must have exhausted his administrative rights"; (2) "the court must find that 'extraordinary and compelling reasons warrant' a reduction of sentence"; and (3) "the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a)." *United States v. Freeman*, No. 02 Cr. 150 (LAP), 2022 WL 1785578, at *2 (S.D.N.Y. June 1, 2022). As the movant, the defendant bears the burden of proving that he is entitled to relief under Section 3582. *Id.*; *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

The defendant is deemed to have satisfied the first prong, the exhaustion requirement, after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). As to the second prong, as the movant, "the defendant bears the burden of proving 'extraordinary and compelling reasons' exist justifying early release." *United States v. Rodriguez*, No. 88 Cr. 642 (LAP), 2022 WL 2533468, at *3 (S.D.N.Y. July 7, 2022).[5] Lastly, the court's finding of such

---

[4] Federal Bureau of Prisons, *BOP COVID-19 Statistics*, https://www.bop.gov/coronavirus/covid19_statistics.html (last visited Oct. 2, 2023).

[5] The Second Circuit has held that the First Step Act of 2018 "allows [district] courts independently to determine what reasons, for purposes of compassionate release, are extraordinary

extraordinary and compelling reasons permits release but does not mandate it, for the court must still consider the Section 3553(a) factors. *United States v. Monsanto*, No. 87 Cr. 555 (LAP), 2021 WL 355049, at *2 (S.D.N.Y. Feb. 2, 2021). Where the court determines "that the Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances," the motion for compassionate release may be denied. *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding compelling reasons warranting defendant's release but nevertheless denying motion for compassionate release because Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [defendant's] sentence").

### III.     Discussion

Muse has not demonstrated extraordinary and compelling reasons justifying a sentence reduction of any kind. Even if he had, the Section 3553(a) factors weigh heavily against his early release.[6] Lastly, because Muse's arguments are entirely without merit, counsel need not be appointed to assist him in further pursuing his Motion.

### A. Muse Has Failed to Meet His Burden to Show Extraordinary and Compelling Reasons Warrant His Early Release.

Muse has not demonstrated extraordinary and compelling reasons to support truncating his original sentence of 405 months. Rather, in support of his early release after 14 years of incarceration,[7] which is less than half of the sentence imposed by the Court, Muse advances virtually all the same arguments that were presented by his counsel in an unsuccessful effort to secure him a bottom-of-the-Guidelines sentence of 27 years (and even that sentence, which the Court properly rejected as insufficient, would have amounted to almost twice the sentence he has served to date). These arguments include his young age at the time of his offense conduct, his challenging life in Somalia, and his mental health disorders. Mot. 5-7, 14-16. These factors were the subject of robust argument at his 2010 sentencing and carefully considered by the Court, Tr. 7-8, 16-17, and none overcame the countervailing Section 3553(a) factors that led this Court to impose a sentence at the top of the Guidelines range, *see infra* III.B. The 405-month sentence imposed by the Court for the defendant's hijacking of an American ship and taking hostage its American captain was warranted then, it remains warranted today, and the defendant should serve it. *See United States v. Ebbers*, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (explaining that a

---

and compelling" and that the BOP Director is no longer the sole arbiter in determining whether the threshold is met." *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

[6] The Government does not dispute that Muse has exhausted his administrative remedies. *See United States v. Rivera*, No. 89 Cr. 346 (LAP), 2021 WL 5235093, at *4 (S.D.N.Y. Nov. 9, 2021) (exhaustion requirement satisfied where the warden denied defendant's request for compassionate release).

[7] Muse seeks, in the alternative, a "modest modification of his sentence." Mot. 21. As explained herein, he does not satisfy his burden to justify any reduction in his sentence.

compassionate release motion is "not an opportunity to second guess or to reconsider whether the original sentence was just").

Muse's remaining arguments center on the harsh conditions of the COVID-19 pandemic and his purported rehabilitation. These arguments are plainly unavailing.

