**Exhibit B**

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3
     UNITED STATES OF AMERICA,
4
               v.
5                              S1 09 cR. 512 (LAP)
     ABDUWALI ABDUKHADIR
6    MUSE,

7              Defendant.

8    ------------------------------x

9

10

11
                         February 16, 2011
12                       10:00 a.m.

13

14

15

16   Before:

17            HON. LORETTA A. PRESKA,

18                    District Judge

19

20

21

22

23

24

25

1                           APPEARANCES

2    PREET BHARARA
         United States Attorney for the
3        Southern District of New York
     BRENDAN MCGUIRE,
4    JEFFREY BROWN,
         Assistant United States Attorneys
5

6    PHILLIP L. WEINSTEIN, ESQ.,
     FIONA DOHERTY, ESQ.,
7    DEIRDRE D. von DORNUM, ESQ.,
         Attorneys for Defendant
8        52 Duane Street
         New York, New York
9
     ALSO PRESENT:
10
     STEVEN SORRELS, Federal Bureau of Investigation
11   FRANKLIN GARCIA, New York City Police Department
     BRAD DUCKWORTH, Navel NCIS
12

13   ABDULAZIZ HUSSEN, Official Somali Interpreter

14   FATIMA DUALEH, Somali Interpreter

15

16                           - - -

17

18            THE CLERK:    United States of America.

19            THE COURT:    United States against Muse.

20            Is the government ready?

21            MR. McGUIRE:    Yes.  Brendan McGuire and Jeffrey Brown

22   for the government.

23            With us at counsel table is Special Agent Steven

24   Sorrels and Detective Franklin Garcia of the Joint Terrorism

25   Task Force and Special Agent Brad Duckworth of the Navel

1    Criminal Investigative Service

2                    THE COURT:    Good morning friends.

3                    And is the defense ready?

4                    MS. DOHERTY:    We are, your Honor.  Fiona Doherty

5    Federal Defenders for Mr. Muse.  With me at counsel table are

6    my colleagues Deirdre von Dornum and Phillip Weinstein.

7                    Also with us is a Somalian interpreter Fatima Dualeh.

8    Of course, our client at the end, Abduwali Muse.

9                    THE COURT:    Good morning.

10                    Ms. Doherty, have you and your client had adequate

11   time to review the presentence report?

12                    MS. DOHERTY:    We have.

13                    THE COURT:    Is there any reason it should not be made

14   part of the record?

15                    MS. DOHERTY:    No, your Honor.

16                    THE COURT:    I have the fax which you folks sent in

17   this morning which is agreed upon added to paragraph 16 of the

18   PSR relating to the phone conversation.

19                    MS. DOHERTY:    That's right, your Honor.  And as your

20   Honor knows, there were a dispute between the defense and the

21   government about the translation of the two calls that have

22   been at issue at the sentencing, the August 22 and August 23,

23   2009 calls from the MCC, and to avoid a Fatico hearing the

24   defense and the government decided what would be best is to

25   include both versions of these calls within the PSR and,

1    therefore, we provided to your Honor in bold the proposed

2    addition.

3                    THE COURT:    Yes.

4                    With that change and that agreement, are there any

5    objections to the presentence report?

6                    MR. McGUIRE:    Not from the government, your Honor.

7                    MS. DOHERTY:    Your Honor, the defense just has two

8    relatively minor points.

9                    THE COURT:    Yes.

10                   MS. DOHERTY:    The first is with respect to paragraph

11   110 of the PSR.

12                   THE COURT:    Yes.

13                   MS. DOHERTY:    We just ask that be amended to clearly

14   reflect the fact that the to suicide attempts by our client,

15   Abduwali occurred in June of 2010 and not May.

16                   THE COURT:    Yes.

17                   MS. DOHERTY:    There is no dispute about that, your

18   Honor.

19                   And also, then, in paragraph 17, the PSR notes that

20   the SAND measures expired in January and we just ask it also be

21   included that our client Abduwali is now in general

22   proposition.

23                   THE COURT:    Yes, Ma'am.

24                   Any other objections to the presentence report?

25                   MS. DOHERTY:    No, your Honor.

5

1          THE COURT:    Thank you.

2          With respect to the offense level computation, I

3    accept the findings of the presentence report set forth at

4    paragraphs 58 through 71 which conclude that a total offense

5    level of 41 is appropriate, including paragraph 72, and

6    actually extending to paragraph 85.

7          With respect to the defendant's criminal history, I

8    accept the findings of the presentence report set forth at

9    paragraphs 86 through 91 that conclude that a criminal history

10   category of I is appropriate.

11         Ms. Doherty, I have the defendant's sentencing

12   submission dated cover letter February 2, I have the

13   government's sentencing submission dated February 9 and I have

14   the defense reply submission dated February 14.

15         I also have letters from victims.

16         Are there any additional written materials I should be

17   looking at, counsel?

18         MR. McGUIRE:    Not from the government, your Honor.

19         MS. DOHERTY:    No, your Honor.

20         THE COURT:    Thank you.

21         Ms. Doherty, would you like to speak on behalf of Mr.

22   Muse?

23         MS. DOHERTY:    Yes, your Honor.

24         The defense is asking for a sentence of 27 years in

25   this case and we would like to emphasize from the outset that

1  nobody here is talking about a lenient sentence.  Our client

2  pled guilty pursuant to a plea agreement with a stipulated

3  guideline range of between 27 and 33.75 years, and under the

4  terms of that plea agreement neither party can advocate for a

5  sentence outside the guideline range, so in asking for 27 years

6  the defense is asking for what can only be described as an

7  extraordinarily long sentence, one that is in the high end of

8  sentences imposed around the world for these types of offenses

9  and a sentence that will ring out powerfully to the

10 international community as strong deterrent.

11        And as in any sentencing proceedings, the primary

12 question here is what sentence is sufficient but not greater

13 than necessary.

14        Of course, the Second Circuit has made clear that the

15 parsimony principle is the driving force behind any sentencing

16 decision.  Accordingly, the many question for the court is what

17 is the incremental value of the additional seven years that the

18 government is seeking here.  Why is an extra seven years

19 necessary for this sentence to be experienced as both deterrent

20 and specific punishment?

21        It is our position that a sentence of 27 years is

22 amply sufficient to punish and deter our client.  No more time

23 is necessary.

24        And I think in evaluating how our client will

25 experience these 27 years, the court should consider a number

1     of very important factors.

2              First, his age.  And although I will come back to the

3     specific of the age question later on, no matter how the court

4     views it, there is really no doubt, no dispute that he is very

5     young, and that is true whether the court accepts the defense's

6     position that he was 16 at the time of the offense or relies on

7     the statements that were made to Detective Gallaway shortly

8     after the offense that he was between 18 and 19.

9              And, of course, when he made those statements he just

10    witnessed his three companions getting killed, he was shackled,

11    he was very different and chaotic circumstances, and a sentence

12    of 27 years is a very harsh punishment against somebody who was

13    clearly so young.

14             Now, in the context of deterrence, the government

15    actually uses his young age against him by pointing out that he

16    will still be relatively young when he is released from prison.

