```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>ABDUWALI ABDUKHADIR MUSE,<br><br>Defendant. | 09 Cr. 512 (LAP)<br><br>ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are Defendant Abduwali Abdukhadir Muse's motion for the appointment of counsel, (dkt. no. 44), and motion for compassionate release or sentence modification, (dkt. no. 45). The Government opposes both motions. (Dkt. no. 50.) Defendant filed a reply in support of his motion for compassionate release. (Dkt. no. 51.) For the reasons set forth below, the motions are denied.

**I.   Background**

   **A.   Defendant's Offense Conduct**

In the spring of 2009, Defendant led a gang of pirates in hijacking three vessels off the coast of Somalia. (Presentence Investigation Report ("PSR"), dated Mar. 11, 2011 [filed under seal] ¶¶ 29, 51.) The pirates pulled alongside each vessel in a small boat and used pistols and machineguns to force the unarmed crewmembers to surrender. (Id. ¶¶ 33, 74, 81-82.) Defendant took command of each ship, and he and his pirate gang held the ships' crewmembers hostage at gunpoint. (Id. ¶¶ 34-35, 74, 81-82.)

Nine pirates led by Defendant hijacked the first two ships, a small French yacht named the Serenity, carrying three men, and a Taiwanese vessel named the Win Far 161, carrying 30 men.[1] (Id. ¶¶ 74, 76, 81.) In April 2009, Defendant and three of the pirates left the Win Far 161 in a boat for the purpose of hijacking the Maersk Alabama, a 500-foot-long U.S.-flagged container ship operated by 20 American sailors. (Id. ¶¶ 28-29, 78.) On April 8, 2009, Defendant and other pirates boarded the ship and launched their attack. (Id. ¶¶ 29, 46.) Defendant, as the leader of the attackers, was the first pirate to board the ship. (Id. ¶ 47.) Defendant fired his gun at the captain of the Maersk Alabama, Captain Richard Phillips, and forced him to empty the ship's safe, taking approximately $30,000 in cash. (Id. ¶ 48.) During the struggle for control of the ship, the crewmembers were able to subdue Defendant and separate him from the other pirates in a safe room. (Id. ¶ 37.)

The other pirates agreed to leave the vessel if the crew provided them with a lifeboat and returned Defendant to them. (Id. ¶ 38.) Captain Phillips boarded the lifeboat with the pirates, and the crew allowed Defendant to also board. (Id.) But Captain

---

[1] Victims from both hijackings identified Defendant as the lead hijacker. (PSR ¶¶ 74, 82.) The Serenity hostages were not released until September 2009, and the Win Far 161 hostages were not released until February 2010; in the course of those 10 months in captivity, two of the hostages died of illness. (Id. ¶ 85.)

2

Phillips was not permitted to return, and, on April 9, 2009, when the USS Bainbridge, a U.S. Navy destroyer, was dispatched to the scene, the pirates and the captain were still on the lifeboat, a short distance from the Maersk Alabama. (Id. ¶ 39.) Over three days of negotiation by radio, Defendant and the other pirates held Captain Phillips hostage, threatening to kill him if they were not provided safe passage from the scene. (Id. ¶ 40.) During that period, Defendant detailed to Captain Phillips how he planned to dispose of the captain's body and recounted to the captain his previous hijackings, which Defendant said had yielded him millions of dollars in ransom. (Id. ¶ 41.) Defendant and his pirate gang assaulted the captain and even conducted a mock execution of him. (Id. ¶ 40.) When Captain Phillips tried to escape into the water, Defendant's pirate gang shot at him until he surrendered and, once he was back in the boat, struck him in the head so hard he bled. (Id. ¶ 41.)

On April 12, Defendant asked to leave the lifeboat and to board the USS Bainbridge, where he received medical treatment and continued to negotiate for safe passage while Captain Phillips was held on the lifeboat by the other pirates. (Id. ¶ 42.) The pirates continued to refuse to release the captain; ultimately, after one pirate shot a gun on the lifeboat, the U.S. Navy shot the three pirates and rescued the captain. (Id. ¶¶ 42, 50.) Two loaded AK-47 assault rifles used by the pirate hijackers were

3

subsequently recovered from the lifeboat, along with assorted magazines and gun straps. (Id. ¶ 43.) Defendant was transferred from U.S. Navy custody to the FBI on April 20, 2009. (Id. ¶ 44.)