First, Muse's generic contention that the COVID-19 pandemic rendered his conditions of confinement "more severe" than they would otherwise have been does not satisfy the requisite showing of extraordinary and compelling circumstances. Mot. 5. As this Court has explained, such reasoning "applies to all prisoners in state and federal custody" and fails to support a sentence reduction where, as here, the defendant "has not proffered any reason why he has been particularly impacted or is at particular risk because of the pandemic." *Freeman*, 2022 WL 1785578, at *3 (citing *United States v. Kurti*, No. 02 Cr. 1014 (LAP), 2021 WL 2823562, at *3 (S.D.N.Y. July 7, 2021)). Muse—who is a young man—cites no comorbidities or medical conditions that might heighten his risk of contracting or suffering severe manifestations of COVID-19 as compared to other inmates, nor do his medical records contain any indication of such conditions. *See United States v. Rodriguez*, 454 F. Supp. 3d 224, 228 (S.D.N.Y. 2020) (Preska, J.) (denying compassionate release where the defendant failed to show he suffered from medical conditions that rendered him uniquely vulnerable to COVID-19). In fact, Muse's medical records show that he is fully vaccinated and that he contracted COVID-19 last year, with no apparent symptoms. *See* Muse Medical Records 35, 36 (submitted under seal as Exhibit C). And as noted, FCI Terre Haute does not currently have a single active case of COVID-19 among inmates or staff members. *See United States v. Batista*, No. 18 Cr. 319 (LTS), 2020 WL 6132239, at *4 (S.D.N.Y. Oct. 19, 2020) (recognizing substantial past COVID-19 infections at facility but taking into account the facility's more recent success in controlling the spread of the virus in concluding that extraordinary and compelling reasons do not warrant a sentence reduction).

Second, though Muse contends there is "overwhelming evidence of his outstanding rehabilitation" while incarcerated, Mot. 10, his disciplinary records "raise questions about the extent of [his] remediation," *United States v. Morrison*, No. 07 Cr. 003 (LAP), 2019 WL 6732877, at *2 (S.D.N.Y. Dec. 11, 2019), *aff'd sub nom. United States v. Lee*, 841 F. App'x 285 (2d Cir. 2021). Muse has incurred infractions for being in an unauthorized area (2012), interfering with taking count (2012), mail abuse (2014), disruptive conduct (2019), possessing a hazardous tool (2020), and refusing to obey an order (2014, 2021). *See* Muse Disciplinary Records 1-3 (submitted under seal as Exhibit D). Regardless of the significance of any individual infraction, this is a notable record spanning almost the entire period of Muse's incarceration, which undermines his claims of purported rehabilitation.

### B. The Section 3553(a) Factors Weigh Heavily Against Muse's Early Release.

Even if Muse had carried his burden of demonstrating extraordinary and compelling circumstances warranting release, which he decidedly has not, Muse's Motion is easily rejected based on the independent reason that the Section 3553(a) factors counsel overwhelmingly against his release. This Court thoroughly reviewed those factors when sentencing Muse to a term of 405 months, and the careful reasoning it employed then "still applies with full force today." *See United States v. Saleh*, No. 93 Cr. 181 (LAP), 2023 WL 158444, at *5 (S.D.N.Y. Jan. 10, 2023) (declining to grant early release where "[t]he 3553(a) analysis has not materially changed" since sentencing).

First, and most importantly, the nature and circumstances of Muse's heinous crimes of terrorism, standing alone, compel denying his Motion for a sentence reduction. As the Court explained at sentencing, piracy is a universal scourge subject to special censure under international law and the U.S. Constitution. Tr. 34:1-10. This was the backdrop against which the Court assessed the "extraordinary" crimes committed by Muse and his gang on the high seas. *Id.* at 33:24. Muse and his pirate confederates were "experienced, coordinated and ruthless in the practice of hijacking, robbery and hostage taking," *id.* at 34:13-17; were "comfortable firing and handling AK-47 machine guns," *id.* at 34:19-20; "and did not hesitate to beat, injur[e] and sho[o]t at their hostages," *id.* at 35:5-8.