17             But, your Honor, if you run the numbers, he will be in

18    his mid-40s at the end of the 27 year sentence, and the court

19    can't evaluate this in a vacuum.  The government says maybe he

20    will turn to piracy doesn't say anything about the actual

21    operation of piracy in Somalia.  When he gets out in 27 years

22    the whole landscape in Somalia will be difference.

23             In considering the need for deterrence the court

24    should consider the life expectancy figures from Somolia.  The

25    latest figure from the World Bank shows life expectancy for a

1     man in Somolia is 48 years.

2              I have the documents if you want to support it.  I

3     already shared these with the government.  He will be in middle

4     40s on a 27 year sentence.  Somebody might argue he will be

5     held here in the United States, those life expectancies figures

6     don't hold up in Mr. Muse's position.

7              There is no doubt the conditions in Somolia that he

8     experienced up until he was arrested will continue to have a

9     powerful effect on him.  It's beyond dispute the childhood

10    malnutrition continues to have an enduring health affect as

11    someone goes older.  And when you are talking about Somalia,

12    you are not just talking about malnutrition, you are talking

13    about severe acute malnutrition as identified in the U.N.

14    report indicted by the defendant.  The body doesn't get the

15    nutrition it needs to develop properly.

16             And I think sort of a clear indication to the court of

17    the health effects that Abduwali will face is evidenced in the

18    treatment that he has gotten so far at the MCC, the dental

19    treatment.  BOP has already removed seven of his teeth and

20    identified two more that need to be extracted, and the decay of

21    teeth is a clear symptom of childhood malnutrition.

22             And the life expectancy figures also raise other

23    important issues.  For woman in Somalia it's 51, for men in

24    Somalia it's 48, which means after 27 years there is

25    practically no chance that his parents will be alive when he

1    gets returned to Somolia.

2              Even for his siblings and his friends, they will be

3    edging up against those life expectancy figures after a

4    sentence of 27 years, and this is all to say why is a

5    significant a sentence of 27 years, why that provides enough

6    punishment and deterrence in this case.

7              A sentence of 27 years is much more extreme given

8    Abduwali's situation as a Somalian raised under these

9    conditions and it's much more severe and it is much more

10   extreme than a sentence that might be imposed on an American

11   where the life expectancy here is 76.  That is almost a 30 year

12   difference, your Honor.

13             Next I would like to move on to the issue of the

14   alleged threat from the MCC, specifically, the issue of the two

15   phone calls that Abduwali made to Somolia on August 22 August

16   23, 2009.

17             The government imposed special administrative measures

18   on Abduwali for a year on the basis of its interpretation of

19   those calls.  He was kept in isolation in a small room, no

20   religious services, no TV, no radio, severely limited access to

21   books.  And although the government doesn't address the issue

22   of the calls a great deal in the submission, the PSR obviously

23   contains a lot of information on that and we would like to

24   address the issue of the calls head on.

25             Now, the chain of events that resulted in the SAND

1   measure began when a manned name Gilbert Victor, who was a

2   hired captain of the boat Serenity told the FBI after two

3   months before his -- he told the FBI about two months before

4   his release he heard that Abduwali had sent --

5                    THE COURT:    From being held as a hostage?

6                    MS. DOHERTY:    Yes, your Honor, absolutely.

7                    Mr. Victor was a member of the crew of the Serenity

8   that was hijacked about a month or so before the Maersk

9   Alabama, and what Victor told the FBI was that about two months

10  before his release he had heard that Abduwali had sent a

11  message from the MCC instructing that the captain of a

12  different ship, the Win Far 161 be killed.

13                   Now, all of Abduwali's calls from the MCC and

14  identified two calls from August 2009 that they thought were

15  consistent with Gilbert's account, and in those two calls

16  Abduwali was talking to his mother and he told his mother he

17  made a promise when he was in Salat and he wanted this promise

18  to be fulfilled.

19                   We spent a lot of time in our submission explaining

20  howl the evidence surrounding these calls does not match up to

21  how the government has interpreted them.  I think one of the

22  most significant issues is the timing of these two calls,

23  because the timing of the calls in late August 2009 doesn't

24  match up with Victor's account.

25                   Victor said that he had heard about this threat in

1    mid-July of 2009 which was five weeks before the calls that the

2    government is relying on were actually made.  Thus, purely as a

3    matter of timing the calls relied upon by the government could

4    not have been the source of the threat.

5           As we explain in our submission, the calls did not

6    concern the captain of the Win Far 161 in any way.  The calls

7    were about a promise and we will go into heavy detail here that

8    we talk about in our submissions, but the calls were about a

9    promise that Abduwali made to a man of a different clan

10   concerning a promise to buy a car in exchange for services that

11   Abduwali had provided that man in Somalia who was aware of it

12   and Abduwali wanted to fulfill the promise and in the calls he

13   is asking his mother not to interfere with them.

14          And our explanation of the calls is supported by a

15   number of important concrete factors.

16          First, the text of the calls themselves.  Your Honor

17   has those both in the PSR and in our submission.  They reflect

18   the fact that the promise was made back when Abduwali was in

19   Somalia and before his capture by the U.S.  Abduwali never

20   returned to Somolia after the capture of the Win Far so he

21   could not be discussing a promise about the Win Far when he was

22   in Somolia so the text just doesn't watch up.

23          Also Abduwali's mother and younger brother

24   independently confirmed to the defense that these calls were

25   about a car.  And your Honor has an affirmation from Mohamad,

1    Exhibit G, talking about all that.

2              And also we provided the court with a separate

3    recording from the MCC which made explicit that that there was

4    a promise concerning Abduwali.  That was what the promise was

5    about.  And, of course, the captain of the Win Far was not

6    harmed.

7              Now, it's also significant that the government view of

8    the alleged threat relies on the account of one witness, and

9    that's Mr. Victor, the captain of the Serenity.  And what do we

10   know about Mr. Victor?

11             Well, we know a number of things.  And we talked about

12   this in our submission.  I will just highlight the issues here,

13   but he has significant credibility problems, reputation for

14   drug smuggling, he lied to the FBI about who was on the

15   Serenity.  He was under active investigation in the case shells

16   about what he was doing during the actual voyage from the

17   Seychelles to Madagascar that is at issue in this case.

18             But, again, even if the court were to accept Gilbert's

19   account, the timing and the story just doesn't match up.

20   Victor's owe account doesn't match the timing of the calls.  So

21   there is no accurate reliable evidence that the court can use

22   on the basis of those calls to use those calls to increase

23   Abduwali's sentence by seven years.  That's why that is

24   significant here.

25             I also would like to address the issue of leadership,

1    your Honor, because in the government's submission they rely

2    heavily on the fact that Abduwali played a leadership role.

3            THE COURT:    I thought that was stipulated to.

4            MS. DOHERTY:    You are right, your Honor, we do not

5    dispute in any way that Abduwali was the leader of the four men

6    or acted as the leader of the four men who took the Maersk

7    Alabama or tried to take the Maersk Alabama.  But he is already

8    being punished extensively for that leadership role.

9            The stipulated guideline range includes a four level

10   enhancement for leadership which increases his offense level

11   from level 37 to 41.  At offense level 37, which he would be at

12   if there were no leadership points, his guideline range would

13   be 210 to 262 months, in other words, 17.5 to 21 years.  So

14   because of his leadership, the guideline range is bumped up by

15   ten years.  That's already a significant punishment and gives

16   no cause for the court to go to the top of the guideline range

17   just to reflect his leadership, it is already amply reflected

18   in the guidelines.