### B.  Defendant's Guilty Plea and Sentencing

On May 18, 2009, Defendant pled guilty to six of the ten counts charged in Superseding Indictment S1 09 Cr. 512 (LAP): hijacking a ship and conspiracy to do the same, in violation of 18 U.S.C. §§ 2280(a)(1)(A) & (H) (Counts Two and Three); hostage-taking and conspiracy to do the same, in violation of 18 U.S.C. § 1203(a) (Counts Five and Six); and kidnapping and conspiracy to do the same, in violation of 18 U.S.C. § 1201(a)(2) & (c) (Counts Eight and Nine). (PSR ¶¶ 1-12.)

In the plea agreement, the parties stipulated to an offense level of 41, which included a four-level leadership enhancement; a criminal history category of I; and a Guidelines range of 324 to 405 months' imprisonment. (Id. ¶ 13.) As the Court observed at sentencing, this Guidelines range reflected a measure of leniency because, due to uncertainty about U.S. jurisdiction, the Guidelines calculation did not take into account Defendant's involvement in the hijackings of the French-owned Serenity or the Taiwanese-owned Win Far 161. (Sentencing Transcript ("Tr."), dated Feb. 16, 2011 [dkt. no. 32] 32:10-14.)

At Defendant's sentencing on February 16, 2011, the defense argued at length for a sentence at the bottom of the Guidelines

4

range, emphasizing Defendant's "very young" age, (id. at 7:2-8, 17:17-19);[2] Somalia's extreme poverty and "official sanctioning of piracy," (id. at 8:7-15, 17:23-18:25); and his mental health problems and suicide attempts while in Bureau of Prisons ("BOP") custody, (id. at 15:5-6, 19:4-20:4).

The Court agreed with the Government and the U.S. Probation Office ("Probation") that a sentence at the top of the Guidelines range was warranted.  Before imposing a sentence, the Court heard the oral statement of a victim of the hijacking present in the courtroom and read aloud from letters submitted by additional victims and their family members.  Three times, the Court noted "the extraordinary nature" of Defendant's offense conduct and of the trauma he had inflicted on his victims and their families. (Id. at 34:11-12, 37:12-14, 42:19-20.)

C. **Defendant's Incarceration at FCI Terre Haute**

Defendant is serving his sentence at FCI Terre Haute, a medium-security federal correctional institution, and his

---

[2] While Defendant's precise age remains uncertain, then-Magistrate Judge Andrew J. Peck conducted a preliminary age hearing at the time of Defendant's initial presentment and determined that Defendant would be treated as an adult in the ensuing proceedings; the defense subsequently agreed not to contest this finding for purposes of the plea. (PSR ¶ 93.) At a hearing on April 21, 2009, Magistrate Judge Peck heard testimony by phone from Defendant's father, who indicated that Defendant was born on November 20, 1993, which would have made Defendant 15 years old at the time of his arrest. (Id.) Dental records from the BOP show that Defendant likely was, in fact, between 17 and 21 at the time of the offense conduct. (Id.)

5

projected release date is not until June 20, 2038. As of October of 2023, there were no confirmed cases of COVID-19 at the facility.[3]

Defendant submitted an administrative request for a sentence reduction, dated April 11, 2023, to the Warden of FCI Terre Haute. In the request, he cited a number of allegedly extraordinary and compelling circumstances purportedly warranting release: the risks posed by the COVID-19 pandemic, Defendant's history of mental health issues, his asserted rehabilitation efforts as allegedly evidenced by his completion of his GED and enrollment in and completion of numerous educational programs while incarcerated, and his status as a non-citizen who would be removed to a third-party host country upon release. (Dkt. no. 45, Ex. 1.) In a letter dated April 27, 2023, the Warden declined to pursue a request for a sentence reduction on his behalf. (Id.)

## II.  Applicable Law

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. Defendant has applied for a reduction in sentence under the so-called "compassionate release" provision of 18 U.S.C. § 3582(c), which provides that a court "may reduce the

---

[3] BOP COVID-19 Statistics, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_statistics.html (last visited Oct. 2, 2023).