In particular, the Court recognized and underscored the gratuitous cruelty that Muse inflicted on his victims and, based on the appalling facts of the hijacking and hostage-taking, properly rejected the defense's argument that the defendant's poverty and difficult upbringing were "the only things that drove [the defendant] to get involved in the conduct in this case." *Id.* at 18:1-7. Citing "[t]he extreme level of violence and sadism that Mr. Muse and his men employed, which . . . was almost all entirely unnecessary to his demands for ransom," the Court concluded: "Mr. Muse and his men were not, as he suggests, halfhearted participants conscripted into service by hunger or other duress." *Id.* at 36:1-6. To the contrary, "they appeared to relish even their most depraved acts of physic[al] and psychological violence and abandoned all pretense of humane treatment of their captives." *Id.* at 36:6-9.

For instance, Muse tied up and conducted the mock execution of Captain Phillips, promising to kill him and bury his remains in the ocean "tomorrow night." PSR ¶ 40. Muse similarly reveled in terrorizing victims of the Serenity and Win Far 161 hijackings that he and his pirate confederates had previously perpetrated. For example, he built an improvised explosive device filled with screws and broken forks, placed it next to the captain of the Serenity, and threatened to detonate it if authorities arrived to rescue the captain. *Id.* ¶ 77. Muse's terrorization of his victims was a distinguishing characteristic of his crimes, and it became apparent at his sentencing that Muse had in this way inflicted immeasurable harms on his victims and their families, ranging from enduring psychological trauma to economic ruin. Cullin Wright, the third officer on board the Maersk Alabama during the hijacking, told the Court that he felt he would "never" again be the person he had been. Tr. 28:8-10. In a letter read aloud by the Court, the wife of another victim, John Cronan, explained that her husband's development of post-traumatic stress disorder after the attack prevented him from returning to work, resulting in the family's financial devastation and the loss of their home. *Id.* at 40:1-41:5. In the face of these stark facts, and all the other circumstances of his crimes present both then and now, there is no reason whatsoever to credit Muse's entirely conclusory claim that he would receive a lower sentence if he were to be sentenced today. Mot. 11-14. His crimes are as disturbing today as they were at the time of their commission. *See, e.g.*, *Saleh*, 2023 WL 158444, at *3 (concluding sentence of 35 years remained appropriate for defendant who attempted to carry out terrorist bombing under the Section 3553(a) factors).

Second, a sentence reduction would be wholly at odds with the need for the sentence imposed to promote respect for the law and further the goal of general deterrence, which has special import here. *See* 18 U.S.C. § 3553(a)(1)(A), (B), (C). Highlighting the "enormous increase" in reports of piracy at sea at the time of Muse's crimes, the Court described general deterrence as

"the most important sentencing factor brought to bear in this case." Tr. 43:14-19. The Court's observations speak to the international import of Muse's brazen attack on the Maersk Alabama—which marked the first time in almost 200 years that pirates captured a U.S.-flagged vessel[8]—and the need for a commensurate sentence that would send a strong message to those who would seek to threaten American sailors, U.S. security, and the conduct of global commerce. Maintaining the existing sentence is necessary to appropriately serve the goal of deterring such piracy attacks on American interests and individuals.

Third, individual deterrence and protecting the community also militate in favor of maintaining the sentenced imposed. Muse's participation in a series of violent hijackings was systematic and ruthless. As detailed above, Muse and his gang used machineguns to hold dozens of men hostage on the open seas and threatened them repeatedly with violence and death. The sheer "wantonness of Defendant's conduct counsels against release," *Rodriguez*, 2022 WL 2533468, at *4, and Muse's empty claims of purported rehabilitation fall flat, as discussed above. *See United States v. Rosa*, No. 88 Cr. 111 (LAP), 2020 WL 5774909, at *2 (S.D.N.Y. Sept. 28, 2020) (denying compassionate release because defendant was a danger to the community, as demonstrated in part by defendant's disciplinary sanctions while incarcerated, including for disruptive conduct and possessing a hazardous tool).