19           And in the government's submission they express

20   Abduwali's leadership role too far and it is not supported by

21   the evidence.

22           On page 21 of their submission the government claims

23   that essentially everything concerning the hijacking of the

24   Serenity, the Win Far 161 and the Maersk Alabama was executed

25   "under the direction of one man."

1          This flies in the face of the expert report that the

2     defense provided to the court from Professor Cassanelli, who is

3     a faculty member of the University of Pennsylvania and also

4     directs that university's Center of African Studies.

5          In this report Dr. Cassanelli makes abundantly clear

6     that modern day piracy in Somolia relies on network supply and

7     financing that go way beyond what happens actually happens in

8     operations at sea and high-level organizers are not anywhere

9     near the actual operation, they leave that entire hand to get a

10    tiny cut of the proceeds.  That is the landscape of the actual

11    piracy operations that are working in Somolia.

12         In its submission the government also attempts to

13    impute to Abduwali's leadership events that took place many

14    months after his capture when he was at the MCC.

15         For example, I don't think this is necessarily clear

16    from the government's submission, but Win Far 161 was captured

17    just two days before the attempted seizure of the Maersk

18    Alabama so Abduwali was involved in that for only two days, but

19    the Win Far was then held for approximately ten months in

20    Somolia before being released, but in discussing what happened

21    during these ten months the government repeatedly refers to

22    actions by Muse.  At that time Abduwali is here.  They can't

23    impute things that happened while he was here to actions that

24    occurred in Somolia.

25         In asking for a sentence of 27 years the defense has

1    asked the court to consider a number of factors.

2              His age, the sanctioning of piracy among officials in

3    Puntland where he lives, his desperate conditions prevailing in

4    Somolia, including the conditions he experienced when he grew

5    up, and also the mental health problems that he experienced in

6    BOP custody.

7              I know I put a lot of that in our submission so I

8    would like to highlight a few issues here and respond to some

9    of the government's arguments.

10             On the question of age, there are no birth records in

11   Somolia after 20 years of Civil War.  What we tried to do is

12   provide the court with the next best thing.  We provided

13   affirmations from his family, specifically from his mother and

14   his brother Mohamad where they clearly say he was 16 at the

15   time of the offense.

16             We also provided an affirmation from a man called

17   Akeem Al Ben Mohammed, and that man is a BBC journalist in punt

18   land, and he was hired by the defense, he worked for the

19   defense as an investigator and an interpreter in Somolia.  He

20   makes clear and he has met Mohamad, Abduwali's younger brother,

21   in person and he makes clear, yes, he seems to be somebody, he

22   looks like somebody who is 16 or 17 years old.  Mohamad is one

23   year younger than Abduwali.  Given this, Abduwali is

24   approximately 18 years old now, two years after the offense.

25   All of that matches up.

1            In choosing to believe that Abduwali is 18 or 19 years

2       old, the government is choosing among contradictory statements

3       that were made immediately after the offense and it's also, of

4       course, relying on the preliminary age hearing that was

5       conducted by Magistrate Judge Peck.

6            But Judge Peck's ruling was not a determinative

7       finding on age, that was an issue that was made -- that was a

8       finding that was made at the presentment, a finding that needed

9       to be made on the spot because there was an immediate issue

10      whether the presentment should be open to the public, so it's

11      wasn't a final decision in any sense.

12           THE COURT:    My understanding was that the defense did

13      not contest that finding for purposes of the plea.

14           MS. DOHERTY:    That is absolutely right, your Honor.

15      This was an active issue on the table even after the

16      presentment, but then because of the plea the defense

17      effectively agreed to waive the issue of age for the plea, but

18      as the government knows, the defense reserves the right to

19      present arguments about age to your Honor.

20           Now, I want to talk very quickly about that age

21      hearing, because the government makes a lot -- takes a lot of

22      significance from the fact that the father made contradictory

23      statements and Abduwali didn't testify, but I think that the

24      government's arguments don't possibly reflects the chaotic

25      environment of my recollection.

1          My colleagues, Mr. Weinstein and von Dornum, had met

2     Abduwali for the first time about half an hour before the

3     hearing.  He was injured, in pain, he spoke Mufti, not English.

4     No person in their right mind, no lawyer in their right mind

5     would put a client on the stand under those circumstances.

6          Also with regard to the contradictory statement or one

7     contradictory statement by the father, it is also important for

8     the court to understand the circumstances under which that

9     testimony was given.  The father obviously was not in the

10    courtroom, it was done by a telephone line to Somolia.  There

11    is no written record of what he actually said in Somolia, you

12    only have the translator's English version and she repeatedly

13    indicate had she was having trouble hearing.  You can see it.

14    Even Judge Peck acknowledged that the father could easily have

15    misunderstood the question, so that is not a determinative

16    finding in any way.

17          But I think the main point to draw from all of this is

18    no matter what the court decides about how old he is, 16 or 18

19    or 19 at the time of the offense, he's very young.  There is no

20    question about that.  And that's also supported by the dental

21    records from the MCC that we talk about in their submission.

22    We just ask that the court take those things into account.

23          We also ask the court to consider the economic

24    conditions in Somolia, the malnutrition, hunting through the

25    garbage for food, working from the age of eight, living

1    independently without adults from the age of 11, the kind of

2    story that really is not imaginable here in the United States.

3    Without education, no support, hunger.  These are the things

4    and the only things that drove him to get involved in the

5    conduct in this case.  And we ask that the court evaluate all

6    of that in connection with what we know about the conditions in

7    Somolia.

8           We used a lot of United Nations reports in our

9    submissions to establish to the court the terrible drought and

10   malnutrition that are prevalent in Somolia.  It's the worse

11   failed state of all failed states.  It's led one policy

12   magazine fail state index now for three years running, and it's

13   the kind of place where children regularly work from an early

14   age, where children regularly are conscripted into the armed

15   forces to be part of the conflict.  It's a brutal place for

16   someone to grow up.

17          And another important point for the defense is the

18   official sanctioning of piracy in Somolia, and for that we

19   presented to the court Professor Cassanelli's report.  While

20   piracy is clearly illegal under international and United States

21   law, there is a very different governmental attitude about

22   piracy in Puntland.  There is official sanctioning, complicity

23   and local officials taking part of the proceeds as payment.  So

24   it's not experienced in the same way in Puntland as it would be

25   here in the United States.

1          And this is really getting to our last point, your

2    Honor, and all of this is about why a sentence of 27 years is

3    sufficient, sufficient in this case, but our last point is

4    mental health, the mental health problems.

5          And your Honor has a report from Dr. Crowle about the

6    mental health problems that Abduwali incurred at the MCC,

7    particularly over the last year when he was isolated in SAND.

8    And, of course, for Abduwali that is compounded BY the complete

9    isolation, being cut off from anything he has ever known.  I

10   mean, it's a completely foreign institutional environment,

11   separated from family, from friends and just being isolated, I

12   think, in a way that an American maybe can't even understand.