6

term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

As this Court has explained, "there are three prerequisites for granting a compassionate release motion": (1) "the defendant must have exhausted his administrative rights"; (2) "the court must find that 'extraordinary and compelling reasons warrant' a reduction of sentence"; and (3) "the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a)." United States v. Freeman, No. 02 Cr. 150 (LAP), 2022 WL 1785578, at *2 (S.D.N.Y. June 1, 2022). As the movant, the defendant bears the burden of proving that he is entitled to relief under section 3582. Id.; see also United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

The Defendant is deemed to have satisfied the first prong, the exhaustion requirement, after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's

7

facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A). As to the second prong, as the movant, "the defendant bears the burden of proving 'extraordinary and compelling reasons' exist justifying early release." United States v. Rodriguez, No. 88 Cr. 642 (LAP), 2022 WL 2533468, at *3 (S.D.N.Y. July 7, 2022).[4] Lastly, the court's finding of such extraordinary and compelling reasons permits release but does not mandate it, for the court must still consider the Section 3553(a) factors. United States v. Monsanto, No. 87 Cr. 555 (LAP), 2021 WL 355049, at *2 (S.D.N.Y. Feb. 2, 2021). Where the court determines that the "Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances," the motion for compassionate release may be denied. United States v. Lisi, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding compelling reasons warranting a defendant's release but nevertheless denying the motion for compassionate release because the Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [defendant's] sentence").

---

[4] The Court of Appeals has held that the First Step Act of 2018 "allows [district] courts independently to determine what reasons, for purposes of compassionate release, are 'extraordinary and compelling'" and that the BOP Director is no longer the sole arbiter in determining whether the threshold is met. See United States v. Brooker, 976 F.3d 228, 234-37 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

8

### III. Discussion

**A. Defendant Has Failed to Meet His Burden to Show Extraordinary and Compelling Reasons Warrant His Early Release**

First, Defendant has failed to demonstrate extraordinary and compelling reasons warranting release. Instead, he recycles arguments made by his counsel at his 2010 sentencing. Indeed, at sentencing, Defendant's counsel argued for a bottom-of-the-guidelines sentence of twenty-seven years – almost twice the period he has so far served. Counsel mentioned Defendant's young age at the time of the offense, the challenges he faced growing up in Somalia, and his mental health disorders. (Compare dkt. no. 45 at 5-7, 14-16, with Tr. 7-8, 16-17.) Those arguments were rejected at sentencing and are rejected now for the same reasons. See United States v. Ebbers, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (explaining that a compassionate release motion is "not an opportunity to second guess or to reconsider whether the original sentence was just").

Defendant also relies on the harsh conditions occasioned by the COVID-19 pandemic and his purported rehabilitation. The Court rejects both arguments.

With respect to Defendant's argument that the COVID-19 pandemic rendered his conditions of confinement "more severe" than they otherwise would have been, (see dkt. no. 45 at 5), as this Court has explained, such reasoning "applies to all prisoners in

9

state and federal custody" and fails to support a sentence reduction where, as here, the Defendant "has not proffered any reason why he has been particularly impacted or is at particular risk because of the pandemic." Freeman, 2022 WL 1785578, at *3 (citing United States v. Kurti, No. 02 Cr. 1014 (LAP), 2021 WL 2823562, at *3 (S.D.N.Y. July 7, 2021)). Defendant — who is a relatively young man — cites no comorbidities or medical conditions that might heighten his risk of contracting or suffering severe manifestations of COVID-19 as compared to other inmates, and his medical records do not contain any indication of such conditions. See United States v. Rodriguez, 454 F. Supp. 3d 224, 228-29 (S.D.N.Y. 2020) (Preska, J.) (denying compassionate release where the defendant failed to show he suffered from medical conditions that rendered him uniquely vulnerable to COVID-19).

In fact, Defendant's medical records show that he is fully vaccinated and that he contracted COVID-19 in January of 2022, with no apparent symptoms. (See dkt. no. 50, Ex. C (Defendant Medical Records) at 35-36 [filed under seal].) And as the Government noted, (dkt. no. 50 at 6), FCI Terre Haute did not, as of October 2023, have a single active case of COVID-19 among inmates or staff members. See United States v. Batista, No. 18 Cr. 319 (LTS), 2020 WL 6132239, at *4 (S.D.N.Y. Oct. 19, 2020) (recognizing substantial past COVID-19 infections at a facility, but taking into account the facility's more recent success in

10

controlling the spread of the virus in concluding that extraordinary and compelling reasons do not warrant a sentence reduction).

Defendant also argues that there is "overwhelming evidence of his outstanding rehabilitation" during his incarceration. (Dkt. no. 45 at 10.) His disciplinary records, however, belie this conclusion. Defendant has incurred infractions for being in an unauthorized area (2012), interfering with taking count (2012), mail abuse (2014), disruptive conduct (2019), possessing a hazardous tool (2020), and refusing to obey an order (2014, 2021). (See dkt. no. 50, Ex. D (Defendant Disciplinary Records) at 1-3 [filed under seal].) Regardless of the significance of any individual infraction, this record of disciplinary infractions spans almost the entire period of Defendant's incarceration, undermining his claims of rehabilitation. For all the reasons above, Defendant has failed to demonstrate extraordinary and compelling circumstances warranting release.