Finally, Muse's history and personal characteristics continue to counsel in favor of the sentence imposed. At sentencing, the Court acknowledged the defense's presentation of the difficult economic conditions Muse had experienced in Somalia, in addition to certain other claimed mitigating factors. Tr. 32:18-22. But the Court also recognized an array of factors that accentuated his culpability for his conduct and the resulting harms suffered by his victims and their families: Muse repeatedly spurned opportunities to safely depart the Maersk Alabama with the tens of thousands of dollars he had taken from its safe, he conducted the attack after having perpetrated previous hijackings, and he did not merely accompany other pirates in assaulting innocent sailors on the high seas but was the pirate who undisputedly served as their leader. *Id.* at 13:4-8, 33. Neither Muse's current claims of rehabilitation, nor his recent BOP classification as a "low risk" recidivist under the First Step Act's PATTERN risk assessment, even approach supplying a basis for revisiting the Court's carefully calibrated analysis of his history and personal characteristics. *See United States v. Castillo*, No. 03 Cr. 979 (KMW), 2023 WL 2262881, at *3 (S.D.N.Y. Feb. 28, 2023) (recognizing the defendant's "substantial rehabilitative efforts" and the BOP's "low risk" classification but concluding that the Section 3553(a) factors weighed against compassionate release given the violence of the defendant's crimes and the harms inflicted on his victims).

In sum, this is a case in which "[r]educing [the defendant's] sentence—when he has served less than half of it—would undermine the goals of sentencing." *See United States v. Gotti*, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020). Muse committed extraordinary crimes warranting an appropriately severe sentence. Because the justifications for his 405-month sentence remain as

---

[8] *Somali Pirates Seize Ship and US Crew Off Horn of Africa*, The Guardian, Apr. 8, 2009, https://www.theguardian.com/world/2009/apr/08/somali-pirates-ship-hijack (last visited Oct. 2, 2023).

compelling today as they were at the time the sentence was imposed, that sentence should not be disturbed.

### C. Muse's Meritless Section 3582(c) Motion Does Not Warrant Appointment of Counsel.

A defendant has no right to counsel when filing a motion for a reduction of sentence under Section 3582(c). *United States v. Fleming*, 5 F.4th 189, 193 (2d Cir. 2021). The decision to appoint counsel is left to the discretion of the district court, which may consider the merits of the defendant's motion as a "significant factor in the exercise of that discretion." *United States v. Reddick*, 53 F.3d 462, 465 n.2 (2d Cir. 1995). Where, as here, "it is readily apparent that the underlying motion is meritless," no appointment of counsel is warranted. *Schlussel v. United States*, No. 08 Cr. 694 (JFK), 2014 WL 1875928, at *3 (S.D.N.Y. May 9, 2014); *see also United States v. Dozier*, No. 18 Cr. 41 (DLC), 2022 WL 836908, at *2 (S.D.N.Y. Mar. 21, 2022) (denying appointment of counsel where defendant failed to show extraordinary and compelling circumstances); *United States v. Diaz*, No. 16 Cr. 719 (RJS), 2022 WL 3020145, at *4 (S.D.N.Y. July 28, 2022) (denying appointment of counsel where Section 3553(a) factors weighed heavily against compassionate release).

### V. Conclusion

The Motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) should be denied. Muse should be required to serve the remaining years of his sentence.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: _____
Jane Chong
Assistant United States Attorney
(917) 763-3172

Cc (By Mail): Abduwali Abdukhadir Muse (FCI Terre Haute)