13         And as the court is aware, Abduwali made several

14   suicide attempts in June of 2010, and during those suicide

15   attempts and even after he was experiencing auditory and visual

16   hallucinations and he couldn't distinguish between those

17   hallucinations and reality, and all of that is documented in

18   the MCC medical records.

19         And this is important because it expresses what

20   Abduwali has experienced in his almost two years of

21   incarceration in BOP custody and he has experienced this as

22   incredible punishment and deterrence already and we think it's

23   very important that the court take that into account.

24         Dr. Crowle has diagnosed Abduwali with depressive

25   disorder, severe TTFC and anxiety disorder.  He talks about the

1    profound distress that Abduwali has experienced.  And, of

2    course, these incredibly painful episodes for Abduwali have

3    enduring effect on his mental health and that is talked about

4    by Dr. Crowle as well.

5           Although Abduwali very recently is back in general

6    population, his experiences is, again, cut off from his

7    culture, his family, will continue to be very painful for him.

8    So we ask that the court consider all of these factors in

9    deciding what sentence is sufficient but not greater than

10   necessary in this case.

11          Thank you, your Honor.

12          THE COURT:    Thank you, Ms. Doherty.

13          Mr. Muse, would you like to speak on your own behalf?

14          THE DEFENDANT (Through the interpreter):  Yes.

15          THE COURT:    Yes, sir.  Would you do so now, please.

16          THE DEFENDANT:    Yes.

17          I'm sorry, I'm sorry very much about what happened,

18   and what happened to the victims who are in the ship.  I am

19   very, very sorry about that.  Also what happened to them.

20          I am very, very sorry about what I caused and all of

21   that was due because of the problems that exist in Somolia.

22   From the time I was born until the time I was captured I have

23   never encountered these people who teach me something or people

24   who tell me something, and I was recruited by people who were

25   more powerful and more intelligent than me.  I had the brains

1    to execute, but I did not have the brain to organize.  I got my

2    hands into something that was more powerful than me and I have

3    been sorry for what I caused, for what I did for the past two

4    years, and even now it's possible that's what going to happen

5    to me I'll never be ordinary, and I'm very, very sorry about

6    that, and I ask for forgiveness to all the people that I harmed

7    and also the U.S. Government.  I ask for forgiveness.  That's

8    all I would like to say.

9              THE COURT:    Thank you, sir.

10             Does the government wish to be heard?

11             MR. McGUIRE:    Yes, your Honor.

12             We would like to just offer principally three points

13   in response to the defense's argument.

14             First, so we are all clear, the defendant sits before

15   the court today for sentencing for one reason and one reason

16   alone, his choices and his actions.

17             When he and his men attempted to hijack the Maersk

18   Alabama and the crew heroically resisted them, he as the leader

19   of that group could have chosen to leave and return to the Win

20   Far, the other ship that he had hijacked.

21             When the crew, after capturing him, agreed to release

22   him in exchange for Captain Phillips, rather than reneging on

23   that agreement and taking Captain Phillips hostage for another

24   four days, the defendant could have agreed, let Captain

25   Phillips return to the Maersk Alabama and he and his men return

1    to Somolia or the Win Far on the lifeboat.

2              And when the Navy showed up and he was in the shadow

3    of the Navy destroyer in the lifeboat with Captain Phillips,

4    he, again, could have chosen so surrender.  These are his

5    choices, he was the leader and he chose not to.

6              To the defense's point about the structure of

7    piracy-related operations, there was no mention by the

8    defendant over the course of a six weeks of these three

9    hijackings and certainly no mention during the four days of

10   negotiations with the U.S. Navy of any boss, of anyone that he

11   had to report to, of anyone's approval he needed to let the

12   captain go.  He repeatedly boasted that he was the leader and

13   that these were his decisions.

14             Today he has to face the consequences of those choices

15   and he should be held to full account for his actions.

16             Secondly, the defendant's conduct in this case is

17   simply put horrific.  The government has detailed it to a great

18   degree in the sentencing submission so I will not go through it

19   again for the court.  His actions speak for themselves and it

20   is clear the trauma that they have caused is impossible to

21   measure.

22             The principal reason for that is not simply the

23   actions themselves, because in this case the defendant not only

24   committed these actions, he reveled in them, he relished in the

25   suffering of his victims, whether it was playing Russian

1   roulette with them, whether it was threatening to cut one of

2   them up and sell his organs or whether it was assembling an IED

3   in front OF them and planting it in front of a hostage and

4   threatening to detonate it if they were discovered.

5           None of this was necessary for the defendant's overall

6   objective, which was a ransom payment.  This was all just done

7   for the sake of it, seemingly for his own and his men men's

8   enjoyment.  He could have achieved the same effect without any

9   of this and without simply telling -- by simply telling those

10  who he was negotiating with in fact he was doing this but he

11  need not actually have done it, but he did it and he seemed to

12  relish it.

13          And in addition when he was caught, when he was

14  arrested, he was unrepentant.  When asked what happened after

15  waiving his Miranda rights, he lied to the interviewing agent

16  and he told him he was forced to do it at gunpoint by other

17  men.

18          And then, of course, as defense commented on at

19  length, there are the calls from the MCC in which, as the

20  defense concedes, whatever the interpretation may be, he

21  continued to engage in piracy related activity from the MCC.

22          The effects of his acts have proven unbearable for

23  many of the victims and, of course, they are multiplied out to

24  the victims' families.  For many their effects will no doubt be

25  both profound and lasting and certainly it appears for many

1  those effects will last beyond 27 years, 33.75 years or

2  whatever sentence the defendant receives because it appears

3  that a number of these individuals will suffer for the rest of

4  their lives.

5          Thirdly and finally, the defendant's conduct here

6  completely dwarfs any arguments made in mitigation by the

7  defense, whether individually or in the aggregate.  None of

8  what the defense is arguing justifies a sentence at the bottom

9  end of the guideline range here.

10          As to the issue of age, again, the government

11  addresses this in its memo.  The defendant has used his

12  youthful appearance as a tool for leniency since the moment he

13  was arrested that's why he provided multiple ages.

14          Magistrate Judge Peck found that the defendant was a

15  adult.  For the last nearly two years while this case has been

16  pending before your Honor he has been prosecuted as an adult.

17  His conduct makes clear that he is an adult and today he should

18  be held to account as an adult for the consequences of his

19  actions.

20          Finally, the defense makes some suggestion in their

21  initial papers and then they press the argument in their reply

22  papers that notwithstanding the fact that the Navy allowed the

23  defendant to surrender on April 12, notwithstanding the fact

24  that the U.S. Government employed every resource it had in

25  order to attempt to achieve a peaceful resolution to the crisis

1    caused by the defendant and notwithstanding the fact that the

2    Navy employed the assistance much Somolia elders, the defense

3    suggests and presses in its reply brief that, in fact, the

4    three men, Muse's three men had agreed to surrender and when

5    they did that the Navy shot them anyway.

6            This argument is outrageous.  It is outrageous.  It

7    flies in the face of the evidence and it defies common sense.

8    The defendant and his men forced the U.S. Navy to be heroes

9    that day and heroes they were and that was it, plain and

10   simple.