### B. The Section 3553(a) Factors Counsel Against Release

Even if Defendant had demonstrated extraordinary and compelling circumstances warranting release, the Section 3553(a) factors counsel against release. As noted at sentencing, the nature and circumstances of Defendant's crimes compel denial of his motion. As the Court explained at sentencing, piracy is a universal scourge subject to special censure under international

11

law and the U.S. Constitution. (Tr. 34:1-10.) Thus, the Court characterized as "extraordinary" the crimes committed by Defendant and his gang on the high seas. (Id. at 33:24.) Defendant and his pirate confederates were "experienced, coordinated[,] and ruthless in the practice of hijacking, robbery[,] and hostage taking," (id. at 34:13-17); were "comfortable firing and handling AK-47 machine guns," (id. at 34:19-20); "and did not hesitate to beat, injur[e,] and sho[o]t at their hostages," (id. at 35:5-8.)

In particular, the Court recognized and underscored the gratuitous cruelty that Defendant inflicted on his victims and, based on the appalling facts of the hijacking and hostage-taking, rejected the defense's argument that Defendant's poverty and difficult upbringing were "the only things that drove [Defendant] to get involved in the conduct in this case." (Id. at 18:1-7.) Citing "[t]he extreme level of violence and sadism that [Defendant] and his men employed, which . . . was almost all entirely unnecessary to his demands for ransom," the Court concluded: "Defendant and his men were not, as he suggests, halfhearted participants conscripted into service by hunger or other duress." (Id. at 36:1-6.) To the contrary, "they appeared to relish even their most depraved acts of physic[al] and psychological violence and abandoned all pretense of humane treatment of their captives." (Id. at 36:6-9.)

12

For instance, Defendant tied up and conducted the mock execution of Captain Phillips, promising to kill him and bury his remains in the ocean "tomorrow night." (PSR ¶ 40.) Defendant similarly reveled in terrorizing victims of the Serenity and Win Far 161 hijackings that he and his pirate confederates had previously perpetrated. For example, he built an improvised explosive device filled with screws and broken forks, placed it next to the captain of the Serenity, and threatened to detonate it if authorities arrived to rescue the captain. (Id. ¶ 77.) Defendant's terrorization of his victims was a distinguishing characteristic of his crimes, and it became apparent at his sentencing that Defendant had in this way inflicted immeasurable harms on his victims and their families, ranging from psychological trauma to economic ruin. Cullin Wright, the third officer on board the Maersk Alabama during the hijacking, told the Court that he felt he would "never" again be the person he had been. (Tr. 28:8-10.) In a letter read aloud by the Court, the wife of another victim, John Cronan, explained that her husband's development of post-traumatic stress disorder after the attack prevented him from returning to work, resulting in the family's financial devastation and the loss of their home. (Id. at 40:1-41:5.)

In the face of these stark facts, and all the other circumstances of his crimes, there is no reason whatsoever to

13

credit Defendant's entirely conclusory claim that he would receive a lower sentence if he were to be sentenced today. (Dkt. no. 45 at 11-14.) His crimes are as disturbing today as they were at the time of their commission. See, e.g., United States v. Saleh, No. 93 Cr. 181 (LAP), 2023 WL 158444, at *3 (S.D.N.Y. Jan. 10, 2023) (concluding sentence of 35 years remained appropriate for a defendant who attempted to carry out a terrorist bombing under the Section 3553(a) factors).

Any reduction in sentence at this time would run counter to the sentencing objective of general deterrence. As the Court noted at sentencing, general deterrence is "the most important sentencing factor brought to bear in this case." (Tr. 43:14-19.) The international import of Defendant's brazen attack on the Maersk Alabama — which marked the first time in almost 200 years that pirates captured a U.S.-flagged vessel[5] — and the need for a commensurate sentence that would send a strong message to those who would seek to threaten American sailors, U.S. security, and the conduct of global commerce counsel against release. Maintaining the existing sentence is necessary to serve the goal of deterring such piracy attacks on American interests and individuals.