11           The breadth and the depth of the suffering that this

12   man has caused is extraordinary.  53 men from six countries

13   over the course of six weeks crossed his path.  They were

14   victimized hundreds of miles out at see isolated from what they

15   knew simply because they were trying to do their jobs.  And as

16   I mentioned earlier, the suffering is multiplied because of the

17   trauma that has now been experienced by all of their family

18   members.

19           He was the leader.  He was the first one on board.  It

20   will be his face that they remember.  It will be his voice that

21   they hear and it will be his laugh that will haunt them.

22           The sentence today, your Honor, not only needs to

23   reflect the seriousness of his offenses, not only needs to

24   reflect the need to protect the public from this man, but it

25   also needs to reflect the need for general deterrence in this

1   area, and respectfully the government submits the sentence in

2   this case should send an unmistakable message to anyone who

3   would considered attacking an American ship or praying on

4   defenseless American sailors.

5          For all of those reasons, a sentence at the bottom end

6   of the applicable guideline range is simply insufficient and

7   the government respectfully requests that the court sentence

8   the defendant at the top end of the guideline range to a

9   sentence of 405 months.

10         Thank you.

11         THE COURT:    Thank you, Ms. Mcguire.

12         Ms. Doherty, would you like to respond?

13         MS. DOHERTY:    Yes.  A couple of points that the

14  government raised, one, being that Abduwali in the moments he

15  was taken particularly into custody was unrepentant and gave a

16  false statement.

17         I think the court could evaluate the circumstance

18  under which that statement was made.  He was terrified.  He had

19  just witnessed his three companions getting killed and he felt

20  that given the circumstances of what he experienced at the

21  shooting he couldn't trust them at that point to tell the

22  truth, but now he has said exactly what happened and he has

23  taken responsibility for his role in the context of what

24  happened on the Maersk Alabama.

25         Also I just want to respond briefly to the

1    government's point about how Abduwali experienced the shooting

2    of his three companions and his belief that they were in the

3    process of surrendering when they were killed.

4            The defense presses this issue in response to the

5    government's argument in its reply memorandum so the court

6    could see that we were by no means pulling any of this out of

7    thin air and there is evidence that an agreement had been

8    reached and that the three men had agreed with Abduwali to

9    release the captain, and one of the things we presented to the

10   court was an affirmation by Serion, who is the Somali elder

11   that the Navy reached out to discuss coming, really to have the

12   authority be involved in the peaceful resolution of this.  And

13   Mr. Weinstein and I traveled to Africa and we personally met

14   with Serion and he gave us this account which is now reflected

15   in the affidavit and that is that his understanding was that

16   the men had agreed to be released without condition.

17           Whether all of this is relevant, I think it is only

18   relevant to the extent Abduwali's experiences of all of this,

19   how he understood and the interpreted the shooting of the men,

20   how terrified he was and how that, too, is powerful punishment

21   and deterrence as experienced by our client.

22           Thank your Honor.

23           THE COURT:    Thank you.

24           Ladies and gentlemen, I understand there are victims

25   present who wish to be heard.

1          Would you come forward, ladies and gentlemen, to the

2    podium.

3          Would you state your name clearly and then I am happy

4    to listen to what you have to say.  Sir.

5          MR. WRIGHT:    My name is Cullin Wright and I was the

6    third officer on board the Maersk Alabama during the hijacking.

7          THE COURT:    Yes, sir.

8          MR. WRIGHT:    I would like to say what happened to us

9    was terrible and it has changed me.  I'm not the same person

10   that I used to be and I never will be.

11         I would like to say that the defendant was the leader

12   of the group.  He was the first person aboard to hold us at

13   gunpoint on the bridge.  I was forced to go down and lower

14   ladder so the rest of the other two pirates could come aboard

15   the whole time at gunpoint.

16         They shot at us and at me from the boat on to the ship

17   and bullets RANG off the bulkhead right next to me.  It's a

18   very, very scary experience.

19         Now, during the time that we spent on board there were

20   three of us on the bridge, the captain and ATF Raffer, which is

21   an AB, and I was on the bridge being held the entire time.  The

22   rest of the crew were at the steering room and they barricaded

23   themselves in there and it was very hot.  We are near the

24   equator and at the steering was approximately 130 degrees, 140

25   degrees.  Now, these men stayed in that at the steering room

1    for about eight hours and by the time them got out they were

2    bearing able to walk and the experience for them was very

3    traumatizing.

4              The defendant and his three companions had many

5    chances to leave the ship.  They were given the money from the

6    safe and they had an opportunity to leave the ship and leave us

7    to go on our way.  They would not do that.

8              After our crew captured the defendant and made the

9    deal to exchange the captain for the defendant, there was a

10   goods chance for them to go off and we would not have been able

11   to catch them.  Instead, they took our captain and we were

12   forced to get our ship operational in a very short time with

13   every man in very bad shape, barely able to walk, but we were

14   able to chase the lifeboat with our captain for seven hours and

15   able to corral the lifeboat so it could not get away and get

16   out of our sight.

17             It took nearly eight hours for the Navy to arrive

18   after we had gotten the pirates off of the ship.  So the whole

19   time very, very bad, but the crew was able to work through it

20   and I believe we saved our captain from going off into the

21   night.

22             Now, it was pretty bad.  I was told before I went to

23   the ship that we would stay at least 300 miles off the coast of

24   Somolia.  There were already attacks that were happening, they

25   were all pretty close a hundred, 200 miles off the coast of

1    Somolia.  When our ship was captured, we were 230 miles off the

2    coast.  Captain Phillips had been aboard approximately a week

3    and in that time he had had at least seven e-mails telling him

4    to stay 600 miles off the coast of Somolia.  He did not do

5    that.  Also when he took over from the previous captain, that

6    captain told him you should say 600 miles off the coast of

7    Somolia.

8              So the captain, for his reasons, put us in a very bad

9    situation, and as counsel stated, defenseless.  We have pocket

10   knives and fire hoses to combat pirates, and since then on the

11   Alabama they have put a secure team, but for the other Maersk

12   ships that travel through that area, they don't have any

13   security.

14             I was on a ship last year that went through that area.

15   We had a military cargo on board.  They put four security

16   personnel when we got to the Red Sea.  We delivered our cargo

17   in the Persian Gulf and as soon as the cargo was off they took

18   the security off.  We're still in pirate waters without any

19   security, and I just wonder was the security for the cargo or

20   for the men.  Also they disabled the firearms on board when

21   they left.

22             I believe there are still nevertheless 700 crew

23   members being held captive by the pirates and our security has

24   not been imposed very much since the event and I would like to

25   see something done about that.

1           Counsel has said that a lenient sentence is in order

2    because of his upbringing and malnutrition.  I don't believe

3    that is true.  I think he needs to serve the extra seven years

4    in an American prison where he can have proper food.  He also

5    may need seven additional years for his mental illness to be

6    treated.

7           And we're not talking only about piracy that he has

8    done, he is responsible for the deaths of his three companions.

9    27 years is a very light sentence for that and I believe 34

10   years is a light sentence, also, but I believe that's your

11   parameter.

12          I would ask the court to impose the heaviest sentence

13   possible.

14          He has changed the lives of everybody that he came

15   across in those six weeks.