---

[5] Somali Pirates Seize Ship and US Crew Off Horn of Africa, The Guardian (Apr. 8, 2009), https://www.theguardian.com/world/2009/apr/08/somali-pirates-ship-hijack (last visited Oct. 2, 2023).

14

Individual deterrence and protecting the community from further crimes by this Defendant also counsel against release. Defendant's participation in a series of violent hijackings was systematic and ruthless. As detailed above, Defendant and his gang used machineguns to hold dozens of men hostage on the open seas and threatened them repeatedly with violence and death. The sheer "wantonness of Defendant's conduct counsels against release," Rodriguez, 2022 WL 2533468, at *4, and Defendant's empty claims of purported rehabilitation fall flat, as discussed above. See United States v. Rosa, No. 88 Cr. 111 (LAP), 2020 WL 5774909, at *2 (S.D.N.Y. Sept. 28, 2020) (denying compassionate release because defendant was a danger to the community, as demonstrated in part by defendant's disciplinary sanctions while incarcerated, including for disruptive conduct and possessing a hazardous tool). Thirteen years after sentencing, Defendant has not accepted responsibility or exhibited any remorse for his offenses and remains a danger to the international shipping community.

Defendant's history and characteristics confirm this danger. Although at sentencing, the Court acknowledged the difficult conditions of Defendant's upbringing and other supposedly mitigating factors, (Tr. 32:18-22), the wantonness of his conduct was startling: Defendant repeatedly spurned opportunities to depart the Maersk Alabama safely with the tens of thousands of dollars he had taken from its safe, he conducted the attack after

15

having perpetrated previous hijackings, and he did not merely accompany other pirates in assaulting innocent sailors on the high seas but was the pirate who undisputedly served as their leader. (Id. at 13:4-8, 33.) Neither Defendant's current claims of rehabilitation, nor his recent BOP classification as a "low risk" recidivist under the First Step Act's PATTERN risk assessment, even approach supplying a basis for revisiting the Court's carefully calibrated analysis of his history and personal characteristics at sentencing. See United States v. Castillo, No. 03 Cr. 979 (KMW), 2023 WL 2262881, at *3 (S.D.N.Y. Feb. 28, 2023) (recognizing the defendant's "substantial rehabilitative efforts" and the BOP's "low risk" classification but concluding that the Section 3553(a) factors weighed against compassionate release given the violence of the defendant's crimes and the harms inflicted on his victims).

In sum, this is a case in which "[r]educing [the defendant's] sentence — when he has served less than half of it — would undermine the goals of sentencing." See United States v. Gotti, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020). Defendant committed extraordinary crimes warranting an appropriately severe sentence. Because the justifications for his 405-month sentence remain as compelling today as they were at the time the sentence was imposed, that sentence should not be disturbed.

16

### C. Defendant's Meritless Section 3582(c) Motion Does Not Warrant Appointment of Counsel

A defendant has no right to counsel when filing a motion for a reduction of sentence under Section 3582(c). United States v. Fleming, 5 F.4th 189, 193 (2d Cir. 2021). The decision to appoint counsel is left to the discretion of the district court, which may consider the merits of the defendant's motion as a "significant factor in the exercise of that discretion." United States v. Reddick, 53 F.3d 462, 465 n.2 (2d Cir. 1995). Where, as here, "it is readily apparent that the underlying motion is meritless," no appointment of counsel is warranted. Schlussel v. United States, No. 08 Cr. 694 (JFK), 2014 WL 1875928, at *3 (S.D.N.Y. May 9, 2014); see also United States v. Dozier, No. 18 Cr. 41 (DLC), 2022 WL 836908, at *2 (S.D.N.Y. Mar. 21, 2022) (denying appointment of counsel where defendant failed to show extraordinary and compelling circumstances); United States v. Diaz, No. 16 Cr. 719 (RJS), 2022 WL 3020145, at *4 (S.D.N.Y. July 28, 2022) (denying appointment of counsel where Section 3553(a) factors weighed heavily against compassionate release). Accordingly, Defendant's motion to appoint counsel is denied.

### IV. Conclusion

Accordingly, for the reasons set forth above, Defendant's motion for compassionate release or a reduction in sentence

17

pursuant to 18 U.S.C. 3582(c)(1)(A), (dkt. no. 45), and his motion for appointment of counsel, (dkt. no. 44), are denied.

The Clerk of the Court shall mail a copy of this order to Defendant.

**SO ORDERED.**

Dated: New York, New York
June 11, 2024

_____
LORETTA A. PRESKA
Senior United States District Judge