16          Thank you.

17          THE COURT:    That you, Mr. Wright.

18          Who else would like to be heard, ladies and gentlemen?

19          (Pause)

20          Anyone else?

21          (Pause)

22          Everyone sure?

23          (Pause)

24          Thank you, ladies and gentlemen.

25          Mr. Muse comes before the court to be sentenced for

1    hijacking a ship, conspiracy to hijack three ships, hostage

2    taking, conspiracy to engage in hostage taking and conspiracy

3    to engage in kidnapping.

4              I am cognizant that Mr. Muse did not plead to Count 1,

5    the piracy count that carries a mandatory life sentence.  He

6    was also permitted not to plead to Counts 4, 7 and 10, the

7    counts relating to possession of machine guns in connection

8    with a crime of violence which also carry mandatory consecutive

9    life sentences.

10             His guidelines calculations does not take into account

11   the hijackings of the Serenity and the Win Far 161 for purposes

12   of calculating his total offense level and, thus, as noted in

13   the presentence report at page 35 Muse has already been

14   afforded some leniency in this case.

15             Now, of course, the guidelines, as you know, ladies

16   and gentlemen, I have calculated the guidelines and have taken

17   them into account.

18             In looking at the history and characteristics of the

19   defendant, of course, thanks to the defense submission I am

20   cognizant of the defendant's upbringing and of the economic

21   conditions and the other conditions that Ms. Doherty mentioned

22   in her presentation.

23             I do note, however, the letter of Heather Cronan, the

24   wife of John Cronan, who was the third engineer on the Maersk

25   Alabama.  She writes:

1              Mr. Muse, it is not my family's fault that we were

2    born in this country and you were born in yours.  I always had

3    deep sympathy for Somolia, its people and the horrendous

4    difficulties your families are forced through no fault of your

5    own to endure.  I have preyed for the people of Somolia and

6    supported those charities that directly provided assistance to

7    you and your people.  But the unimaginable struggles the people

8    of Somolia face every day are not my fault.  My family did

9    nothing to you, yet you attacked the Maersk Alabama, my husband

10   and our family.

11             I also take into account the government's rendition of

12   the various opportunities that Mr. Muse had to turn back from

13   this course during the course of the facts.

14             I also note, as I set out in detail in the papers, the

15   previous hijackings, the other hijackings which this defendant

16   has engaged in.

17             In connection with his history and characteristics, I

18   also take into account the stipulated fact and the fact which

19   Mr. Wright noted that this defendant was the leader of this

20   organized gang of pirates.

21             I take into account, of course, the nature and

22   circumstances of the crime.  And, again, I am cognizant that

23   technically the defendant did not plead to the piracy count.

24             I do note, however, the extraordinary nature of the

25   underlying conduct here.  As Professor Kenneth Randell, of the

1    University of Alabama has explained, prosecution of piracy is

2    one of the few items that all nations agree on under what is

3    known as the universality principle.  Piracy is an offense that

4    any state can define and punish because pirates have long been

5    considered the enemies of all humanity.  Because of this

6    universal concern any state may prosecute piracy regardless of

7    the sites of the offense, the nationality of the offender and

8    the offended.  Our Constitution specifically authorizes

9    Congress "to define and punish piracy committed on the high

10   seas."

11              And it is that extraordinary conduct that is the

12   subject of this sentencing.

13              As pointed out in part of the government's submission,

14   the gang of men who violently and mythology seized control of

15   the Maersk Alabama and other vessels were experienced,

16   coordinated and ruthless in the practice of hijacking, robbery

17   and hostage taking.  They were skilled seamen who understood

18   how to track and approach larger vessels from their speed

19   boats.  They were comfortable firing and handling AK 47 machine

20   guns.

21              There is no doubt that the pirates were armed as Mr.

22   Wright pointed out.  The crew members of the Maersk Alabama

23   said so in interviews with some of the folks present here and

24   the Navy recovered two loaded AK 47 assault rifles, two gun

25   straps each containing three AK 47 magazines and one magazine

1    for a handgun from the lifeboat that Captain Phillips was held

2    in.

3              The men who undertook these actions understood how to

4    board and then commandeer various types of target vessels

5    quickly and efficiently.  They did not hesitate to beat, injury

6    and shot at their hostages.  They were willing to hold their

7    captives for months and they refused to surrender even having

8    been given numerous opportunities to do so.

9              Their approach was premeditated, organized and

10   relentless.  As has been stipulated to by the defendant and his

11   lawyers, he was the leader of that band of pirates.

12             The pirates' owe conduct made clear that they were not

13   merely robbing crew members to support themselves.  As Mr.

14   Wright pointed out, they were given the funds in the Maersk

15   Alabama's save, which I understood to be some $30,000.  But

16   that wasn't enough.  There's was a far more ambitious and

17   lucrative objective, multi-million dollar ransom payments in

18   exchange for the lives of crew members.  They were committed to

19   holding on to their dozens of hostages for as long as was

20   necessary to get paid even if the hostages died as a result.

21             Indeed, the presentence report notes that Mr. Muse

22   said to Captain Phillips that he was looking for a

23   multi-million dollar ransom and observed if the ransom was only

24   a few million dollars for the captain, that wasn't worth it and

25   he rather kill the captain than accept that amount.

1          The extreme level of violence and sadism that Mr. Muse

2     and his men employed, which, as the government points out, was

3     almost all entirely unnecessary to his demands for ransom,

4     demonstrates that Mr. Muse and his men were not, as he

5     suggests, halfhearted participants conscripted into service by

6     hunger or other duress; they appeared to relish even their most

7     depraved acts of physician and psychological violence and

8     abandoned all pretense of humane treatment of their captives.

9          As we know and as the presentence report details,

10    Captain Phillips was held in the lifeboat for several days and

11    Mr. Muse and his crew physically assaulted him and conducted a

12    mock execution of him.  They repeatedly threatened to kill him.

13         At one point when Captain Phillips began to chew on

14    the ropes tied around his wrists and his legs, a pirate stuck a

15    stick inside Captain Phillips mouth and after doing it Mr. Muse

16    called the captain Stick Mouth and shined a flashlight into his

17    mouth to make sure the stick stayed in place.

18         At one point when the captain tried to escape the

19    lifeboat by jumping into the water, another of the pirates shot

20    at him until he surrendered.

21         The next day Mr. Muse told personnel on the U.S. S

22    Bainbridge that "we are going to punish him now, we are going

23    to tie him," and so they did, binding his hands and feet and

24    tying his hands to the side of the lifeboat.

25         Mr. Muse also accused Captain Phillips of being dirty

1    and performed a religious ritual involving ropes that caused

2    the captain to believe that he was going to die.

3              Mr. Muse told the captain at that time that he was

4    going to bury him in a shallow area of the ocean because he,

5    the captain, was dirty, and then he said to Captain Phillips,

6    "Not tonight, tomorrow night."

7              The captain understood that Mr. Muse meant that he was

8    going to be killed the following night.

9              At some point one of the pirates hit Captain Phillips

10   in the head so hard that he thought he had been shot in the

11   head and, of course, he started to bleed as a result of that.

12             As the government noted in its presentation, the

13   extraordinary nature of this offense extends to the trauma

14   caused to the various victims.

15             For example, in his letter dated January 22, 2011,

16   Captain Phillips says, "I am writing this letter on behalf of

17   all American mariners, American as well as my fellow brothers

18   and sisters sailing on all the flags of the world."

19             He continues:

20             The mariners of the world have to deal with piracy

21   with limited means and assistance.

22             He talks about some of the areas and he says, it

23   affects us in our daily lives and it is not a Disneylandesque

24   problem.  These are not Johnny Depps.  They threaten seamen's

25   lives repeatedly, they shot at us, they deprive us of rights

1     that they themselves complain about.  They assault us, deny us

2     food, water and have a general disregard for mariners.  They

3     terrorize mariners with mock killings, telling us that they

4     will kill us tomorrow, next week, in an hour.  They have killed

5     people.  Many people could be killed while they attempt to take

6     over one of our ships.  I was almost hit on three different

7     occasions by their rifle fire.  They have no compunction with

8     beating people to bending them to their ways and be

9     subservient.

10              He continues:

11              Most pirates are on a catch and release program.

12    There is no punishment if they are caught.  We must accept as a

13    legal system the burden of punishing these pirates as many

14    countries do not.

15              Not all Somolians are pirates.  These pirates choose

16    their way of life with total disregard to their victims.  They

17    threaten to kill me on multiple occasions.  They put weapons in

18    my face with sneers on their faces, they slapped and hit me

19    multiple times.  This person was their leader and he just does

20    not care about others.  They held a gun to my head and pulled

21    the trigger repeatedly to try and control me.

22              My family had to endure the five days worrying and

23    wondering what was going to happen and he was just as much a

24    terrorist to them as to me.

25              I ask not for revenge or brutality, only for justice

1    for me, my family and my fellow sailors who ply the world's

2    waters and abide by the world's laws.  He has had his days in

3    court.  When do the victims get theirs?

4             I note the letter of John Cronan, also a crew member

5    on the Maersk Alabama.  He writes:

6             I have been a United States merchant marine for 28

7    years.  I have sailed to all parts of the world and under a

8    wide range of conditions.  Until April 8, 2009 I never once

9    feared for my life.  I am not a soldier, I never desired to be

10   a soldier, I just want to go to work and provide for my family.

11            He goes on:

12            I was simply doing an honest day's work when you, Mr.

13   Muse, chose to climb the side of my ship armed with automatic

14   weapons knowing my shipmates and I were unarmed.  We were

15   delivering food aid for your people.  You boarded the Maersk

16   Alabama shooting at us.

17            He goes on to talk about the 130 degree heat that Mr.

18   Wright told us about.

19            He says, I looked into the faces of my shipmates and

20   feared some of them would not survivor the horrible smothering

21   heat and I preyed to my God that I would not be one of them.  I

22   held my daughter's pictures in the dark praying I would have

23   the opportunity to tell them how much I loved them one more

24   time.

25            He continues:

1          As a result of PTSD for the first time in my life I am

2      unable to return to work and unable to provide for my family.

3      All of this pails to the effect your actions have had on my

4      children.  I have held them in the middle of the night when

5      they had nightmares about you.

6          He said, we captured you, we captured you and it is my

7      conviction that we treated you better than you would have

8      treated us.  You gave no regard for me or my family, yet my

9      shipmates and I treated your wound.  We gave you food and

10     water.  In return you took our captain and left us to chase you

11     still unarmed for many hours.

12         Mr. Cronan's wife Heather, whom I referred to earlier,

13     notes that since returning from the Alabama my husband has

14     suffered tremendously with post-traumatic stress disorder.

15     Most nights he does not sleep and on the nights he does I have

16     learned to wake him from his nightmares with my feet to avoid

17     being struck in the face as he lashes out at pirates in his

18     sleep.

19         Our youngest daughter still has nightmares and has

20     experienced fear that Mr. Muse will somehow escape from prison

21     and come searching for her.

22         She continues:

23         Our family has been financially devastated by Mr. Muse

24     and his colleagues.  My husband, a lifelong merchant seaman, is

25     still unable to return to work.  John's income as an engineer

1    represented more than half our total household income.  As a

2    result of John's unexpected loss of income, my home was lost to

3    foreclosure.  The out-of-pocket costs paid to various therapist

4    to help our family heal has totaled to date in the thousands of

5    dollars.

6            Mr. Cronan's daughters write -- Annie writes, I was 12

7    years old when you attacked the Maersk Alabama.  My sister was

8    nine.  My sister and I woke up that morning hearing our mom

9    crying.  We were confused and scared.  My mom tried to tell us

10   everything was going to be okay, but the look in her eyes made

11   us know this was serious.  We never thought anything could

12   happen to our parents.  My sister has nightmares and I sleep in

13   her room because she is too scared to sleep by herself since

14   the attack.  Our stepdad is sad so much now.

15           She goes on:

16           We don't understand why you would steal from a ship

17   that was delivering food to your country.

18           I note the letter from Kelley Baughman Fisher, who is

19   the wife of first assistant engineer Matthew Fisher.

20           Ms. Fisher is also a merchant mariner working as an

21   engineer aboard U.S. flagged oil tankers so she knows where of

22   she speaks.

23           She says, my husband came home from the Alabama in

24   April of 2009 a changed man.  While he did not suffer from the

25   more physically apparent symptoms of PTSD as some of the crew

1    did, his personality and actions began to change.  Our marriage

2    began to deteriorate though I did not realize it until it was

3    too late to save it.  We are in the process of divorcing right

4    now.

5            I have become close with a number of the crew members

6    of the Alabama and their families in the past year and a half.

7    I have seen these friends go through incredible hardships

8    through the attack, mental, physical, emotional and financial.

9    We turn to each other through these problems because there are

10   very few people in this country who can understand what we went

11   through and what we continue to go through as a result of the

12   attack on the Alabama.

13           And so, ladies and gentlemen, I take into account the

14   history and characteristics of this defendant and the nature

15   and circumstances of the offense.

16           Moving to the paragraph 2 factors under Section

17   3553(a), I think it is apparent by now that a lengthy sentence

18   is required to reflect the seriousness of the offense, to

19   promote respect for the law and to provide just punishment for

20   such an extraordinary offense.

21           Paragraph B discusses the need to afford adequate

22   deterrence to criminal conduct.

23           The presentence report points out that the March 16,

24   2009 report of the Secretary General of the United Nations to

25   the United Nations Security Council addressed the threat that

1    piracy and armed robbery at sea pose to the security of

2    international navigation off the coast of Somolia.  According

3    to the report, in 2008 there were 111 reported incidents of

4    piracy or armed robbery at sea against ships off the coast of

5    Somolia.  The report states that this number constitutes an

6    annual increase of nearly 200 percent when compared to the

7    number of reported incidents in 2007.

8              The report also states that by the end of 2008 one

9    group of pirates based in Somolia was believed to have earned

10   approximately $30 million in ransom payments.

11             And I take into account that this report was in 2007

12   and 2008.  That would be the year before the events at issue

13   here.

14             This documented enormous increase in the reporting

15   incidents of piracy or armed robbery at sea emphasizes the

16   importance of general deterrence as a sentencing factor here.

17   Indeed, I think it is fair to say that general deterrence of

18   this type of conduct is the most important sentencing factor

19   brought to bear in this case.

20             Of course, paragraph C talks about the need to protect

21   the public from further crimes of this defendant.

22             I am cognizant of the points made by Ms. Doherty in

23   her sentencing submission and in her presentation today about

24   the need to protect the public from crimes of this defendant,

25   and I'm also, of course, cognizant of her argument that a

1   sentence above the lower end of the guideline range is greater

2   than what is necessary to meet the sentencing factors,

3   especially the factors of deterrence.

4           I disagree there and, indeed, it is this marked uptick

5   in piracy and armed robbery at sea and the need to deter other

6   individuals from undertaking this kind of conduct that counsels

7   for the higher sentence and which makes the higher sentence

8   absolutely necessary to fulfill the sentencing factors.

9           The other factors listed in paragraph 3553(a)(2) are

10  not particularly relevant here and carry virtually no weight in

11  contrast to the need for general deterrence here.

12          Accordingly, counsel, taking into account all of the

13  sentencing factors, it is my intention to impose a sentence of

14  405 months on Counts 5, 6, 8 and 9 to run concurrently, 204

15  months on Counts 2 and 3 for a total of 405 months.

16          It is my intention to impose a period of three years

17  of surprised release on Counts 2 and 3, five years on Counts 5,

18  6, 8 and 9 to run concurrently for a total of five years.

19          It is not my intention to impose a fine.

20          It is my intention to impose the amount of $550,000 in

21  restitution as set out by the presentence report, and thanks to

22  Mr. DeMarco's submission on behalf of Maersk lines $550,000 is

23  estimated to be the unreimbursable costs incurred by the Maersk

24  line in connection with these unfortunate activities.

25          It is also my intention to impose the mandatory $600

1    special assessment.

2                    It is my intention to accept the suggested special

3    terms and conditions of supervised release, including providing

4    access to financial information, not opening lines of credit,

5    et cetera, unless in compliance with the installment payment

6    schedule, undergoing substance abuse treatment, obeying the

7    immigration laws and submission to a search.

8                    It is also my intention to adopt the restitution plan

9    set out at page 38 of the presentence report.

10                   Counsel, is there any reason such a sentence should

11   not be imposed?

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. WEINSTEIN:  No, your Honor.

2            MR. McGUIRE:    No, your Honor.

3            MS. DOHERTY:    Your Honor, we may just have one

4    request.

5            THE COURT:    But of course.

6            MS. DOHERTY:    Just about the designation issue.  I

7    don't know if this is now appropriate.

8            THE COURT:    May I turn to you for that in just a

9    moment, please.

10            MS. DOHERTY:    Thank you, your Honor.

11            THE COURT:    Thank you, Mr. Doherty.

12            Mr. Muse, you are sentenced, sir, to a period of 405

13    months incarceration on Counts 5, 6, 8 and 9, 204 months on

14    Counts 2 and 3 for a total of 405 months incarceration.

15    Following that period you will spend a period of five years on

16    supervised release on Counts 5, 6, 8 and 9, three years on

17    Counts 2 and 3 for a total of five years of supervised release.

18            During that period you will comply with all of the

19    standard terms and conditions of supervised release.  Among

20    them are that you not commit another federal, state or local

21    crime; you not illegally possess a controlled substance; and

22    you not possess a firearm or other destructive device.

23            In addition to those and all of the other standard

24    terms and conditions of supervised release you will provide the

25    probation officer with access to any requested financial

1    information.  You will not incur any new credit charges or open

2    any additional lines of credit without the approval of the

3    probation officer unless you are in compliance with the

4    installment payment schedule for restitution.

5            You will participate in a program approved by the

6    probation officer for substance abuse.  That program will

7    include testing to determine whether you have used drugs or

8    alcohol.

9            The court authorizes the release of available drug

10   treatment evaluations and reports to the substance abuse

11   treatment provider as approved by the probation officer.

12           You might be required to contribute some or all of the

13   costs of the program depending on your ability to pay and the

14   availability of third party payment.

15           Also during the periods of supervised release you will

16   obey the immigration laws of this country and comply with all

17   directives of the immigration authorities.

18           During that period you will also submit your person,

19   residence, place of business, vehicle or any other premises

20   under your control to a search on the basis that the probation

21   officer has reasonable belief that contraband or evidence of a

22   violation of the conditions of your relation may be found

23   there.

24           The search must be conducted at a reasonable time and

25   in a reasonable manner.  Failure to submit to such a search may

1    be grounds for revoking your supervised release.

2              It is your obligation to inform other residents of the

3    premises that the premises might be subject to a search under

4    this condition.

5              As I noted, I do not impose a fine, but I impose the

6    restitution amount of $550,000 to be paid to the clerk of the

7    court, United States District Court, 500 Pearl Street, New

8    York, New York.  From time to time the clerk will disburse

9    amounts to Maersk Lines.

10             During the period of incarceration if you are engaged

11   in a Bureau of Prisons non-UNICOR work program you will pay $25

12   per quarter toward criminal financial penalties.  If you

13   participate in the Bureau of Prisons UNICOR program at a grade

14   1 through 4, you will pay 50 percent of your monthly UNICOR

15   earnings toward the civil financial penalties consistent with

16   Bureau of Prisons regulations at 28 C.F.R., Section 545.11.

17             And finally, sir, I impose the mandatory $600 special

18   assessment and that should be paid promptly.

19             Following release, restitution payments shall be paid

20   in monthly installments also to the clerk of court at a rate no

21   less than ten percent of your gross monthly income.

22             It is my duty to inform you, sir, that unless you have

23   waived it, you have the right to appeal this sentence and you

24   might have the right to appeal in forma pauperis, which means

25   as a poor person with the waiver of certain fees and expenses.

1              Ms. Doherty, you wish to speak about a designation?

2              MS. DOHERTY:    Yes, your Honor.  We just ask

3     respectfully that the court make a number of recommendations to

4     the Bureau of Prisons.

5              First, that if possible, consistent with security

6     needs, that he be housed with other Somali speaking inmates.

7              Then that he would receive mental health treatment and

8     also educational opportunities, including most significantly, I

9     think English language instructions to lessen his isolation

10    over these years.

11             THE COURT:    It is so recommended.

12             MS. DOHERTY:    Thank you, your Honor.

13             THE COURT:    Is there anything further, ladies and

14    gentlemen?

15             MR. McGUIRE:    Your Honor, just two very minor issues.

16             With respect to restitution, if your Honor permits,

17    probation has provided the government with the address to which

18    the clerk --

19             THE COURT:    Would you read it out?

20             MR. McGUIRE:    I will put it into the record.

21             Restitution should be directed to the following

22    address:

23             Maersk Line Limited, One Commercial Place, 20th floor,

24    Norfolk, Virginia 23510-2103 with the notation Maersk Alabama

25    restitution.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              And the second issue, your Honor, is the government

2     would respectfully move now for the dismissal of the four open

3     counts against the defendant.

4              THE COURT:    So ordered.

5              Anything else, ladies and gentlemen?

6              MS. DOHERTY:    No, your Honor.

7              MR. McGUIRE:    No, your Honor.

8              THE COURT:    Counselor, thank you for your excellent

9     presentations.

10              Good morning, ladies and gentlemen.

11                           - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25